YAR R. CHAIKOVSKY (SB# 175421)
yarchaikovsky@paulhastings.com
PHILIP OU (SB# 259896)
philipou@paulhastings.com
JOSEPH J. RUMPLER, II (SB# 296941)
josephrumpler@paulhastings.com
BERKELEY FIFE (SB# 325293)
berkeleyfife@paulhastings.com
BORIS LUBARSKY (SB# 324896)
borislubarsky@paulhastings.com
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, California  94304-1106
Telephone:  1(650) 320-1800
Facsimile:  1(650) 320-1900

Attorneys for Plaintiff
APPLIED MATERIALS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLIED MATERIALS, INC., | CASE NO. 5:20-cv-9341 |
| Plaintiff, | **COMPLAINT FOR DECLARATORY JUDGMENT** |
| vs. | |
| DEMARAY LLC, | |
| Defendant. | |

## NATURE OF THE ACTION

1.  This is an action for declaratory relief arising under the patent laws of the United States. Applied Materials, Inc. ("Applied") brings the instant action because there is a substantial controversy between Applied and Defendant Demaray LLC ("Demaray"), two parties having adverse legal interests, of sufficient immediacy and reality to require a judicial declaration of the parties' legal rights.  On July 14, 2020, Demaray filed lawsuits alleging that certain of Applied's customers, Intel and Samsung, infringe United States Patent Nos. 7,544,276 (the '276 patent) and 7,381,657 (the '657 patent) (collectively, the "Asserted Patents") by using "semiconductor manufacturing equipment including reactive magnetron sputtering reactors" manufactured by Applied. ("Customer Suits").  True and correct copies of these complaints are attached as Exhibits A and B ("Customer Complaints").

2.  The Asserted Patents are both entitled "Biased Pulse DC Reactive Sputtering of Oxide Films" and share a common specification.  The '276 patent discloses only apparatus claims directed to a reactor having certain hardware components (herein also, "the '276 reactor patent"), and Intel and Samsung's alleged infringement is based on their use of Applied's reactors to produce semiconductor products.  On information and belief, neither Samsung nor Intel makes, sells or offers to sell reactors; the alleged infringement of the '276 reactor patent by Samsung or Intel is based on their *use* of the accused reactor supplied by the manufacturer, Applied.  The '657 patent (herein also, "the '657 process patent") discloses method claims for depositing films, where again, Intel and Samsung's alleged *use* of the reactors supplied by Applied, allegedly infringes the claimed methods.  The Applied reactors identified and accused in the Customer Complaints are used for the same applications by Applied in its own laboratories in the Northern District of California for research and development and customer demonstrations.

COMPLAINT FOR DECLARATORY
JUDGMENT

3.   Thus, contrary to the arguments Demaray has made to this Court, this is "a case where one entity [Applied] makes an [allegedly] infringing product [Applied's accused reactors], and its customers [Intel and Samsung] are then sued for nothing more than purchasing and using it [as a practical matter based on the commercial realities] in the only way possible." *Applied Materials, Inc. v. Demaray LLC,* Case No. 5:20-cv-5676-EJD ("DJ Action"), Dkt. No. 25, p. 6:5-9.  As John Forster, Applied's Senior Director, Process Engineer for Metal Deposition Products, who has worked at Applied since October 1993, explained in his declaration submitted to the Court in opposing Demaray's motion to dismiss for lack of subject matter jurisdiction in the DJ Action:

> Customers like Intel and Samsung typically provide Applied with a set of specifications for a type of film they would like to deposit, and based on those specifications, Applied manufactures and configures the RMS reactors to deposit films according to the customers' specifications.  Post-installation modifications, such as modifying the power supply or adding an additional component, such as a filter, to the system as installed by Applied, could, for example, cause the RMS reactor to no longer meet the customers' required specifications or impact the warranty of the reactor.

DJ Action, Dkt. No. 42-1, ¶ 6 (also attached hereto as Exhibit Q)

4.   On information and belief, Demaray is well aware of these commercial realities and the relationships between an equipment supplier like Applied and its customers, like Samsung and Intel, who use Applied's customized equipment for material deposition processes to manufacture its products.  Demaray's principal, Dr. Ernest Demaray, is a former employee of Applied Komatsu, a joint venture of Applied in the 1990s, and claims to have over fifty years of experience working with or in the semiconductor industry.  DJ Action, Dkt. No. 23-1, ¶¶ 2, 4.  A true and correct copy of Dr. Demaray's declaration is also attached as Exhibit M.  On information and belief, Demaray also has extensive knowledge regarding the semiconductor industry through its purported consultant attorney hired to manage the Customer Suits, Scot Griffin.  On information and belief, Mr. Griffin has extensive knowledge about the semiconductor industry, having worked for over a decade in-house at Intel, Spansion, Inc. (another semiconductor manufacturer) and Tessera, Inc. (a

COMPLAINT FOR DECLARATORY JUDGMENT

company that purported to be a global leader in the development of semiconductor packaging technology).  A true and correct copy of Mr. Griffin's LinkedIn profile is attached as Exhibit R.

5.   In considering the Customers Suits' allegations with the commercial realities of Applied's relationships with its customers—including that Applied designs, manufactures and installs its reactors at its customers' fabrication facilities, and thereafter provides maintenance and support for those reactors—Demaray's affirmative act of filing the Customer Suits, which implicitly accused Applied and Applied's reactors of infringement, created a reasonable potential that infringement claims could be brought against Applied based on the same allegations.  As a result of Applied's reasonable apprehension of suit, on August 13, 2020, Applied filed a declaratory judgment action of non-infringement of the Asserted Patents. *Applied Materials, Inc. v. Demaray LLC*, Case No. 5:20-cv-5676-EJD, Dkt. No. 1.  On September 4, 2020, Applied moved for a preliminary injunction to enjoin Demaray from proceeding with its Customer Suits during the pendency of the DJ Action. *Id.*, Dkt. No. 13.

6.   Demaray opposed by arguing that the Court did not have subject matter jurisdiction over the DJ Action by representing that its allegations in the Customer Suits were directed at "particular configurations" made by Intel and Samsung to Applied's reactors such that "Demaray [did not] accuse **Applied PVD reactors standing alone** of infringement in the Texas cases—Demaray accused particular reactor configurations, and methods of depositing thin films using them, of infringement in the Texas cases…".  DJ Action, Dkt. No. 23, p. 5:26-6:9 (emphasis added).  But nowhere in the Customer Complaints did Demaray allege that its accusations of infringement did not accuse "Applied PVD reactors standing alone".  Nor did Demaray provide any evidence, let alone allege in the Customer Complaints, that Intel and Samsung's alleged infringement was based on post-installation modifications to the hardware of the PVD reactors after the reactors were manufactured, configured, and installed by Applied.  On information and belief, Demaray's subject

COMPLAINT FOR DECLARATORY JUDGMENT

matter jurisdiction challenge, including its arguments that the Customer Complaints were directed to post-installation modifications by the customers, was simply a vehicle to slow down the DJ Action while the Customer Suits proceeded.  As explained below, Demaray's representations that it was not accusing "**Applied PVD reactors standing alone** of infringement" was not true, as confirmed by Demaray's recent statements that it may accuse Applied of infringement and subsequently seeking discovery through subpoenas for documents and testimony directed to *Applied's configuration* of its reactors as supplied to the customers in order to determine "which reactors are in dispute" (*i.e.,* which allegedly infringe).

7.  On information and belief, although the Customer Complaints did not make an express allegation of infringement against Applied, Demaray, in particular Dr. Demaray and Mr. Griffin, understood and knew that their allegations against Intel and Samsung based on their use of Applied's reactors would be objectively and reasonably interpreted as an implied assertion against Applied.  While their knowledge is not required to establish a justiciable case or controversy, it undermines Demaray's characterization of the allegations in the Customer Suits in challenging this Court's subject matter jurisdiction and further evidences Demaray's bad faith in bringing that challenge.  Setting aside Demaray's after-the-fact representations to the Court and the veracity of those statements when considering Dr. Demaray's and Mr. Griffin's intimate knowledge and experience in this industry, Applied did in fact reasonably and objectively interpret the Customer Complaints at the time the DJ Action was filed as affirmative acts by Demaray that created a reasonable potential that infringement claims could be brought against Applied.  DJ Action, Dkt. No. 42-1, ¶¶ 5-9 (also at Ex. Q).

8.  On information and belief, the implications of Demaray's statements and arguments made in challenging subject matter jurisdiction were that Intel and Samsung further "configured" Applied's reactors such that their use of the further configured reactors allegedly infringed the

COMPLAINT FOR DECLARATORY
JUDGMENT

Asserted Patents, but the reactors as manufactured and sold by Applied, did not.  The Court credited

Demaray's representations regarding its allegations in its Customer Complaints in finding that there

was not an actual controversy that Applied might be liable for direct infringement at the time

Applied filed its DJ Action.  DJ Action, Dkt. No. 46, p. 7:12-19 ("In particular, Demaray alleges

Intel and Samsung configure the reactors such that they are comprised of a pulsed DC power supply

coupled to the target area, a RF bias power supply coupled to the substrate, and a narrow band

rejection filter placed between the DC power supply and the target area in order to deposit the thin

layer films in its semiconductor products."); p. 8:8-11 ("Although Applied is a supplier of the

reactors capable of this configuration and deposition method, ***Demaray does not allege in the***

***WDTX Actions that Applied itself configures the reactors or promotes the patented configuration***

***and method***.  *See generally* Intel Compl.; Samsung Compl (also at Exs. A–B).  Without more,

Applied cannot be held liable for direct infringement.") (emphasis added).

9.    Since the filing of the DJ Action, Demaray's conduct in the Customer Suits and in the DJ

Action have (i) undermined the veracity of Demaray's representations to this Court regarding its

allegations in its Customer Complaints and (ii) demonstrated that even if an actual case or

controversy did not exist at the time the DJ Action was filed (Applied maintains that one did), an

actual case or controversy exists now and with respect to this new complaint.  Based on the facts

that exist today, there can be no good faith dispute as to the Court's subject matter jurisdiction.  The

totality of these affirmative acts in contrast to the inconsistent statements made to the Court, are

described in detail herein, are summarized in the tables below:

COMPLAINT FOR DECLARATORY
JUDGMENT

| Demaray's Representations (in red) / Affirmative Acts Supporting Subject Matter Jurisdiction (acts expressly directed at Applied in green) and/or Contradicting Representations | Reference Citation |
|---|---|
| **July 14, 2020:** Demaray files Customer Complaints against Applied's customers accusing their use of Applied's reactors of infringement and exclusively relying on Applied information | *Infra*, ¶¶ 30-39; Exs. A, B. |
| **September 25, 2020:** Demaray represents to this Court that its allegations in the Customer Suits are not directed at Applied, but at post-installation configurations performed by Intel and Samsung relating to the power supply and narrow band-rejection filter limitations | *Infra*, ¶ 42; DJ Action, Dkt. No. 23, p. 2:1-6, 2:21-23, 4:22-5:2, 5:26-6:1, 6:4-9. |
| **October 9, 2020:** Demaray serves infringement contentions in Customer Suits relying on the same Applied information as Customer Complaints, but no allegations or evidence of post-installation modifications or "configurations" to relevant hardware | *Infra*, ¶¶ 43-44; Exs. C, D. |
| **October 9, 2020:** Demaray continues prosecution of Customer Suits, despite receiving confirmation in declarations in DJ Action rebutting Demaray's theory of post-installation configurations by the customers | *Infra*, ¶ 45; DJ Action, Dkt. No. 26-12 at ¶¶ 15–16; Dkt. No. 26-8 at ¶¶ 10–11; Dkt. No. 26-10 at ¶ 12. |
| **October 22, 2020:** Demaray refuses to provide its infringement contentions, which would inform how one would objectively and reasonably interpret the allegations in the Customer Complaints, to Applied or the Court | *Infra*, ¶¶ 43, 48; Ex. S |

COMPLAINT FOR DECLARATORY JUDGMENT

| Demaray's Representations (in red) / Affirmative Acts Supporting Subject Matter Jurisdiction (acts expressly directed at Applied in green) and/or Contradicting Representations | Reference Citation |
|---|---|
| **November 18-30, 2020:** Demaray refuses to inform Applied whether Demaray intends to file compulsory counterclaims of infringement against Applied | *Infra,* ¶ 46-47; Ex. E; DJ Action, Dkt. No. 40 (JCMS) at 5:26-27, 6:7-11 |
| **November 23, 2020:** Demaray moves to dismiss the DJ Action for lack of subject matter jurisdiction, continuing to allege that its Customer Complaints were directed to post-installation modifications or "configurations" by Samsung/Intel to relevant hardware | DJ Action, Dkt. No. 39 |
| **November 23, 2020:** Based on Demaray's representations that Applied's reactors standing alone did not infringe the Asserted Patents in the Customer Suits, Applied requests a covenant not to sue; to-date, none has been granted | *Infra,* ¶ 46, Ex. E |
| **November 30, 2020:** Demaray again represents that its allegations in the Customer Suits did not accuse "Applied's reactors standing alone of infringement" despite declarations from Samsung and Intel in the DJ Action rebutting Demaray's theory of post-installation configurations of Applied's reactors by the customers | DJ Action, Dkt. No. 40 (JCMS) at 5:19-22 |
| **November 30, 2020:** Demaray claims that its infringement contentions are based on confidential reverse engineering reports "detailing Intel's and Samsung's infringing use of the claimed reactor configurations" but the contentions has no discussion or even reference to such reports | *Infra,* ¶ 47; DJ Action, Dkt. No. 40 (JCMS) at 5:15-22; 11:8-11 |

COMPLAINT FOR DECLARATORY JUDGMENT

| Demaray's Representations (in red) / Affirmative Acts Supporting Subject Matter Jurisdiction (acts expressly directed at Applied in green) and/or Contradicting Representations | Reference Citation |
|---|---|
| **November 30, 2020:** Demaray confirms in the Joint Case Management Statement it will seek discovery from Applied's regarding Applied's configurations to determine whether it will allege infringement against Applied and that it may accuse Applied of infringement | DJ Action, Dkt. No. 40 (JCMS) at 5:6-11; 11:11-14 |
| **December 12, 2020:** Demaray serves Applied with subpoenas for documents and deposition testimony regarding Applied's configuration of the reactors supplied to Intel and Samsung, including for the specific hardware components Demaray claimed were configured by Intel and Samsung | *Infra,* ¶¶ 14, 49-50; Ex. F and G |
| **December 20, 2020:** Demaray confirms in correspondence to the Court in the Customer Suits that the discovery sought in its subpoenas to Applied was "necessary to determine which reactors are in dispute" (*i.e.,* which reactors allegedly infringe) "[g]iven Applied's involvement in the development, manufacture, assembly and installation of reactors which are then used by Intel/Samsung in an infringing manner." | *Infra,* ¶¶ 15-16, 50; Ex. H |

10. On October 9, 2020, Demaray served its infringement contentions in the Customer Suits. The contentions failed to provide any allegations or evidence of Intel or Samsung "configuring" the reactors supplied by Applied in a manner that could be reasonably interpreted as alleging that Intel and Samsung (as the users of the reactors) infringe, but that Applied (as the supplier of the reactors) allegedly does not. For example, for claim 1 of the '276 reactor patent, Demaray relied

COMPLAINT FOR DECLARATORY JUDGMENT

exclusively on the same Applied documentation as referenced in the Customer Complaints, while failing to cite to any evidence from Intel or Samsung.  True and correct copies of public versions of the infringement contentions against Intel and Samsung are attached as Exhibits C and D respectively.

11. On the same day, in support of Applied's motion for preliminary injunction, declarations from Intel, Samsung and Applied were submitted in the DJ Action rebutting Demaray's allegations that Intel and Samsung "configure the reactors" in an allegedly infringing manner.  DJ Action, Dkt. No. 26-12 at ¶¶ 15–16; Dkt. No. 26-8 at ¶¶ 10–11; Dkt. No. 26-10 at ¶ 12.  Accordingly, on information and belief, at least as of October 9, 2020, Demaray was on notice that Intel and Samsung did not perform the post-modification configurations Demaray purported to allege in seeking to distinguish Intel and Samsung's alleged infringement from any allegations that would be directed at Applied.  Demaray never challenged the veracity of those declarations, but only argued that the Court should not consider them because they were created after the filing of the DJ Action.

12. Demaray's affirmative acts supporting subject matter jurisdiction continued.  Between November 18, 2020 and November 30, 2020, Applied and Demaray held multiple conferences and exchanged multiple correspondence where Applied repeatedly asked Demaray whether it intended to file compulsory counterclaims of infringement of the Asserted Patents against Applied in the DJ Action.  Demaray refused to confirm that it would *not* file infringement claims against Applied, claiming it needed discovery from Applied.  On information and belief, if Demaray's infringement allegations were truly directed at post-installation modifications of Applied's reactors by Samsung and Intel, as opposed to directed at the reactors manufactured, sold and installed by Applied, Demaray could have confirmed that position and ended the inquiry.  Demaray, of course, did not.  Applied also asked Demaray whether it would provide Applied with a covenant not to sue;

COMPLAINT FOR DECLARATORY
JUDGMENT

Demaray did not agree to provide one.  A true and correct copy of the correspondence between counsel is attached as Exhibit E.

13. Based on these exchanges and the developments since Demaray filed its Customer Suits, in discussing a proposed schedule in the DJ Action, Applied reasoned in the Parties' November 30, 2020 Joint Case Management Statement that "to the extent there was not a case or controversy at the time Applied filed its declaratory judgment action (Applied contends there was), there certainly is now in the absence of a covenant not to sue that Demaray has yet to provide."  DJ Action, Dkt. No. 40 at 13:9-12.   In response, Demaray did not disagree, only stating that "the Court and the parties can address such a future case, and the jurisdictional merits associated therewith, if it is ever brought."  *Id.* at 13:22-24.

14. Less than two weeks later, on December 12, 2020, Demaray took further affirmative acts directed at Applied by serving Applied with subpoenas for the production of documents and deposition testimony in the Customer Suits to determine whether Applied and its reactors supplied to Intel and Samsung allegedly infringe.  A true and correct copy of the subpoenas are attached as Exhibit F and G.  The subpoenas were directed at "each Applied reactor supplied to Intel or Samsung with a RMS PVD chamber" and specifically requested documents regarding, for example, "the configuration of the reactor" (Request No. 6); "any filters configured to be used with the power sources" (Request No. 6); "the power sources to the target and the power sources to the substrate" (Request No. 9); "the use of pulsed DC power to the target in RMS PVD chambers in Applied reactors" (Request No. 10); "the use of an RF bias on the substrate and pulsed DC power to the target in RMS PVD chamber in Applied reactors" (Request No. 11); and "the use of a filter with a RMS PVD chamber in Applied reactors with an RF bias on the substrate and pulsed DC power to the target" (Request No. 12), as well as deposition testimony regarding the same.  Notably, these hardware components and their "configuration" in the reactors are what Demaray repeatedly argued

COMPLAINT FOR DECLARATORY JUDGMENT

in multiple pleadings before this Court were "configurations" made by Applied's customers, and not Applied, to argue that this Court did not have subject matter jurisdiction over the DJ Action.

15. For avoidance of any ambiguity as to the purpose of the subpoenas and whether Demaray's allegations in the Customer Suits could be reasonably and objectively interpreted as being directed at Applied and Applied's reactors as manufactured and sold to its customers, on December 20, 2020, Demaray explained in correspondence to the Court in the Customer Suits that the discovery sought was "necessary to determine which reactors are in dispute" (*i.e.,* which reactors allegedly infringe) and that it sought discovery from Applied "[g]iven Applied's involvement in the development, manufacture, assembly and installation of reactors which are then used by Intel/Samsung in an infringing manner." A true and correct copy of Demaray's correspondence is attached as Exhibit H. Nowhere in the subpoenas or correspondence to the Court in the Western District of Texas did Demaray explain, as it did to this Court in the DJ Action, that its allegations were directed at the use of reactors that allegedly infringed only after post-installation modifications by Applied's customers.

16. The subpoenas to Applied seeking discovery regarding Applied's configurations of its reactors supplied to Intel and Samsung, and not Intel/Samsung's alleged post-installation modifications or configurations of the reactors, "to determine which reactors are in dispute" are additional affirmative acts directed at Applied giving rise to an actual case or controversy between Demaray and Applied. The subpoenas further directly contradict Demaray's prior representations to this Court that the allegations in the Customer Complaints were directed to Samsung and Intel's alleged post-installation configurations of Applied's reactors and confirm that the Customer Complaints, objectively interpreted, made an implied assertion of infringement against Applied. On information and belief, Demaray knows, and always has known including at the time it filed the Customer Suits, that Intel and Samsung used the accused reactors as manufactured, sold and

COMPLAINT FOR DECLARATORY
JUDGMENT

installed by Applied, such that any allegations against Intel and Samsung based on their use of the reactors are implicit allegations against Applied for its manufacture and sale of the same reactors for the same alleged reasons.

17. Under the totality of the evidence and the facts that exist today, which include: (i) the commercial realities of the relationship between Applied and its customers using Applied's products; (ii) Demaray's exclusive reliance on Applied's products in the Customer Complaints; (iii) Demaray's infringement contentions in the Customer Suits; (iv) Applied's customers' confirmation that they do not perform the post-installation modifications to Applied's reactors that Demaray contended took place; (v) Demaray's refusal to grant Applied a covenant not to sue; (vi) Demaray's refusal to inform Applied or the Court in the DJ Action whether it will assert compulsory counterclaims; (vii) Demaray's requests to obtain discovery from Applied to determine if Applied allegedly infringes; (viii) Demaray's serving of subpoenas to Applied for discovery regarding the reactors it supplies to Intel and Samsung, including Applied's configurations of the hardware components Demaray previously alleged that Intel and Samsung configures on their own; and (ix) Demaray's representations in the Customer Suits that the discovery from Applied is necessary to determine which reactors allegedly infringe—there is a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality regarding the Asserted Patents.

18. Demaray's filing and continued prosecution of the Customer Suits based on Samsung and Intel's use of equipment supplied by Applied give rise to a substantial controversy between Applied and Demaray of sufficient immediacy and reality for another, independent reason—Applied's reactors (including their use by Applied's customers) are already covered by a license to the Asserted Patents.  In December of 1998, Demaray's founder, Dr. Ernest Demaray, along with several colleagues from Applied or Applied Komatsu, left to form a new company: Symmorphix,

Inc. ("Symmorphix").  Symmorphix and Applied Komatsu negotiated a Sales and Relationship Agreement ("SRA") which facilitated the former employees' continued work on technology they had been developing at Applied Komatsu, including sputtered silicon deposition technology.  A true and correct copy of the December 11, 1998 SRA is attached as Exhibit I.

19. Symmorphix and Applied Komatsu were two sophisticated commercial entities that negotiated an arms' length commercial contract permitting Symmorphix to continue using Applied Komatsu's equipment and intellectual property to develop its own, granting Applied Komatsu a license to certain Symmorphix patents (which include the Asserted Patents), and preventing Applied Komatsu from competing with Symmorphix.  The license and release provisions were set forth in Exhibit C to the SRA, entitled "Future Dealings, Intellectual Property, Confidential Information and Licenses."  A true and correct copy of Exhibit C to the December 11, 1998 SRA is attached as Exhibit J.

20. On information and belief, after the SRA was executed, Symmorphix sought to amend certain provisions of Exhibit C of the SRA, including by adding the clause "[t]o the extent required by existing AKTA Employee Agreements with any Symmorphix personnel" to further limit the scope of the license granted by Symmorphix to Applied to only the inventions of the former Applied Komatsu employees with assignment provisions for which Applied Komatsu agreed to release.  A true and correct copy of the January 29, 1999 Modified Exhibit C is attached as Exhibit K.

21.  The license grant expressly permitted Applied Komatsu to transfer or assign such license grant to Applied, and expressly allowed its customers to use such inventions as well.  Accordingly, Demaray's Customer Suits, based on Intel and Samsung's use of equipment supplied by Applied, violates the license grant in the SRA. Therefore, Applied's reactors, including their use by Intel, Samsung or any other customer of Applied that Demaray may sue in the future, cannot infringe.

COMPLAINT FOR DECLARATORY JUDGMENT

22. On information and belief, the former Applied and Applied Komatsu employees continued to use Applied's confidential information, intellectual property and equipment to develop technology at Symmorphix. On information and belief, Symmorphix also continued to hire personnel from Applied and Applied Komatsu, including Mukundan Narasimhan, one of the four named inventors on the Asserted Patents, who left Applied to join Symmorphix on April 16, 2001. On information and belief, using confidential information produced, conceived, made or first actually reduced to practice during either Mr. Narasimhan's employment at Applied or within a year of his termination, Mr. Narasimhan filed a patent application relating to his work at Applied and that led to the Asserted Patents. Pursuant to Mr. Narasimhan's employment agreement, his ownership rights in the application automatically assigned to Applied, such that Demaray does not have complete ownership over the Asserted Patents. That defect in the chain of title precludes Demaray from asserting infringement of the Asserted Patents.

23. Therefore, Applied requests declaratory relief as follows: (1) a declaratory judgment that Applied's products do not infringe the Asserted Patents because they do not meet each and every limitation of any asserted claim; (2) a declaratory judgment that Applied's products cannot infringe because Applied and its customers using Applied's equipment have a license to use the Asserted Patents by reason of a license granted in the SRA; and (3) a declaratory judgment that Applied's products cannot infringe the Asserted Patents because Demaray does not have full ownership rights in the Asserted Patents.

## THE PARTIES

24. Plaintiff Applied Materials, Inc. ("Applied") is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business at 3050 Bowers Avenue, Santa Clara, CA 95054-3299. Applied is a leader in materials engineering solutions that creates technology and products used for semiconductor fabrication, including but not limited to reactors

COMPLAINT FOR DECLARATORY JUDGMENT

in the Endura product line identified by Demaray in the Customer Complaints and accused in Demaray's infringement contentions in the Customer Suits.

25. Defendant Demaray LLC ("Demaray") is a limited liability company organized and existing under the laws of the state of Delaware. Dr. Richard Ernest Demaray is the founder of Demaray LLC. Dr. Demaray is also one of the named inventors on the Asserted Patents. Dr. Demaray describes Demaray LLC as a "Silicon Valley, CA" company which "[is] about the portfolio of my patents."[1]  Dr. Demaray claims to have "been working in and with the semiconductor industry for more than fifty years."  DJ Action, Dkt. No. 25-3, ¶ 2.

## SUBJECT MATTER JURISDICTION

26. This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, and under the patent laws of the United States, 35 U.S.C. §§ 1–390. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1338(a), and 2201(a).

27. On July 14, 2020, Demaray undertook the affirmative acts of filing two actions in the Western District of Texas against Intel and Samsung, accusing them of infringing the Asserted Patents by using Applied's reactors. *Demaray LLC v. Intel Corporation,* No. 6:20-cv-634 (W.D. Tex. July 14, 2020); *Demaray LLC v. Samsung Electronics Co., Ltd, et al.,* No. 6:20-cv-636 (W.D. Tex. July 14, 2020). *See* Exs. A, B.  While the Customer Complaints did not name Applied as a Defendant or expressly accuse Applied of infringement, based on the commercial realities of Applied's relationship with its customers, including the manner in which it designs, manufactures, configures and installs its reactors to meet its customers' required specifications, the allegations made an implied assertion of infringement against Applied. Applied also objectively and reasonably believed the allegations were directed at Applied.

---

[1] https://www.edemaray.com/bios.html

COMPLAINT FOR DECLARATORY JUDGMENT

28. The Customer Complaints allege infringement of claim 1 of U.S. Patent No. 7,544,276, entitled "Biased Pulse DC Reactive Sputtering of Oxide Films", reproduced below with the limitations annotated [1a] – 1[e]:

1. A reactor according to the present invention, comprising:

[1a] a target area for receiving a target;

[1b] a substrate area opposite the target area for receiving a substrate;

[1c] a pulsed DC power supply coupled to the target area, the pulsed DC power supply providing alternating negative and positive voltages to the target;

[1d] an RF bias power supply coupled to the substrate; and

[1e] a narrow band-rejection filter that rejects at a frequency of the RF bias power supply coupled between the pulsed DC power supply and the target area.

29. The Customer Complaints allege infringement of claim 1 of U.S. Patent No. 7,544,657, also entitled "Biased Pulse DC Reactive Sputtering of Oxide Films", reproduced below with the limitations annotated [1a] – 1[e]:

1. A method of depositing a film on an insulating substrate, comprising:

[1a] providing a process gas between a conductive target and the substrate;

[1b] providing pulsed DC power to the target through a narrow band rejection filter such that the target alternates between positive and negative voltages;

[1c] providing an RF bias at a frequency that corresponds to the narrow band rejection filter to the substrate;

[1d] providing a magnetic field to the target; and

[1e] reconditioning the target; wherein reconditioning the target includes reactive sputtering in the metallic mode and then reactive sputtering in the poison mode.

COMPLAINT FOR DECLARATORY JUDGMENT

30. Demaray accused Applied's customers of infringing the Asserted Patents by using "RMS reactors" in the "Endura product line from Applied Materials, Inc." to deposit layers into certain semiconductor products. Ex. A at ¶ 25; Ex. B at ¶ 28. Specifically, Demaray identified "reactors that can be configured for deposition of TaN layers (*e.g.,* CuBS RFX PVD [*sic*] with the Encore II Ta(N) barrier chamber) and TiN (*e.g.,* Cirrus ionized PVD chamber)". *Id.* To support its claims for infringement, Demaray relied exclusively on Applied's products, materials, literature, and website. *See generally* Exs. A–B. Every image in the Customer Complaints are of Applied's reactors or components thereof, or are images of diagrams and schematics of Applied's reactors and/or are from Applied's website or product materials.

31. Applied designs, tests, develops, manufactures, and supplies its reactors to semiconductor product manufacturers, such as Intel and Samsung, including reactors in the Endura product line. These reactors are used by Applied's customers to deposit film layers in semiconductor products. Applied has designed, tested, developed, manufactured, and supplied RMS reactors for many years, and intends to continue to do so. Applied's customers, such as Intel and Samsung, do not simply purchase Applied's RMS reactors "off the shelf" to be used in the process of making semiconductor products. Rather, Applied's customers typically provide Applied with a set of specifications for a type of film they would like to deposit, and based on those specifications, Applied manufactures and configures the RMS reactors to deposit films according to the customers' specifications. Applied then assembles and installs the reactor at the customers' fabrication facilities through a complex process requiring precision and planning between Applied and Applied's customer.

32. Thus, on information and belief, Intel and Samsung use the Applied reactors identified in the Customer Complaints as manufactured and installed by Applied at their respective fabrication facilities, without modifying the relevant hardware components (*e.g.,* the power supplies coupled to the target and the substrate or any filter between the power supply and the target).

COMPLAINT FOR DECLARATORY
JUDGMENT

33. While Demaray's Customer Complaints made vague allegations to "configurations" of Applied's reactors, those allegations either relied exclusively on evidence from Applied (as opposed to Samsung or Intel) or on no evidence whatsoever. *See*, *e.g.*, Ex. A at ¶¶ 33, 36, 39; Ex. B at ¶¶ 36, 39, 42 ("On information and belief, [Intel/Samsung] configures, or causes to be configured … "). Demaray made these "configuration" allegations for claim 1 of the '276 patent as to three power supply-related limitations contained in [1c]-1[e]: (1) the "pulsed DC power supply coupled to the target," (2) "an RF bias power supply coupled to the substrate," and (3) "a narrow band-rejection filter that rejects at a frequency of the RF bias power supply coupled between the pulsed DC power supply and the target area." *Id.*  Based on the commercial realities of Applied's relationship with its customers, including Applied's understanding that its customers generally use the reactors as manufactured, configured and installed by Applied without post-installation hardware modifications, Applied reasonably and objectively interpreted these allegations as directed at Applied and Applied reactors.

34. Regarding the first limitation—"pulsed DC power supply coupled to the target"—Demaray relied exclusively on (1) schematics from Applied's product literature, Ex. A at ¶¶ 34, 35 (first image); Ex. B at ¶¶ 37, 38 (first image), and (2) an image of an Applied Endura reactor, Ex. A at ¶ 35 (second image); Ex. B at ¶ 38 (second image). Demaray did not allege that Samsung or Intel "configured" the accused reactors with respect to this hardware component by, for example, coupling its own power supply to the target or replacing the power supply provided by Applied.

35. Regarding the second limitation—"an RF bias power supply coupled to the substrate"—Demaray relied exclusively on (1) a schematic from Applied's product literature, Ex. A at ¶ 37; Ex. B at ¶ 40, and (2) two images of Applied's reactors. Demaray did not allege that Samsung or Intel "configured" the accused reactors with respect to this hardware component by, for example,

COMPLAINT FOR DECLARATORY JUDGMENT

coupling its own RF bias power supply to the substrate or replacing the power supply provided by Applied.

36. Regarding the third limitation—the "narrow band-rejection filter"—Demaray provided no citation to any evidence whatsoever, whether from Applied, Samsung or Intel. Ex. A at ¶¶ 39-40; Ex. B at ¶¶ 42-43. Rather, Demaray alleged that Intel and Samsung each "configures, or causes to be configured the [Intel/Samsung] RMS reactors such that they compromise a narrow band-rejection filter that rejects at a frequency of the RF bias power supply coupled between the pulsed DC power supply and the target area" and that this filter is used to "protect the pulsed DC power supply from feedback from the RF bias power supply." *Id.* Based on the commercial realities of Applied's relationship with its customers, including Applied's understanding that its customers generally use the reactors as manufactured and installed by Applied without post-installation hardware modifications, Applied reasonably and objectively interpreted this allegation to be directed at Applied. Nor did Demaray provide any basis or explanation as to how Intel and Samsung, through any purported post-installation modifications, met this limitation.

37. In the Customer Complaints, each claim limitation [1a] – [1e] of the '276 reactor patent, except for the "narrow band-rejection filter" limitation [1e] for which no evidence was presented, relied on Applied's products, materials, literature, and website. Although Demaray did not explicitly identify any Applied product information in support of its allegations regarding the "narrow band-rejection filter" claim limitation [1e] of the '276 patent, *see* Ex. A at ¶¶ 39-40 and Ex. B at ¶¶ 42-43, Applied's Senior Director, Process Engineer for Metal Deposition Products, John Forster, who has worked at Applied since October 1993, explained that "adding an additional component, such as a filter, to the system as installed by Applied, could, for example, cause the RMS reactor to no longer meet the customers' required specifications or impact the warranty of the reactor." Ex. Q at ¶ 6. Mr. Forster provided additional explanation for why after Applied reviewed

COMPLAINT FOR DECLARATORY
JUDGMENT

the Customer Complaints against Intel and Samsung, Applied interpreted those allegations as direct at Samsung and Intel's use of the reactors as manufactured, configured and installed by Applied. *Id.* at ¶¶ 4-9. Accordingly, Applied reasonably and objectively interpreted Demaray's affirmative act of asserting that Intel and Samsung infringed the '276 reactor patent, as creating a reasonable potential that infringement claims, *e.g.,* for the manufacture or sale of the same reactors, could be brought against Applied based on the same allegations.

38. In the Customer Complaints, each claim limitation [1a] – [1e] of the '657 patent, including limitations [1b] and [1c] that include the "narrow band-rejection filter", relied on Applied's products, materials, literature, and website. Accordingly, Applied reasonably and objectively interpreted Demaray's affirmative act of asserting that Intel and Samsung infringed the '657 patent, as creating a reasonable potential that infringement claims, *e.g.,* for the same use of the same reactors in Applied's laboratory for research and development or customer demonstrations or for inducing the alleged direct infringement of Applied's customers, could be brought against Applied based on the same allegations.

39. Based on the commercial realities of Applied's relationship with its customers, including Applied's own knowledge as to the processes for which Applied designs, manufactures, sells and installs its reactors at its customers' fabrication facilities, and thereafter provides on-site maintenance and support of its reactors, when considering the totality of the allegations made in the Customer Complaints, Applied objectively and reasonably interpreted the affirmative acts of Demaray filing the Customer Complaints and the allegations therein as making an implied assertion of infringement of the Asserted Patents against Applied.

40. Having a reasonable apprehension that it would face an infringement suit, on August 13, 2020, Applied filed a complaint for a declaratory judgment that Applied and its reactors do not infringe the Asserted Patents. DJ Action, Dkt. No. 1. Applied subsequently amended its complaint

COMPLAINT FOR DECLARATORY JUDGMENT

on September 1, 2020, to add non-infringement claims based on certain license and assignment agreements. DJ Action, Dkt. No. 13.

41. On September 4, 2020, Applied filed a motion for preliminary injunction to enjoin Demaray from proceeding in its Customer Suits against Intel and Samsung during the pendency of this action. Dkt. No. 14.

42. On September 25, 2020, Demaray responded by asserting that the Court lacked jurisdiction over Applied's non-infringement claims because there was no case or controversy.  DJ Action, Dkt. No. 23.  In support, Demaray made the following representations to this Court to argue that Applied's reactors as manufactured, configured and installed by Applied, were not accused of infringement, but rather that Intel and Samsung "configured" the reactors on their own, after Applied's installation of the reactors at the customers' fabrication facilities, in a manner that allegedly infringes the Asserted Patents:

- "In this instance, ***Applied's reactors standing alone are not accused of infringement*** in Texas." *Id.* at 2:1-2 (emphasis added).

- "Instead, methods of thin film deposition in a reactor with a ***specific configuration used by Intel and Samsung***, and that specific reactor configuration, are accused. ***There is no allegation in Texas (or in this case) that Applied provides the special reactor configuration to Intel or Samsung or encourages its use***, or that Applied's reactors standing alone have no substantial non-infringing uses." *Id.* at 2:2-6 (emphasis added).

- "The Texas cases concern ***particular uses by the Texas defendants of manufacturing equipment those defendants have configured in a specific manner*** to make their own semiconductor products." *Id.* at 2:21-23 (emphasis added).

- "Because the Demaray patents concern methods of depositing high quality thin films in products by ***using particular PVD reactor configurations, and are not directed at***

*general PVD reactors standing alone, Applied is not a defendant* in the Texas cases." *Id.* at 4:22-24 (emphasis added).

- "*Intel and Samsung actually use the claimed methods* and determine the processes used to deposit thin films in their semiconductor fabrication plants, *having made the choice to use the claimed pulsed DC power supply coupled to the target, RF bias on the substrate and a narrow band rejection filter* as set forth in the Demaray patent claims." *Id.* at 4:24-28 (emphasis added).

- "*Applied's reactors standing alone, in contrast, have many potential non-infringing configurations* and Applied has not alleged that it recommends or configures its PVD reactors as required by the claims." *Id.* at 4:28-5:2 (emphasis added).

- "*Nor did Demaray accuse Applied PVD reactors standing alone of infringement* in the Texas cases—Demaray accused particular reactor configurations, and methods of depositing thin films using them, of infringement in the Texas cases…" *Id.* at 5:26-6:1 (emphasis added).

- "In particular, Intel's and Samsung's use of a pulsed DC power supply coupled to the target, RF bias on the substrate and a narrow band rejection filter to deposit high quality thin films in its semiconductor devices is accused. The Applied Endura reactors are merely examples of a PVD reactor configurable by third parties in an infringing manner. *This is not a case where one entity makes an infringing product, and its customers are then sued for nothing more than purchasing and using it in the only way possible*." 6:4-9 (emphasis added).

43. Two weeks later, on October 9, 2020, Demaray served its infringement contentions in the Customer Suits. On October 14, 2020, Applied requested that Demaray provide the contentions to Applied, as Applied believed that the scope of the infringement allegations was relevant to the

COMPLAINT FOR DECLARATORY
JUDGMENT

pending injunction motion. Demaray refused. A true and correct copy of the parties' correspondence is attached as Exhibit S. On information and belief, Demaray sought to preclude Applied from obtaining and submitting the infringement contentions to this Court, recognizing that they likely would undermine the positions taken in opposing Applied's motion for preliminary injunction and representations that its infringement allegations were directed to post-installation configurations by Applied's customers to the accused reactors. Applied eventually obtained public versions of the contentions after Samsung and Intel objected to Demaray's improper confidentiality designations and the Court ruled on those objections. Exs. C, D.

44. Contrary to the bulleted representations to this Court identified above in Demaray's challenge to subject matter jurisdiction, but consistent with the Customer Complaints, Demaray's contentions ***failed to make any allegation*** that Intel and Samsung make post-installations modifications to the relevant hardware in the reactors supplied by Applied, such as the power supplies coupled to the target or substrate, or any filters between the power supply and the target. Like the Customer Complaints, the contentions repeatedly cite to the same sources of information from Applied's products, materials, literature, and website. For example, Claim 1 of the '276 reactor patent relies exclusively on Applied's products, materials, literature, and website.

45. On October 9, 2020, in support of Applied's motion for preliminary injunction, declarations from Intel, Samsung and Applied were submitted rebutting Demaray's allegations that Intel and Samsung "configure the reactors" in an allegedly infringing manner. DJ Action, Dkt. No. 26-12 at ¶¶ 15–16; Dkt. No. 26-8 at ¶¶ 10–11; Dkt. No. 26-10 at ¶ 12. Accordingly, on information and belief, as of October 9, 2020, Demaray was on notice that Intel and Samsung did not perform the post-modification configurations it alleged in seeking to distinguish Intel and Samsung's alleged infringement from any allegations that would be directed at Applied.

COMPLAINT FOR DECLARATORY
JUDGMENT

46. Between November 18, 2020 and November 30, 2020, Applied and Demaray held multiple conferences exchanged multiple correspondence where Applied repeatedly asked Demaray whether it intended to file compulsory counterclaims of infringement against Applied in the DJ Action.  Demaray refused to confirm that it would not file infringement claims against Applied, claiming it needed discovery from Applied.  Applied also asked Demaray whether it would provide Applied with a covenant not to sue, but Demaray has not provided one.  Ex. E.

47. In the parties Joint Case Management Conference Statement, submitted on November 30, 2020, Demaray continued its refusal to inform Applied and the Court as to whether it would file claims of infringement against Applied.  DJ Action, Dkt. No. 40, p. 6:7-11 ("The most appropriate course (and the one provided for by the Federal Rules) is to resolve Demaray's pending motion and then, only if necessary after resolution of the motion, allow targeted discovery of information from Applied regarding matters such as [Applied's] configurations of PVD reactors that Applied makes, sells and uses.  Demaray could then, if it turns out to be necessary, promptly address whether counterclaims for infringement are appropriate in this case.").  Demaray also continued to misrepresent the allegations in its infringement contentions to this Court by stating they were "based on confidential reverse engineer[ing] reports detailing Intel's and Samsung's infringing use of the claimed reactor configurations."  *Id.* at 5:26-27.

48. Demaray objected to Applied's submission of the contentions to the Court, *see id.* at 4:24-28, but as they show, there is no reference to confidential reverse engineering reports of its infringement claims.  *Compare* Exs. C and D with DJ Action, Dkt. No. 40, p. 5:15-22 ("Demaray relied upon, among other sources, confidential reverse engineering of Intel and Samsung products suggesting Intel's and Samsung's use of the infringing reactor configurations, including the use of a narrow band-rejection filter and pulsed DC power supply. Applied ignores this reverse engineering support for Demaray's allegations against Intel and Samsung products. Demaray's

COMPLAINT FOR DECLARATORY JUDGMENT

allegations in the Texas complaints Demaray did not accused Applied's reactors standing alone of infringement and has made no express or implied infringement assertions against Applied in the Texas complaints or anywhere else.")

49. Less than two weeks later, on December 12, 2020, Demaray took further affirmative acts directed at Applied by serving Applied with subpoenas for the production of documents and deposition testimony in the Customer Suits to determine whether Applied and its reactors supplied to Intel and Samsung allegedly infringe. Exs. F and G. The subpoenas were directed at "each Applied reactor supplied to Intel or Samsung with a RMS PVD chamber" and specifically requested documents and deposition testimony regarding *Applied's configuration* (not Intel's or Samsung's configuration) of the reactors.  Demaray subsequently confirmed in correspondence to the Court in the Customer Suits on December 20, 2020 that the discovery sought was "necessary to determine which reactors are in dispute" (*i.e.,* which reactors allegedly infringe) and that it sought discovery from Applied "[g]iven Applied's involvement in the development, manufacture, assembly and installation of reactors which are then used by Intel/Samsung in an infringing manner."  Ex. H.

50. The additional affirmative acts of serving subpoenas on Applied seeking discovery regarding *Applied's configurations* of its reactors supplied to Intel and Samsung, and not Intel/Samsung's alleged post-installation modifications or configurations of the reactors, "to determine which reactors are in dispute" further cement that an actual case or controversy of real sufficient and immediacy and reality exists between Demaray and Applied.  The subpoenas further contradict Demaray's prior representations to this Court that the allegations in the Customer Complaints were directed to Samsung and Intel's alleged post-installation configurations of Applied's reactors and confirm that the Customer Complaints, objectively interpreted, made an implied assertion of infringement against Applied.

COMPLAINT FOR DECLARATORY JUDGMENT

51. On information and belief, Demaray knows, and always has known including at the time it filed the Customer Suits, that Intel and Samsung used the accused reactors as manufactured, sold and installed by Applied, such that any allegations against Intel and Samsung based on their use of the reactors are implicit allegations against Applied for its design, testing, development, manufacture and sale of the same reactors for the same alleged reasons.

52. Under the totality of the evidence and the facts that exist today, which include: (i) the commercial realities of the relationship between Applied and its customers using Applied's products; (ii) Demaray's exclusive reliance on Applied's products in the Customer Complaints; (iii) Demaray's infringement contentions in the Customer Suits; (iv) Applied's customers' confirmation that they do not perform the post-installation modifications to Applied's reactors that Demaray contended took place; (v) Demaray's refusal to grant Applied a covenant not to sue; (vi) Demaray's refusal to inform Applied or the Court in the DJ Action whether it will assert compulsory counterclaims; (vii) Demaray's requests to obtain discovery from Applied to determine if Applied allegedly infringes; (viii) Demaray's serving of subpoenas to Applied for discovery regarding the reactors it supplies to Intel and Samsung, including Applied's configurations of the hardware components Demaray previously alleged that Intel and Samsung configures on their own; and (ix) Demaray's representations in the Customer Suits that the discovery from Applied is necessary to determine which reactors allegedly infringe—there is a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality regarding the Asserted Patents.  There is a reasonable potential that Demaray could accuse Applied of infringement based on the same allegations, including for direct and indirect infringement claims.

53. For example, direct infringement claims against Applied could be brought based on making, offering to sell, or selling the same reactors that Demaray continues to accuse in the Customer Suits. Indeed, Demaray has affirmatively sought discovery from Applied to confirm whether these

COMPLAINT FOR DECLARATORY JUDGMENT

reactors *as supplied* to Intel and Samsung allegedly infringe, including specific requests regarding Applied's sale of the reactors supplied to Intel or Samsung.  Ex. F (Transfer Request 2: "All sales documents for each Applied reactor supplied to Intel or Samsung with a RMS PVD chamber, including without limitation, purchase orders, fulfillment documents and documents identifying the location of the sale, delivery, and installation of such reactors.").  On information and belief, Demaray does not allege that Applied's customers infringe based on **their purchase of the reactors**; thus, any manufacturer of reactors supplied to customers such as Intel and Samsung would objectively and reasonably interpret Demaray's affirmative acts of seeking discovery regarding Applied's **sales of reactors** as seeking evidence of Applied's alleged infringement  (and not that of Applied's customers).  Moreover, Applied objectively and reasonably believes this to be true.  Based on Demaray's subpoena in addition to all of its other affirmative acts originating from is filing of the Customer Suits up and through its communications or other interactions with Applied to this day, a substantial controversy exists between Demaray and Applied having adverse legal interests regarding the infringement of the Asserted Patents. That controversy has and continues to exist such that Applied is entitled to seek declaratory relief.

54. Demaray may also assert direct infringement claims against Applied based on Applied's own use of the same reactors accused in the Customer Suits.  On information and belief, Demaray continues to accuse Samsung and Intel of infringing the '276 reactor patent and the '657 process patent based on their use of the Cirrus and CuBs chambers in Applied's Endura product line for the deposition titanium nitride and tantalum nitride layers.  The same accused chambers for the same accused applications (*i.e.,* deposition of titanium nitride and tantalum nitride layers) are used by Applied in its laboratory facilities in the Northern District of California for research and development and demonstration purposes for its customers.

COMPLAINT FOR DECLARATORY JUDGMENT

55. Moreover, based on the totality of the facts that exist at present-day, including each of the affirmative acts taken by Demaray since the filing of the Customer Complaints, there is a reasonable potential that Demaray could bring indirect infringement claims against Applied based on alleged inducement.  For example, Demaray may allege that Applied has had knowledge of the Asserted Patents since at least Applied's filing of the DJ Action.  As of at least October 9, 2020, Demaray has known that Applied's customers do not perform the post-installation modifications that Demaray represented to this Court were the bases for its infringement allegations in the Customer Complaints. Yet Demaray has not withdrawn those Customer Complaints, and continues to prosecute them, including by seeking discovery directly from Applied regarding ***Applied's configurations*** of the accused reactors.  Knowing that Applied's customers use the accused Applied reactors as manufactured and supplied to them, Demaray is already necessarily alleging that Applied intentionally causes, encourages, or aids Intel and Samsung to infringe by designing, developing, manufacturing, assembling, and installing the reactor systems to fit their specific needs. *See, e.g.,* Exs. C, D (infringement contentions); Exs. F, G (subpoenas to Applied).

56. Likewise, as to contributory infringement, there is a reasonable potential that Demaray could allege that Applied's reactors are used to commit acts of direct infringement (Demaray alleges Applied's reactors form the basis of infringement against Intel and Samsung); that use of Applied's reactors constitutes a material part of the invention (Applied's reactors are highlighted extensively throughout Demaray's infringement contentions); and that Applied knew its products are especially made or especially adapted for use in an infringement of the Asserted Patents (Demaray's allegations against Intel and Samsung have now put Applied on notice of Demaray's belief that the reactors are allegedly used in an infringing manner).

57. Finally, there is a reasonable potential that Demaray could allege that the reactors are not a staple article or commodity of commerce suitable for substantial noninfringing use based on two

COMPLAINT FOR DECLARATORY JUDGMENT

primary factors. First, Demaray contends that any alleged noninfringing configuration—*e.g.*, a configuration without a "narrow band rejection filter"—would render the reactor inoperable and self-destructing. Ex. A at ¶ 40 ("On information and belief, a narrowband filter is used in the Intel RMS reactors as configured to . . . protect the pulsed DC power supply from feedback from the RF bias power supply"); Ex. B at ¶ 40; *see also* Dkt. No. 23 at 4:6-8 ("The narrow band rejection filter allows the power sources to properly function, but prevents damaging feedback to the pulsed DC power source from the RF bias."). Second, Demaray's allegations that Applied's two biggest customers—the biggest chipmakers in the world—both use the alleged configurations in the same manner so as to avoid damaging the reactor's power supply suggests that this configuration is the primary and substantial use of the reactor, and that any other alleged configuration is *de minimus* or insubstantial.

58. This Court has subject matter jurisdiction, when considering the totality of the facts that exist today, which go well beyond Demaray's filing of the Customer Complaints and Demaray's subsequent characterizations of the allegations contained therein.

## **PERSONAL JURISDICTION AND VENUE**

59. This Court has personal jurisdiction over Demaray. Among other things, Demaray has continuous and systematic business contacts with Northern California. Demaray's "founder and president," Dr. Demaray, describes Demaray as a "Silicon Valley, CA" company:[2]

Experience:
Founder and President: Demaray LLC March 2013 – Present   Silicon Valley CA
Intellectual Property invention and development, including licensing for thin film energy conversion and storage technologies and devices, thin film optics, solar energy, photo-chemistry, solid state Li+ ion films and devices, advanced thin film coatings and devices.

_____
[2] https://www.edemaray.com/bios.html; https://www.linkedin.com/in/ernestdemarayphd/.

COMPLAINT FOR DECLARATORY JUDGMENT

**Founder and President**

Demaray LLC

Jan 2006 – Present · 14 yrs 7 mos

Silicon Valley CA

Intellectual Property invention and development, including licensing for thin film energy conversion and storage technologies and devices, thin film optics, solar energy, photo-chemistry, solid state Li+ ion films and devices, advanced thin film coatings and devices.

On information and belief, according to Demaray's website, several of the Board members and employees of Demaray are from and/or based in Northern California.[3] Under its "Partners" sub-page, Demaray's website lists the University of California at Santa Cruz as one of its primary partners, and claims that "Professor Kobayashi of UCSC is working with Demaray LLC to further develop the Sun2Fiber technology with a grant from ARPA-E."[4] Further, on information and belief, the technology underlying the Asserted Patents was allegedly developed in Northern California.

60. In addition, this Court has personal jurisdiction over Demaray because Demaray has purposefully directed into California its enforcement activities regarding the Asserted Patents. As referenced above, Demaray has filed complaints against Intel (headquartered in Northern California)[5] and Samsung (conducts substantial business operations related to the allegedly infringing technology in Northern California and holds a large US office in Northern California).[6] Further, Demaray's complaints against both Samsung and Intel accuse Applied technology, and Applied is also headquartered in Northern California.[7] And, at least against Samsung, Demaray relies on meetings occurring in Northern California to establish alleged pre-suit notice and knowledge of the Asserted Patents, and alleged willful infringement.[8]

---

[3] https://www.edemaray.com/bios.html.
[4] https://www.edemaray.com/partners.html
[5] https://www.intel.com/content/www/us/en/support/articles/000015107/programs.html
[6] **Error! Hyperlink reference not valid.**https://www.samsung.com/us/ssic/location/san-jose-ca/
[7] http://www.appliedmaterials.com/company/contact/locations
[8] *See* Ex. B at ¶¶ 24–25.

COMPLAINT FOR DECLARATORY JUDGMENT

61. Venue is proper in this District under 28 U.S.C. §§ 1391(b), (c), because a substantial part of the events giving rise to Applied's claim occurred in this district, and because Demaray is subject to personal jurisdiction here.

62. On information and belief, Dr. Demaray has filed over a hundred patents over the course of his career, which has been spent almost entirely in Northern California.[9] After receiving the entirety of his education at schools located in Northern California (Cal State Hayward and the University of California at Santa Cruz), Dr. Demaray has spent almost 40 years working at California-based companies, including Applied Komatsu, Varian Semiconductor, Symmorphix, and Demaray.[10] On information and belief, Dr. Demaray and the co-inventors of the Asserted Patents conceived of the alleged inventions in the Asserted Patents using the confidential information, intellectual property, and equipment of their former employers, Applied and Applied Komatsu.

63. On information and belief, in addition to Dr. Demaray, Ravi Mullapudi, one of the other named inventors of the Asserted Patents, also resides in Northern California. On information and belief, Gary Edwards, the patent prosecution attorney for the Asserted Patents, resides in Northern California.[11] Further, on information and belief, the research and development of the Asserted Patents was performed in Northern California. On information and belief, the Sales and Relationship Agreement between Applied Komatsu and Symmorphix, which granted Applied a license to the Asserted Patents, as detailed *infra*, was negotiated and executed in Northern California. Likewise, on information and belief, the majority of the individuals involved in the negotiations on behalf of Applied Komatsu and Symmorphix that led to the SRA are located in Northern California, including Larry Edelman, Jim Scholer, James Sponseller, and Mike Danaher.

## **FACTUAL BACKGROUND**

---

[9] https://www.linkedin.com/in/ernestdemarayphd/
[10] *Id.*
[11] https://www.haynesboone.com/people/e/edwards-gary

COMPLAINT FOR DECLARATORY
JUDGMENT

64. Demaray, its principals and predecessor companies, on the one hand, and Applied and Applied Komatsu, on the other hand, have a long history together, including as it relates to the Asserted Patents.

65. On information and belief, Dr. Demaray was a general manager of a joint venture between Applied and Komatsu Ltd., called Applied Komatsu Technology, Inc. ("AKT"), developing sputtered silicon deposition technology.[12] On information and belief, Dr. Demaray, and other employees working with Dr. Demaray, were working in Northern California and employed by AKT's subsidiary, AKTA (collectively, AKT and AKTA are referred to herein as "Applied Komatsu").

66. On information and belief, Dr. Demaray, along with several other colleagues from Applied and/or Applied Komatsu left in late 1998 to start a new company, Symmorphix. On information and belief, Dr. Demaray was a founder, Chairman of the Board, and CTO of Symmorphix.[13]

67. On information and belief, at Symmorphix, Dr. Demaray and his team of former Applied or Applied Komatsu employees continued to develop the technology they worked on at Applied or Applied Komatsu related to sputtered silicon deposition technology.

68. On December 11, 1998, Applied Komatsu and Symmorphix negotiated and executed a Sale and Relationship Agreement ("SRA") to govern the parties' future commercial relationship, including as it relates to the purchase and sale of Applied Komatsu reactor systems, Symmorphix's use of Applied Komatsu's facilities, and the parties' respective intellectual property rights resulting from the parties' commercial arrangement. *See* Ex. I.[14]

---

[12] https://www.linkedin.com/in/ernestdemarayphd/
[13] https://www.linkedin.com/public-profile/in/ernestdemarayphd/; DJ Action, Dkt. No. 23-1 at ¶ 5.
[14] Ex. I has been redacted to remove confidential financial information and to remove hand-written notes from the copy of the SRA maintained by Applied in its business records.

COMPLAINT FOR DECLARATORY JUDGMENT

69. Pursuant to the SRA, Applied Komatsu agreed to sell, and Symmorphix agreed to purchase, certain PVD reactor systems developed by Applied Komatsu. *Id.* at ¶¶ 1–3. Applied Komatsu also agreed to provide Symmorphix with access to Applied Komatsu's facilitates through and including April 30, 1999. *id.* at ¶ 6, and the SRA specifically permitted access to certain former Applied Komatsu employees, including Dr. Demaray and Ravi Mullapudi, *id.* at ¶ 9—two of the named inventors of the Asserted Patents.[15] Other provisions of the SRA governed other aspects of the parties' commercial relationship, including solicitation prohibitions, required insurance coverages and licenses, shipping and receiving, environmental and hazardous waste policies, worksite training, and costs and expenses associated with the facilities and equipment. *Id.* at ¶¶ 10–20.

70. Paragraph 21 of the SRA also makes reference to and incorporates "Exhibit C" into the SRA, which relates to, among other things, intellectual property rights and licenses: "The parties have agreed to certain provisions regarding future dealings, intellectual property, confidential information, and licenses, as described in Exhibit C, attached hereto and made part of this Agreement." *Id.* at ¶ 21. There are two documents titled "Exhibit C": the one executed December 11, 1998, and attached to the SRA ("Original Exhibit C"), and a modified Exhibit C that was executed on January 27, 1999 ("Modified Exhibit C"), which supersedes the Original Exhibit C. *See* Ex. J (Original Exhibit C) and Ex. K (Modified Exhibit C).

71. The Original Exhibit C provided Symmorphix the right to first refusal of certain PVD systems, and provided Applied Komatsu the first right to apply any sputtered silicon PVD systems, spares, and upgrades. It also provided certain license grants between the parties: (1) Applied Komatsu granted Symmorphix a license to Applied Komatsu's patent rights to use with products

---

[15] Symmorphix continued using the Applied Komatsu facilities and equipment until at least September 30, 1999, as evidenced by the "First Addendum to Sales and Relationship Agreement" and "Second Addendum to the Sale and Relationship Agreement." (True and correct copies of the Addendums to the SRA are attached hereto as Exhibit L.)

COMPLAINT FOR DECLARATORY
JUDGMENT

purchased from or supplied by Applied Komatsu; and (2) Symmorphix granted Applied Komatsu a license to patent rights relating to sputtered silicon deposition technology, with an approximate two year time window, but with also a non-compete provision that "AKTA shall not utilize such rights to pursue the same product objectives concerning flat panel displays as Symmorphix":

> a) **AKTA grants to Symmorphix** a non-assignable, non-transferable, non-exclusive, royalty free license to use, with products purchased from or supplied by AKTA ("Products"), patented methods and processes of AKTA which are appropriately utilizable in the Products, and to AKTA's rights under any patents, inventions, or technology relating to sputtered silicon deposition technology owned by AKTA, for the purposes of providing sputtered silicon deposition services ("Services"). This license does not extend to the use of any of AKTA's patented methods or processes in products not purchased from or supplied by AKTA or in Products which have been substantially altered by any third party except Symmorphix.

> b) **Symmorphix grants to AKTA** a non-assignable, non-transferable, non-exclusive, royalty-free license to any rights of Symmorphix under any patents issues based on any patent applications filed before January 1, 2001, for inventions, improvements, or enhancements developed by Symmorphix relating to sputtered silicon deposition technology, provided that AKTA shall not utilize such rights to pursue the same product objectives concerning flat panel displays as Symmorphix. Notwithstanding the generality of the foregoing, AKTA shall be authorized to assign or transfer any or all of the above license to one or more of AKTA's parent entities, with the same restriction on competition with the Services provided by Symmorphix, and AKTA's customers may use equipment provided by AKTA incorporating inventions licensed to AKTA hereunder without further consideration.

Ex. J (Original Exhibit C at ¶ 3) (emphasis added).

72. Original Exhibit C also set forth the parties' agreement regarding the parties' respective rights in connection with the assignment provisions in the former Applied Komatsu employment agreements. On information and belief, and according to the sworn declaration of Dr. Demaray, "[a]s part of the [SRA], Applied Komatsu agreed to release [Dr. Demaray] and the other former employees joining Symmorphix from assignment provisions in certain employment agreements." DJ Action, Dkt. No. 23-1 at ¶ 6. A true and correct copy of Dr. Demaray's sworn declaration is also attached as Exhibit M.

73. Specifically, paragraph 4 of Original Exhibit C acknowledged the "presumption … that AKTA owns all inventions disclosed by AKTA employees and related to the work done for AKTA after leaving AKTA employment", and ***notwithstanding the presumption***, the parties agreed that Applied Komatsu would continue to retain intellectual property rights assigned by former employees that were conceived or developed during the period of their employment with Applied Komatsu (*i.e.*, on or before December 31, 1998), but that inventions conceived by Symmorphix on or after January 1, 1999, cannot be claimed by Applied Komatsu (with the exception of the rights granted in the license described above):

> 4. Symmorphix understands and agrees that intellectual property conceived or received by AKTA employees (including those individuals named in Section 9 of this Agreement) during the period of their respective employment is owned by AKTA, pursuant to individual written agreements with AKTA. Nothing in this Agreement shall transfer any ownership right in any intellectual property owned by AKTA, including all rights contained in patent applications and inventions disclosures held by AKTA. Notwithstanding the presumption, contained within those certain written agreements with AKTA, that AKTA owns all inventions disclosed by AKTA employees and related to the work done for AKTA after leaving AKTA employment, the parties hereto agree that:
>
> - Any invention in the field of sputtered silicon deposition technology conceived or developed by any of the individuals named in Section 9 of this Agreement on or before December 31, 1998, shall be owned by AKTA;
>
> - Symmorphix and AKTA shall cooperate to provide any documentation, filing, and execution required to fulfill or effect this provision, including specifically all patent matters;
>
> - AKTA does not own and shall not claim any right (other than the license grant to AKTA detailed in Section 3 of this Exhibit C of this Agreement) to intellectual property developed by Symmorphix on or after January 1, 1999;
>
> - AKTA does not own and shall not claim any right in any other proprietary property of Symmorphix which was developed by or for Symmorphix on or after November 1, 1998, including without limitation business plans and company organization of Symmorphix.

Ex. J (Original Exhibit C at ¶ 4).

74. On information and belief, after the parties signed the SRA on December 11, 1998 (including Original Exhibit C), Symmorphix approached Applied Komatsu on January 11, 1999,

COMPLAINT FOR DECLARATORY
JUDGMENT

requesting to amend Original Exhibit C relating to the license grant to Applied Komatsu. True and correct copies of the correspondence from Symmorphix and draft revisions to Original Exhibit C are attached hereto as Exhibit N.

75. On information and belief, Symmorphix's stated concern was that the existing license grant flowing from Symmorphix to Applied Komatsu at paragraph 3(b) of the Original Exhibit C "may allow [Applied Komatsu] to use Symmorphix's patents to compete with Symmorphix in flat panel displays," which Symmorphix viewed as discouraging it from filing patents for its inventions. *Id.*

76. On information and belief, in order to encourage Symmorphix's filing for patents in the sputtered silicon space, Symmorphix proposed to amend the license grant, which in turn, Symmorphix asserted, would benefit Applied by producing more patents that would be subject to the license grant:

> Paragraph 3b) discourages Symmorphix from filing patents regarding sputtered silicon. Keeping Symmorphix' innovations trade secrets only poses the risk that another equipment vendor could independently develop and patent similar innovations. ***I believe that Applied Materials would like Symmorphix' sputtered silicon innovations to be patented (hence, protected) and may appreciate a license. I suggest that paragraph 3b) be revised to restrict the license of Symmorphix' patents back to AKTA (and AKTA's parents) for use on silicon wafers for semiconductors***. This would still provide a "balanced agreement," which was one of Larry Edelman's objectives - i.e., offset paragraph 3a) with 3b) – as paragraph 3a) is narrow. (Its purpose is only to allow Symmorphix to use AKT's sputtered silicon technology with systems we purchase from AKT and be able to modify the system).

Ex. N (emphasis added).

77. On information and belief, the ensuing negotiations culminated in the execution of the Modified Exhibit C, which made the following material changes, among others: (1) it clarified and/or expanded Symmorphix's license rights to AKTA's; (2) it removed the "before January 1, 2001" temporal limitation of Applied Komatsu's license rights while also prohibiting Applied Komatsu from using such rights to pursue a business providing "sputtered silicon deposition services" (*i.e.,* a broader non-compete provision); and (3) it further limited the scope of Applied

COMPLAINT FOR DECLARATORY
JUDGMENT

Komatsu's license rights such that the rights could not be derived from Symmorphix personnel who were not previously Applied Komatsu employees (*i.e.*, Applied Komatsu's license rights are only implicated by inventions from former Applied Komatsu employees who left and joined Symmorphix, and to the exclusion of Symmorphix personnel who never had Employment Agreements having relevant assignment provisions with Applied Komatsu). *See* Ex. K at ¶ 3(a), 3(b).

78. A comparison between the license provisions (paragraphs 3.a and 3.b) of Original Exhibit C and Modified Exhibit C is presented below (with green representing added language and red representing deleted language) to illustrate the negotiated and agreed-to changes appearing in Modified Exhibit C:

a. AKTA grants to Symmorphix a non-assignable, non-transferable, non-exclusive, perpetual, royalty free license to use, with equipment and associated software documentation with products purchased from or supplied by or for AKTA ("Products"), patented methods and processes of AKTA which are appropriately utilizable in the Products, and to AKTA's rights under any patents, patent applications, inventions, or technology relating to sputtered silicon deposition technology owned by or licensed to AKTA wherein such license contains the right to sub-license without cost to AKTA, or where the license contains a provision to sub-license with cost, Symmorphix may choose to pay the royalty thereunder to use such license, including the inventions and intellectual property referred to in Section 4 of this Exhibit C of this Agreement, for the purposes of providing sputtered silicon deposition services ("Services"). This license does not extend to the use of any of AKTA's patented methods or processes in products not purchased from or supplied by or for AKTA or in Products which have been substantially altered by any third party except Symmorphix.

b. To the extent required by existing AKTA Employee Agreements with any Symmorphix personnel, Symmorphix grants to AKTA a non-assignable, non-transferable, non-exclusive, perpetual, royalty-free license to any rights of Symmorphix under any patents issues based on any patent applications filed before January 1, 2001, for inventions, improvements, or enhancements developed by Symmoprhix relating to sputtered silicon deposition technology, provided that AKTA shall not utilize such rights to pursue a business of providing Services the same product objectives concerning flat panel displays as Symmorphix. Notwithstanding the generality of the foregoing, AKTA shall be authorized to assign or transfer any or all of the above license to one or more of AKTA's parent entities, with the same restriction on competition with the Services provided by Symmorphix, and AKTA's customers may use equipment provided by

COMPLAINT FOR DECLARATORY
JUDGMENT

AKTA incorporating inventions licensed to AKTA hereunder without further consideration.

79. On information and belief, as described, the purpose of the additional lead-in language at paragraph 3(b)—"To the extent required by existing AKTA Employee Agreements with any Symmorphix personnel"—was to further limit the scope of the license from Symmorphix back to Applied Komatsu and its parent subsidiaries (*e.g.,* Applied) to only inventions derived from former Applied Komatsu employees, and not from Symmorphix employees who did not come from Applied Komatsu.

80. On information and belief, the lead-in language was proposed by Symmorphix at the suggestion of Symmorphix's corporate counsel, Michael Danaher, and intended to limit the scope of the license to inventions derive from the former Applied Komatsu employees having invention assignment provisions in their Employment Agreements.  On information and belief, Symmorphix, including its executives and founders Bob Conner and Dr. Demaray, understood this to be the intent of the lead-in-language, and communicated this intent to AKT in renegotiating the provisions of Original Exhibit C.

81. On information and belief, Symmorphix, including its executives and founders Bob Conner and Dr. Demaray, understood that the intent of the lead-in language was **not** to condition the license grant in Paragraph 3(b) to the validity or enforceability of the assignment provisions in the employment agreements of the former Applied Komatsu employees.  On information and belief, Symmorphix never communicated to AKT that the intent of the lead-in language was to condition the license grant in Paragraph 3(b) to the validity or enforceability of the assignment provisions in the employment agreements of the former Applied Komatsu employees.

82. On information and belief, the parties already bargained for the release of the assignment provisions in the employment agreements as part of the SRA, as confirmed by Dr. Demaray's sworn declaration.  Ex. M at ¶ 6.  While Dr. Demaray's declaration acknowledged the bargained for

COMPLAINT FOR DECLARATORY JUDGMENT

release, Dr. Demaray ignores the clause within the release that makes clear that Applied Komatsu

retains the rights in the license granted in the license provision of Section 3 of Exhibit C:

> Notwithstanding the presumption, contained within those certain written
> agreements with AKTA, that AKTA owns all inventions disclosed by AKTA
> employees and related to the work done for AKTA after leaving AKTA
> employment, the parties hereto agree that:
>
> …
>
> • AKTA does not own and shall not claim any right (**other than the license
>   grant to AKTA detailed in Section 3 of this Exhibit C of this
>   Agreement**) to intellectual property developed by Symmorphix on or after
>   January 1, 1999;
>
> …

Ex. J, ¶ 4 (emphasis added); *compare* Ex. K (unchanged in Modified Exhibit C).

83. On information and belief, following the execution of the Modified Exhibit C to the SRA,

the license granted by Symmorphix to Applied Komatsu and Applied remained valid and

enforceable up and through present day, and provides a license to Applied to the Asserted Patents

which also covers the use by Applied's customers of Applied's equipment.

84. On information and belief, no Court, including the District Court of the Northern District

of California in *Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. (Shanghai) Co.,* 630

F. Supp. 2d 1084, 1090 (N.D. Cal. May 20, 2009), has found the license granted by Symmorphix

to Applied Komatsu invalid, void or unenforceable.

85. On information and belief, the SRA was negotiated between two sophisticated commercial

entities, represented by counsel, that entered into an arms' length commercial contract permitting

Symmorphix to continue using Applied Komatsu's equipment and intellectual property to develop

its own, provided that certain rights, including a license to certain Symmorphix patents (which

include the later filed and issued Asserted Patents), be granted to Applied Komatsu in return.

86. On information and belief, the rights and benefits granted to Symmorphix that it bargained

for in the SRA facilitated the conception and reduction to practice of the alleged inventions filed

COMPLAINT FOR DECLARATORY
JUDGMENT

for on March 16, 2002, in U.S. Patent Application No. 10/101,863 ("'863 Application"), naming Richard E. Demaray, Hongmei Zhang, Mukundan Narasimhan, and Ravi Mullapudi as named inventors.

87. On October 1, 2004, U.S. Patent Application No. 10/954,182 was filed as a continuation application of the '863 Application naming Richard E. Demaray, Hongmei Zhang, Mukundan Narasimhan, and Ravi Mullapudi as named inventors. On June 3, 2008, this application issued as U.S. Patent No. 7,381,657. A true and correct copy of the '657 patent is attached hereto as Exhibit O.

88. On September 16, 2005, U.S. Patent Application No. 11/228,834 was filed as a divisional application of the '863 Application naming Richard E. Demaray, Hongmei Zhang, Mukundan Narasimhan, and Ravi Mullapudi as named inventors. On June 9, 2009, this application issued as U.S. Patent No. 7,544,276. A true and correct copy of the '276 patent is attached hereto as Exhibit P.

89. On information and belief, one or more of the named inventors who left Applied Komatsu to work at Symmorphix, including at least Ravi Mullapudi, had the following assignment provision in their Applied Komatsu Employee Agreement, such that the '657 patent and the '276 patent (the Asserted Patents) fall within the scope of the license granted to Applied Komatsu under paragraph 3(b) of Modified Exhibit C:

> In case any invention is described in a patent application or is disclosed to third parties by me after terminating my employment with [Applied Komatsu], it is to be presumed that the invention was conceived or made during the period of my employment for [Applied Komatsu], and the invention will be assigned to [Applied Komatsu] as provided by this Agreement, provided it relates to my work with [Applied Komatsu] or any of its subsidiaries.

90. On information and belief, Mukundan Narasimhan ("Narasimhan"), one of the other named inventors, left Applied to join Symmorphix on April 16, 2001. On information and belief,

Narasimhan worked on sputtered silicon deposition technology at Applied prior to joining Symmorphix.   Narasimhan's Employee Agreement with Applied contains the following assignment provision:

> In case any invention is described in a patent application or is disclosed to third parties by me within one (1) year after terminating my employment with APPLIED, it is to be presumed that the invention was conceived or made during the period of my employment for APPLIED, and the invention will be assigned to APPLIED as provided by this Agreement, provided it relates to my work with APPLIED or any of its subsidiaries.

The Asserted Patents claim priority to the '863 Application, which was filed on March 16, 2002, and within one year of Narasimhan terminating his employment with Applied.

### FIRST COUNT
### (Declaration of Non-Infringement of U.S. Patent No. 7,544,276)

91. Applied restates and incorporates by reference all allegations in this Complaint as if fully set forth herein.

92. Demaray claims to own all rights, title, and interest, including the right to seek damages for past, present, and future infringement thereof, in the '276 patent.

93. Under the totality of the evidence and the facts that exist today, which include: (i) the commercial realities of the relationship between Applied and its customers using Applied's products; (ii) Demaray's exclusive reliance on Applied's products in the Customer Complaints; (iii) Demaray's infringement contentions in the Customer Suits; (iv) Applied's customers' confirmation that they do not perform the post-installation modifications to Applied's reactors that Demaray contended took place; (v) Demaray's refusal to grant Applied a covenant not to sue; (vi) Demaray's refusal to inform Applied or the Court in the DJ Action whether it will assert compulsory counterclaims; (vii) Demaray's requests to obtain discovery from Applied to determine if Applied allegedly infringes; (viii) Demaray's serving of subpoenas to Applied for discovery regarding the reactors it supplies to Intel and Samsung, including Applied's configurations of the

COMPLAINT FOR DECLARATORY JUDGMENT

hardware components Demaray previously alleged that Intel and Samsung configures on their own; and (ix) Demaray's representations in the Customer Suits that the discovery from Applied is necessary to determine which reactors allegedly infringe—there is a substantial, immediate, and real controversy that exists between Applied and Demaray regarding whether Applied and Applied's reactors infringe or have infringed the '276 patent. A judicial declaration is necessary to determine the parties' respective rights regarding the '276 patent.

94. Applied's reactors in the Endura product line that have been identified and accused in the Customer Suits do not directly or indirectly infringe any claim of the '276 patent. To the best of Applied's knowledge, no third party, including Intel, Samsung and any other customer of Applied, infringes any claim of the '276 patent by using Applied's reactors in the Endura product line. Applied has not caused, directed, requested, or facilitated any such infringement, much less with specific intent to do so. Applied's reactors in the Endura product line are not designed for use in any combination which infringes any claim of the '276 patent. To the contrary, each is a product with substantial uses that does not infringe any claim of the '276 patent.

95. Applied seeks a judgment declaring that Applied's reactors, including those in the Endura product line, do not directly or indirectly infringe any claim of the '276 patent. In its complaints against Applied's customers, Demaray cites to Applied's Endura products as purported evidence of infringement of claim 1 of the '276 patent. Based on Applied's present understanding of claim 1 of the '276 patent and Demaray's allegations, Applied's Endura products fail to meet or embody limitations of claim 1 of the '276 patent. For example, claim 1 recites a reactor comprising, in part, "a pulsed DC power supply coupled to the target area" and "a narrow band-rejection filter that rejects at a frequency of the [RF] bias power supply coupled between the pulsed DC power supply and the target area." Applied's Endura products do not infringe claim 1 of the '276 patent at least because these products do not meet or embody a reactor comprising "a pulsed DC power supply

COMPLAINT FOR DECLARATORY
JUDGMENT

coupled to the target area" and/or "a narrow band-rejection filter that rejects at a frequency of the [RF] bias power supply coupled between the pulsed DC power supply and the target area."

## SECOND COUNT
### (Declaration of Non-Infringement of U.S. Patent No. 7,381,657)

96. Applied restates and incorporates by reference all allegations in this Complaint as if fully set forth herein.

97. Demaray claims to own all rights, title, and interest, including the right to seek damages for past, present, and future infringement thereof, in the '657 patent.

98. Under the totality of the evidence and the facts that exist today, which include: (i) the commercial realities of the relationship between Applied and its customers using Applied's products; (ii) Demaray's exclusive reliance on Applied's products in the Customer Complaints; (iii) Demaray's infringement contentions in the Customer Suits; (iv) Applied's customers' confirmation that they do not perform the post-installation modifications to Applied's reactors that Demaray contended took place; (v) Demaray's refusal to grant Applied a covenant not to sue; (vi) Demaray's refusal to inform Applied or the Court in the DJ Action whether it will assert compulsory counterclaims; (vii) Demaray's requests to obtain discovery from Applied to determine if Applied allegedly infringes; (viii) Demaray's serving of subpoenas to Applied for discovery regarding the reactors it supplies to Intel and Samsung, including Applied's configurations of the hardware components Demaray previously alleged that Intel and Samsung configures on their own; and (ix) Demaray's representations in the Customer Suits that the discovery from Applied is necessary to determine which reactors allegedly infringe—there is a substantial, immediate, and real controversy that exists between Applied and Demaray regarding whether Applied and Applied's reactors infringe or have infringed the '657 patent.  A judicial declaration is necessary to determine the parties' respective rights regarding the '657 patent.

COMPLAINT FOR DECLARATORY JUDGMENT

99. Applied's reactors in the Endura product line that have been identified and accused in the Customer Suits do not directly or indirectly infringe any claim of the '657 patent. To the best of Applied's knowledge, no third party, including Intel, Samsung and any other customer of Applied, infringes any claim of the ' 657 patent by using Applied's reactors in the Endura product line. Applied has not caused, directed, requested, or facilitated any such infringement, much less with specific intent to do so. Applied's reactors in the Endura product line are not designed for use in any combination which infringes any claim of the '657 patent. To the contrary, each is a product with substantial uses that does not infringe any claim of the '657 patent.

100.      Applied seeks a judgment declaring that Applied's reactors, including those in the Endura product line, do not directly or indirectly infringe any claim of the '657 patent. In its complaints against Applied's customers, Demaray cites to Applied's Endura products as purported evidence of infringement of claim 1 of the '657 patent. Based on Applied's present understanding of claim 1 of the '657 patent and Demaray's allegations, Applied's Endura products fail to meet or embody steps of the method recited in claim 1 of the '657 patent. For example, claim 1 recites a method comprising, in part, "providing pulsed DC power to the target through a narrow band rejection filter such that the target alternates between positive and negative voltages" and "providing an RF bias at a frequency that corresponds to the narrow band rejection filter to the substrate." Using Applied's Endura products does not infringe claim 1 of the '657 patent at least because these products do not comprise "providing pulsed DC power to the target through a narrow band rejection filter such that the target alternates between positive and negative voltages" and/or "providing an RF bias at a frequency that corresponds to the narrow band rejection filter to the substrate."

**THIRD COUNT**
**(Declaration of Non-Infringement Based on License)**

COMPLAINT FOR DECLARATORY
JUDGMENT

101.     Applied restates and incorporates by reference all allegations in this Complaint as if fully set forth herein.

102.     A substantial, immediate, and real controversy exists between Applied and Demaray regarding whether Applied's reactors infringe or have infringed the Asserted Patents. A judicial declaration is necessary to determine the parties' respective rights regarding the Asserted Patents.

103.     Applied has a perpetual, royalty-free license to the Asserted Patents pursuant to the terms of the SRA between Applied Komatsu and Symmorphix.

104.     Applied Komatsu and Symmorphix executed the SRA and Modified Exhibit C, agreeing that Symmorphix grants Applied Komatsu a perpetual, royalty-free license to Symmorphix's patents "based on any patent applications filed for inventions, improvements, or enhancements developed by Symmorphix relating to sputtered silicon deposition technology." Ex. K at ¶ 3(b). The Asserted Patents relate to sputtered silicon deposition technology. Further, Applied Komatsu is authorized to assign or transfer its license to any of Applied Komatsu's parent entities, including Applied. *Id*.

105.     The SRA limits the scope of the license grant to those patents invented by former Applied Komatsu employees having assignment provisions in their Employment Agreements for which the parties negotiated a release in paragraph 4 of Exhibit C, subject to Applied Komatsu receiving the license rights provided in paragraph 3(b). *Id*. On information and belief, at least named inventor Ravi Mullapudi had an Applied Komatsu Employee Agreements with the following provision:

> In case any invention is described in a patent application or is disclosed to third parties by me after terminating my employment with [Applied Komatsu], it is to be presumed that the invention was conceived or made during the period of my employment for [Applied Komatsu], and the invention will be assigned to [Applied Komatsu] as provided by this Agreement, provided it relates to my work with [Applied Komatsu] or any of its subsidiaries.

COMPLAINT FOR DECLARATORY
JUDGMENT

106.     The Asserted Patents relate to sputtered silicon deposition technology, and all four named inventors are former Applied or Applied Komatsu employees. Applied is a parent entity of Applied Komatsu. Under the terms of Modified Exhibit C, Applied has a perpetual, royalty-free license to the Asserted Patents.

107.     Thus, Applied holds a non-exclusive, perpetual, royalty free license to the Asserted Patents by virtue of the Sales and Relationship Agreement, and its amendments, between Applied Komatsu and Symmorphix. Further, Applied's customers' use of Applied's products incorporating Applied's license without further consideration are similarly permitted under of the Sales and Relationship Agreement, and its amendments.

108.     Accordingly, Applied seeks a declaration that Applied holds a non-exclusive, perpetual, royalty free license to the Asserted Patents and thus, Applied's products cannot infringe.

### FOURTH COUNT
**(Declaration of Non-Infringement Based on Assignment of Rights to Applied and Demaray's Failure to Join All Co-Owners)**

109.     Applied restates and incorporates by reference all allegations in this Complaint as if fully set forth herein.

110.     A substantial, immediate, and real controversy exists between Applied and Demaray regarding whether Applied's reactors infringe or have infringed the Asserted Patents. A judicial declaration is necessary to determine the parties' respective rights regarding the Asserted Patents.

111.     On information and belief, Narasimhan, one of the named inventors of the Asserted Patents, left Applied to join Symmorphix on April 16, 2001. On information and belief, Narasimhan's Employment Agreement contains the following assignment provision:

> **In case any invention is described in a patent application or is disclosed to third parties by me within one (1) year after terminating my employment** with APPLIED, it is to be presumed that the invention was conceived or made during the period of my employment for APPLIED, and **the invention will be assigned to APPLIED as provided by this Agreement**, provided it relates to my work with APPLIED or any of its subsidiaries.

112.     On March 16, 2002, the '863 Application, the parent patent application to the Asserted Patents, was filed naming Narasimhan as one of the named inventors. The '863 Application was filed less than one year after Narasimhan's termination from Applied. On information and belief, at Symmorphix, the named inventors continued their development work from their time at Applied or Applied Komatsu related to sputtered silicon deposition technology using confidential information, intellectual property and equipment of Applied or Applied Komatsu.

113.     On information and belief, Mr. Narasimhan's Applied Employment Agreement further provides:

> **I agree that all inventions**, copyrightable works and confidential information (including but not limited to new contributions, improvements, ideas or discoveries, whether patentable or not and computer source code and documentation) **produced, conceived**, made or first actually reduced to practice **by me solely or jointly with others** during the period of my employment with APPLIED (the foregoing are subsequently referred to as Creative Works), **are hereby assigned to APPLIED and shall be the exclusive property of APPLIED**.

114.     On information and belief, based on Demaray's interpretation of the Asserted Patents in alleging infringement in the Customer Suits against Applied's customers based on their use of Applied's physical vapor deposition (PVD) reactors used for the deposition of titanium nitride and tantalum nitride, to the extent Narasimhan conceived, made or first actually reduce to practice the purported inventions of the Asserted Patents, Narasimhan did so during the period of his employment with Applied.

115.     On information and belief, Narasimhan's assignment obligations to Applied in Applied's Employment Agreement automatically assigned Narasimhan's ownership rights in the Asserted Patents to Applied.

116.     On information and belief, no Court, including the District Court of the Northern District of California in *Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. (Shanghai)*

COMPLAINT FOR DECLARATORY JUDGMENT

*Co.,* 630 F. Supp. 2d 1084, 1090 (N.D. Cal. May 20, 2009), has addressed whether Narasimhan's assignment agreement in his Employment Agreement, including as it pertains to the assignment of inventions conceived, made or first actually reduced to practice during his employment at Applied or by using Applied's confidential information, is invalid, void or unenforceable.

117.     Thus, Applied's products cannot infringe the Asserted Patents because the rights of named inventor, Narasimhan, in the Asserted Patents were assigned to Applied, making Applied at least a co-owner of the Asserted Patents that has not joined and will not join Demaray in alleging infringement of the Asserted Patents.

118.     Demaray cannot bring a claim of infringement of the Asserted Patents and is not entitled to any relief without joining all co-owners. As such, Applied seeks a declaration that Applied's products cannot infringe the Asserted Patents because not all co-owners are joined.

## **PRAYER FOR RELIEF**

WHEREFORE, Applied prays for judgment and relief as follows:

A.   Declaring that Applied's products, including those used in the Endura product line, do not directly or indirectly infringe any claim of the '276 patent and enjoining Demaray, its officers, agents, employees, attorneys, and all persons in active concert or participation with them, from directly or indirectly charging infringement, or instituting further action for infringement, of the to the '276 patents against Applied or any of its customers;

B.   Declaring that Applied's products, including those used in the Endura product line, do not directly or indirectly infringe any claim of the '657 patent and enjoining Demaray, its officers, agents, employees, attorneys, and all persons in active concert or participation with them, from directly or indirectly charging infringement, or instituting further action for infringement, of the to the'657 patent against Applied or any of its customers;

COMPLAINT FOR DECLARATORY
JUDGMENT

C.  Declaring that Applied holds a non-exclusive, perpetual, royalty free license to the Asserted Patents and thus, Applied's reactors cannot infringe the Asserted Patents, and enjoining Demaray, its officers, agents, employees, attorneys, and all persons in active concert or participation with them, from directly or indirectly charging infringement, or instituting further action for infringement, of the to the Asserted Patents against Applied or any of its customers based on Applied's license;

D.  Declaring that that Applied's products cannot infringe the Asserted Patents because the rights of named inventor, Mukundan Narasimhan, in the Asserted Patents were assigned to Applied, making Applied at least a co-owner of the Asserted Patents that has not joined and will not join Demaray in alleging infringement of the Asserted Patents;

E.  Finding that this is an exceptional case under 35 U.S.C. § 285;

F.  Awarding Applied its costs and attorneys' fees in connection with this action; and

G.  Such further and additional relief as the Court deems just and proper.

### JURY DEMAND

Applied demands a jury trial on all issues and claims so triable.

DATED:  December 24, 2020

YAR R. CHAIKOVSKY
PHILIP OU
JOSEPH J. RUMPLER, II
BERKELEY FIFE
BORIS LUBARSKY
PAUL HASTINGS LLP


By: */s/ Yar R. Chaikovsky*
　　　YAR R. CHAIKOVSKY

Attorneys for Plaintiff
APPLIED MATERIALS

COMPLAINT FOR DECLARATORY JUDGMENT