YAR R. CHAIKOVSKY (SB# 175421)
yarchaikovsky@paulhastings.com
PHILIP OU (SB# 259896)
philipou@paulhastings.com
JOSEPH J. RUMPLER, II (SB# 296941)
josephrumpler@paulhastings.com
DAVID OKANO (SB# 278485)
davidokano@paulhastings.com
ANDY LEGOLVAN (SB# 292520)
andylegolvan@paulhastings.com
BORIS LUBARSKY (SB# 324896)
borislubarsky@paulhastings.com
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, California  94304-1106
Telephone:  1(650) 320-1800
Facsimile:  1(650) 320-1900

MATTHIAS KAMBER (SB#232147)
matthiaskamber@paulhastings.com
PAUL HASTINGS LLP
101 California Street, 48th Floor
San Francisco, California  94111
Telephone:  1(415) 856-7000
Facsimile:  1(415) 856-7100

Attorneys for Plaintiff
APPLIED MATERIALS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLIED MATERIALS, INC., | CASE NO. 5:20-cv-09341-EJD |
| Plaintiff, | **PLAINTIFF APPLIED MATERIALS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** |
| vs. | |
| DEMARAY LLC, | |
| Defendant. | |

# Table of Contents

**Page**

I.      Background of the Patents-in-Suit ................................................................. 1

II.     WDTX Claim Constructions..........................................................................3

III.    Claim Terms With Disputed Constructions ................................................... 4

    A.      "narrow band rejection filter" ............................................................... 4

        1.      Repeated and Consistent Statements Define the Claimed "NBRF" .......... 4

        2.      Demaray's Purported Plain and Ordinary Meaning Interpretation Conflicts With Patentee's Repeated and Consistent Statements on Not Distorting the Shape of the "Pulsed DC Power".................................. 6

        3.      Applied's Proposal is Consistent with NBRF's Plain Meaning ................. 8

    B.      "pulsed DC [power/power supply]"........................................................ 8

        1.      "Oscillating" in the Parties' Competing Constructions Must Connote More Than "Alternating" or "Changing" ................................... 10

        2.      "pulsed DC power" is "in the form of a square wave" ........................... 12

        3.      Demaray's Proposed Constructions Should Be Rejected ........................ 14

        4.      Demaray's Proposals Appear to be an Attempt at Capturing Conventional DC Power Supplies it Disclaimed ..................................... 15

    C.      "a method of depositing an insulating film on a substrate, comprising:"............ 16

    D.      "the insulating film"............................................................................. 18

    E.      "wherein an oxide material is deposited on the substrate, and the insulating film is formed by reactive sputtering in a mode between a metallic mode and a poison mode"................................................................................ 18

        1.      The Claims Support Applied's Plain and Ordinary Meaning .................. 19

        2.      Patentee's Repeated and Consistent Statements in the Specification Support Applied's Plain and Ordinary Meaning...................................... 20

        3.      Patentee's Lexicography of "Poison Mode" Supports Applied's Plain and Ordinary Meaning ............................................................... 21

        4.      Patentee's Claim Amendments to Overcome Prior Art During Prosecution Further Confirms Applied's Plain and Ordinary Meaning ............................................................................................ 22

    F.      "insulating substrate" ......................................................................... 23

        1.      Demaray's Proposal To Not Construe the Term Should Be Rejected ...... 23

        2.      Applied's Proposal Should Be Adopted ................................................ 24

i

1

# **TABLE OF AUTHORITIES\***

2

Page(s)

3

**Cases**

4

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,

5

    967 F.3d 1353 (Fed. Cir. 2020)..................................................................................................17

6

*Capella Photonics, Inc. v. Ciena Corp.*,

    546 F. Supp. 3d 977 (N.D. Cal. 2021) .......................................................................................4

7

*Comcast Cable Communs. Corp. v. Finisar Corp.*,

8

    No. C 06-04206 WHA, 2007 U.S. Dist. LEXIS 28994 (N.D. Cal. Apr. 6, 2007) ......................4

9

*Dippin' Dots, Inc. v. Mosey*,

10

    476 F.3d 1337 (Fed. Cir. 2007)..................................................................................................6

11

*Edwards Lifesciences LLC v. Cook Inc.*,

    582 F.3d 1322 (Fed. Cir. 2009)................................................................................................22

12

*GPNE Corp. v. Apple Inc.*,

13

    830 F.3d 1365 (Fed. Cir. 2016)..........................................................................................12, 20

14

*Hoffer v. Microsoft Corp.*,

15

    405 F.3d 1326 (Fed. Cir. 2005)................................................................................................20

16

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,

    22 F.4th 1369 (Fed. Cir. 2022)................................................................................................22

17

*Lenovo Holding Co., Inc. v. DoDots Licensing Sols. LLC*,

18

    No. 2021-1247, 2021 WL 5822248 (Fed. Cir. 2021) ...............................................................22

19

*O2 Micro, Int'l Ltd. v. Beyond Innovation Tech. Co.*,

20

    521 F.3d 1351 (Fed. Cir. 2008).....................................................................................4, 11, 19

21

*Personalized Media Communs., LLC v. Apple Inc.*,

    952 F.3d 1336 (Fed. Cir. 2020)..................................................................................................5

22

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,

23

    182 F.3d 1298 (Fed. Cir. 1999)................................................................................................17

24

*Poly-America, L.P. v. API Indus., Inc.*,

    839 F.3d 1131 (Fed. Cir. 2016)................................................................................................21

25

*Power Mosfet Techs. L.L.C. v. Siemens AG*,

26

    378 F.3d 1396 (Fed. Cir. 2004)..................................................................................................6

27

*Southwall Techs., Inc. v. Cardinal IG Co.*,

28

    54 F.3d 1570 (Fed. Cir. 1995)..................................................................................................16

**Table of Contents**
(continued)

*TomTom, Inc. v. Adolph*,
 790 F.3d 1315 (Fed. Cir. 2015) ...........................................................................17, 18

*TVIIM, LLC v. McAfee, Inc.*,
 851 F.3d 1356 (Fed Cir. 2017) ......................................................................................6

*Wasica Finance GmbH v. Continental Automotive Systems, Inc.*,
 853 F.3d 1272 (Fed. Cir. 2017) ...................................................................................15

*Unless otherwise noted, internal citations and subsequent history are omitted; emphasis added.

I.   **BACKGROUND OF THE PATENTS-IN-SUIT**

U.S. Patent Nos. 7,544,276 ('276 patent, Ex. 1) and 7,381,657 ('657 patent, Ex. 2)—both titled "Biased Pulse DC Reactive Sputtering of Oxide Films"—concern physical vapor deposition ("PVD") reactors and methods for film deposition.  By the patentee's own admission, they "do not cover all PVD reactor configurations" but are directed to "a particular PVD configuration" for "reactive magnetron sputtering" (Ex. 3 at ¶¶ 12, 9) with three specific elements in all claims:

- a ***pulsed DC power*** coupled to the target area,
- an ***RF bias*** coupled to the substrate, and
- a ***narrow band rejection filter*** **("NBRF")** that rejects at a frequency of the RF bias coupled between the pulsed DC power and the target area.

*See e.g.,* Ex. 4 (-00103 IPR POPR) at 9.  These three elements are highly interrelated as the extensive prosecution record shows.  As claimed, the NBRF is coupled "between" the pulsed DC power supply and target (*see* '276 patent at cl. 1, Fig. 1A),[1] and thus, for the pulsed DC power to reach the target, it must pass through, and not be rejected by the NBRF.  *See* '276 patent at Fig. 1A (shown to the right, annotated to highlight these



three interrelated claim elements (pulsed DC power supply 14, narrow band rejection filter 15, and RF power supply 18) and pulsed DC power passing through the filter 15 to reach target 12).

The issued claims, in fact, are materially different from those first presented to the Patent Office in the parent application (U.S. Patent Application No. 10/101,863, now U.S Patent No. 7,378,356 (hereafter "'356")).  None of the original claims recited an ***RF bias*** or a ***narrow band rejection filter***.  Ex. 5 ('356 FH) at 36-39.  Most original claims did not even recite any filter.  *Id.*

---

[1] *See also* '657 patent, cls. 1, 2 ("providing pulsed DC power to the target ***through*** a [NBRF]")

In its very first Office Action ("OA") Response, the patentee amended all of the claims so that every claim required a ***filter*** (Ex. 5 at 185-87).  In its next OA Response, the patentee added an ***RF bias*** requirement for every claim.  *Id*. at 659-661.  The patentee then amended claims to recite "a ***band rejection filter*** at a frequency of the bias power" (*id.* at 1126), and stated that the claimed "***filter*** protect[s] the ***pulsed DC*** power supply from the ***RF power of the bias***" and "must pass the ***pulsed DC*** signal without unduly affecting the shape of that signal."  *Id*. at 1130.  That OA Response included a declaration from Demaray's principal and named inventor, Dr. Demaray, attesting to the band rejection filter, the frequencies it rejects and those it passes, the pulsed DC power supply and its waveform shape, and the interrelatedness of these elements:

> My co-inventors and I developed the band-rejection filter described in the specification and claimed in U.S. Application Serial No. 10/101, 863 to overcome the problem of catastrophic failure of the pulsed-DC power supply output electrometer circuit during operation. We discovered that a ***band-rejection filter***, which is ***a filter that passes all of the frequencies of the square wave power supply except within a narrow band centered on the RF frequency of the RF bias***, protected the ***pulsed-DC power supply*** from the RF energy while not distorting the pulses generated by the pulsed-DC power supply applied to the target.

*Id.* at 1134 (¶ 4); *see also* Ex. 6.

Dr. Demaray represented that other filters that do *not* pass all frequencies except within a narrow band centered on the RF bias frequency "will not protect the pulsed-DC power supply from the RF bias and will also unduly distort the square-wave of the pulsed-DC power signal applied to the target, which detrimentally affects the deposition conditions."  Ex. 5 at 1134 (¶ 3). The OA Response reiterated these very same points.  *Id*. at 1130-31.

With the claims still rejected, the patentee secured an interview with the Examiner (Ex. 5 at 1294) in which, Dr. Demaray and co-inventor Hongmei Zhang "described … the development of the invention, including the development of applicant's pulsed-DC processing technology" and "discussed amending the claims to clarify the distinctions between the claimed invention" and the prior art.  *Id*. at 1301.  These amendments, filed right after the interview, included adding new

claims reciting "a ***narrow*** band rejection filter" (*id.* at 1299).  The patentee's OA Response

further reiterated the interrelatedness of these three primary elements:

> [A] narrow band rejection filter … both ***protects the DC power supply from the RF bias power*** and ***passes the pulsed DC frequencies which form the square pulse of the pulsed DC power*** to the target ***so that the benefits of pulsed DC deposition with RF bias can be realized***.

*Id*. at 1302-03; *see also id.* at 1307 (square wave DC pulse is formed of all frequencies both

higher and lower than the biased frequency that the filter rejects; filter prevents distortion of

pulse).  The patentee explained that the "***narrow*** band rejection filter has a small effect on the

square shape of the pulsed DC pulse," in contrast to filters that reject frequencies outside a narrow

band, thus "effectively destroying the shape of the square pulse …." *Id*. at 1303.

By amending the claims in the '276 patent application to recite "narrow band-rejection

filter" and "RF bias" (Ex. 7 ('276 FH) at 326) and cancelling claims that did not recite these

elements (*id*. at 420-422), the '276 claims were finally allowed.  The '657 claims were also

allowed only after similar amendments.  Ex. 8 ('657 FH) at 970-74.

The record is clear that the issued claims cover the "particular PVD configuration,"

described above.  Yet, Demaray's proposed constructions seek to capture a much broader set of

configurations—including ones that use a continuous (and not pulsed) DC power supply and

filters that reject more than just a narrow band of frequencies—a scope that the patentee gave up

during prosecution.  It is in light of this record that the claims are to be construed.

## II.     **WDTX CLAIM CONSTRUCTIONS**

In co-pending litigations in the Western District of Texas against Applied's customers, the

Texas Court held claim construction proceedings on the same disputed terms.  Although the

Texas Court found that most of the terms should be construed to have their plain and ordinary

meaning, it acknowledged that to the extent Demaray was not applying the plain and ordinary

meaning of a term, that dispute should be raised during summary judgment after Demaray had

made its infringement theory concrete in its final infringement contentions and/or expert reports, which is several months away.  Ex 9 (WDTX 8/17/21 Markman Hearing Tr.) at 13:7-19, 14:1-12.

Notwithstanding the claim construction proceedings by the Texas Court, Applied respectfully submits that this Court can (and should) resolve these claim construction disputes now.  *O2 Micro, Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of [asserted] claims, the court, not the jury, must resolve that dispute.").  Moreover, this Court is not bound by the plain and ordinary meaning or other claim constructions of the Texas Court.  *See Capella Photonics, Inc. v. Ciena Corp.*, 546 F. Supp. 3d 977, 983 (N.D. Cal. 2021) ("The prior constructions of other district courts are entitled to reasoned deference, with such deference turning on the persuasiveness of the order; in the end, [however, the Court] will render its own independent claim construction.") (internal quotations omitted) (alterations in original); *Comcast Cable Communs. Corp. v. Finisar Corp.*, No. C 06-04206 WHA, 2007 U.S. Dist. LEXIS 28994, at *7 (N.D. Cal. Apr. 6, 2007) (construing claim terms differently than prior construction by Eastern District of Texas holding "[i]n this order, the **Texas Court's claim constructions will be considered only for their persuasive value.**")

## III.   CLAIM TERMS WITH DISPUTED CONSTRUCTIONS

### A.   "narrow band rejection filter" ('276 pat., cls. 1, 6; '657 pat., cls. 1, 2)

| Applied's Proposal | Demaray's Proposal |
|---|---|
| "filter that passes all of the frequencies of the power supply except within a narrow band" | Plain and ordinary meaning |

#### 1.   Repeated and Consistent Statements Define the Claimed "NBRF"

The patentee repeatedly and consistently defined (1) during prosecution, (2) the Texas claim construction process, and (3) the recent *Inter Partes* Review ("IPR") proceedings, that the claimed NBRF "is a filter that passes all of the frequencies of the power supply except within a

narrow band." *Personalized Media Communs., LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) ("[A]n **applicant's repeated and consistent remarks during prosecution can define a claim term** by demonstrating how the inventor understood the invention.").

Dr. Demaray first defined the claimed filter in a 2006 declaration to the PTO: "a band rejection filter, which **_is_ a filter that passes all of the frequencies of the square wave power supply except within a narrow band** centered on the RF frequency of the RF bias." Ex. 6 at ¶ 4. This was not a one-off statement. Over the next sixteen months, in three separate PTO responses by the applicants, patentee repeatedly emphasized this definition:

- **June 12, 2006:** "The filter **must** pass the pulsed DC signal without unduly affecting the shape of that signal while rejecting the RF power [and] …. [t]herefore, the filter **passes all frequencies except for the frequency of the [substrate] bias itself**". Ex. 5 at 1130-31.

- **February 6, 2007:** "Applicants discovered that a narrow band rejection filter … **passes the pulsed DC frequencies which form the square pulse of the pulsed DC power** to the target so that the benefits of pulsed DC deposition with RF bias can be realized." *Id.* at 1302-03.

- **October 2, 2007:** "With a band rejection filter, **all of the pulsed DC power except that within the rejected band passes** to the target." *Id.* at 1387.

This definition was so clear that even Demaray **in litigation**—presumably relying on Dr. Demaray's PTO declaration—proposed before the Texas Court that NBRF be construed as "a filter that passes all of the frequencies of the power supply except within a narrow band". Ex. 10 (Jan. 8, 2021 Proposed Claim Constructions); Ex. 11 (Jan. 15, 2021 Extrinsic Evidence).[2]

---

[2] Demaray later changed its proposed construction to focus on what the filter rejects ("filter which rejects a narrow band of frequencies"), rather than what it passes, in order to improperly broaden the scope of the term. Ex. 10 at 7-8 ("Rejecting and passing frequencies are different subjects, and adding extraneous 'passing' limitations would be improper."). While not apparent from a

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

Demaray did not stop there.  Despite changing its position before the Texas Court, a month later in co-pending IPR proceedings, Demaray adopted the applicant's definition:

> The inventors explained during prosecution that the claimed filter "***is*** a filter that ***passes all of the frequencies of the [] power supply except within a narrow band*** centered on the RF frequency of the RF bias...." Ex. 1052 at 1130-31, 1134.

Ex. 4 at 24; *see also id.* at 12; Ex. 31 (-00104 IPR POPR) at 24, 57; *see TVIIM, LLC v. McAfee, Inc.*, 851 F.3d 1356, 1362 (Fed Cir. 2017) ("[T]erms must be construed the same way for the purpose of determining invalidity and infringement.").  Demaray's expert, Dr. Glew, also agreed with this definitional statement and applied this meaning in his opinions in those IPRs.  *See infra* at 7. Ex. 13 (IPR2021-00103, Ex. 1106) at 135:22-136:16.

### 2. **Demaray's Purported Plain and Ordinary Meaning Interpretation Conflicts With Patentee's Repeated and Consistent Statements on Not Distorting the Shape of the "Pulsed DC Power"**

Despite Demaray's repeated and consistent statements defining the NBRF as ***a filter that passes all of the frequencies of the square wave power supply except within a narrow band***, Demaray seeks to expand the scope of the term through its alleged plain and ordinary meaning construction.  Demaray's apparent position is that a NBRF can be a filter "that is also engineered to do other things" (Ex. 12 at 9)—including rejecting (not passing) **other** frequencies outside of the narrowband.  But, such an interpretation cannot comport with the patentee's repeated and

---

plain reading of this new construction, Demaray's intent was made clear through briefing before the Texas Court.  In it's reply, Demaray argued: "this is a 'comprising' claim and a filter that is directed at rejecting frequencies in narrowband, but that is also engineered to do other things as well (*e.g.,* a dual notch filter rejecting at a second frequency), certainly be encompassed by the claim term." *Id.* at 9.  But "[c]omprising, while permitting additional elements not required by a claim, does not remove the limitations that are present." *Power Mosfet Techs. L.L.C. v. Siemens AG*, 378 F.3d 1396, 1409 (Fed. Cir. 2004); *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007) ("[C]omprising is not a weasel word with which to abrogate claim limitations").

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

consistent statements that the NBRF must pass all frequencies outside of the narrow band so that "the square wave pulse of the DC power" can be "transmitted through the filter to the target" and the benefits of the "pulsed DC power" are "realized."  Ex. 5 at 1307 (if more than "a narrow band of frequencies" is blocked, "the benefits of the pulsed DC power are not realized").  As claimed (and shown above in annotated Fig. 1 (*see supra* at 1)), the NBRF is coupled "between" the pulsed DC power supply and the target.  Thus, in order for the pulsed DC power to reach the target, it must pass through the NBRF, and cannot be rejected or blocked by the NBRF.

"[P]ulsed DC power," as the patentee explained, is actually comprised of "many … constituent frequencies."  Ex. 5 at 1457; Ex. 32 (-00130 IPR, Ex. 2009) at ¶ 23 (Demaray's expert explaining this fact in co-pending IPR proceedings involving the patents-in-suit); *see also id.* at ¶¶ 24-27, 97, and 179.  According to the patentee, in "order for the pulsed DC power applied to the target to be useful, the pulsed DC power must include substantially all of" these "constituents."  Ex. 5 at 1386-87.  Thus, by using an NBRF that only rejects frequencies within a narrow band and passes all others outside that band, it "allows the square wave pulse of the DC power, **which is formed of all frequencies both higher and lower** than the biased frequency to be transmitted through the filter to the target."  *Id.* at 1307.

The patentee also repeatedly distinguished the NBRF from other filters, such as "band pass filters" and "low pass filters," which do not pass all frequencies outside a narrow band and thus "result[] in a distortion of the pulsed DC signal."  Ex. 5 at 1131 ("Fukui teaches a band pass filter, specifically a low-pass filter, which would not protect the DC power supply from RF and which would unreasonably distort the pulsed-dc shape . . . a band pass filter does not allow the broad frequency range required for the square wave of the pulsed-DC supply"); 1134 ("band-pass filter … will also unduly distort the square-wave of the pulsed DC power signal..."); 1135.  As the patentee explained, because these un-claimed filters "block[] a portion of the pulsed DC

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

1  frequency to the target," the "benefits of using pulsed DC are lost."  *Id.* at 1302.  Yet Demaray's

2  version of an NBRF "that is also engineered to do other things" could include each of these other

3  types of filters that Demaray distinguished—*e.g.,* a NBRF "that is also engineered" to reject all of

4  the frequencies lower than the narrow band is a low pass filter.  That cannot be correct.

### 3.   **Applied's Proposal is Consistent with NBRF's Plain Meaning**

5

6  Finally, aside from the patentee's repeated and consistent assertions that the NBRF must

7  pass all of the frequencies outside of the narrow band, that understanding of an NBRF is also

8  consistent with the term's plain meaning.  *See*, *e.g.*, Ex. 14 at 992 ("[a] band-rejection filter…is

9  … designed to pass energy at all frequencies, except within a certain range.").

10

11  Indeed, Dr. Glew admitted that "a narrow band rejection filter attenuates a certain band

12  and tries not to attenuate signals outside of that band" such that "the signal that is outside of the

13  narrow band in the frequency domain will largely pass through unattenuated."  Ex. 15 (2/17/22

14  Glew Tr.) at 43:7-16; *see also id*. at 59:6-23 (a filter that rejects between zero and 27 MHz but

15  "doesn't pass anything below 27 [MHz]" is not a band rejection filter), 292:9-13 ("So I

16  understand a filter circuit is a circuit that removes certain frequencies.  When it's not filtering,

17  then everything else **goes through**, albeit with certain imperfections.").

18

### B.   **"pulsed DC [power/power supply]" / ('657 pat., cls**. 1, 2; '276 pat., cls. 1, 6)

19

20

| | **Applied's Proposal** | **Demaray' Proposal** |
|---|---|---|
| "pulsed DC power" | "direct current power that *oscillates* *[e.g., having a frequency]* in the form of a square wave" | "direct current power that *oscillates* *[i.e., alternates]* between positive and negative voltages" |
| **Highlighted** language not part of proposed constructions but added to focus the dispute. | | |
| "[pulsed DC power] supply" | "supply for providing [direct current power that *oscillates* in the form of a square wave]" | "supply for providing pulsed **DC**[3] power" |

21

22

23

24

25

26  [3] This morning (Applied's filing deadline), Demaray revised its proposed construction for "pulsed

27  DC power supply" in its PLR 4-2 disclosures (Ex. 16) and the Joint Claim Construction

28  Statement (Dkt. No. 126) by adding "**DC**" to its construction of "supply for providing pulsed

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

The two primary disputes are: (1) what it means for direct current power to "oscillate", and (2) whether the "pulsed DC power" is in the form of a square wave.  As explained more fully below, Applied's proposed constructions comport with its plain meaning and intrinsic record, including Demaray's own definition of "pulsed DC power" made during prosecution to obtain allowance of the claims, and should therefore be adopted.  On the other hand, Demaray improperly seeks to expand the scope of the claimed configuration to cover PVD systems using *conventional* (and not *pulsed*) DC power supplies that may unexpectedly shut off on occasion (or even once or not at all during a PVD process).  Under Demaray's proposed constructions and application of those constructions to Applied's PVD products, these conventional DC power supplies may allegedly provide a "pulse" thereby qualifying them as "pulsed DC power supplies". In doing so, Demaray (through its tortured application), effectively removes "pulsed" from the claims.  Demaray's attempt to broaden the scope of these claim terms must be rejected.

The patentee knew the difference between DC power and ***pulsed*** DC power, and those differences were critical in distinguishing its PVD configuration from the prior art.  Conventional ***DC*** sputtering in the 1990s used *continuous* DC power with a feature that provided occasional shut down of the power at unexpected, non-predetermined times.  (Ex. 17 MDX Manual) at 0022 ("shutting the power off"); Ex. 18 (MDX Whitepaper)).The patentee explained that the films it sought to deposit were "almost ***impossible*** to deposit by ***conventional*** reactive ***DC*** magnetron sputtering." '657 patent, 4:49-53.  Instead, the patentee proposed using ***pulsed DC power***, which

---

[**DC**] power."  Counsel represented the omission was inadvertent, though Dr. Glew's testimony introduces ambiguity on this issue.  *Compare* Ex. 22 at ¶¶ 49-61: no affirmative opinion for "pulsed DC power supply," only "pulsed DC power") to Ex. 15 at 177 (opining that a POSITA would **not** understand the term "pulsed DC power supply" in the '276 patent to mean "supply for providing direct current power that oscillates between positive and negative voltages").

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

as admitted by Dr. Demaray, outputted a square-wave pulse and required a specific type of filter (the NBRF) to protect the power supply while maintaining this particular waveform.  Ex. 6 at ¶ 3. His defining of "pulsed DC" as "square wave" was not simply an exemplary implementation of a preferred embodiment—it was repeatedly made and relied upon in multiple office actions and statements to the Patent Office explaining how the alleged inventions overcame the prior art.  Demaray's expert, Dr. Glew, also agrees that **pulsed DC power** outputs a "roughly approximate" "square wave", as shown above Ex. 22 at ¶ 55.

Accordingly, the "pulsed DC power" terms should be construed to be in the form of a square wave that oscillates at regular intervals.

1.    **"Oscillating" in the Parties' Competing Constructions Must Connote More Than "Alternating" or "Changing"**

There is no dispute that (1) "pulsed DC power" is "direct current power that **oscillates**" and that, (2) as required by the express claim language, the "pulsed DC power" provides "alternating positive and negative voltages" to the target.  However, the parties appear to dispute what it means to "oscillate."  Based on Demaray's infringement contentions as to Applied products in its lawsuits against Applied's customers in Texas, and confirmed by the recent testimony of Dr. Glew, Demaray appears to contend that "pulsed DC power" (through its proposed construction requiring "direct power that oscillates…" simply requires change from one voltage to another, irrespective of whether it occurs only once, occasionally or with any frequency (e.g., at regular intervals).   *See* Ex. 15 at 212:18-24 (On cross-examination, Dr. Glew, explained: "This oscillation is bimodal or a binary oscillation.  Negative to positive to negative. That's all that's required.  It doesn't require that it go from one fixed negative value to one fixed positive value back to one fixed value, just that it goes negative, positive, negative."); *see also id.*

at 139:6-9 (Dr. Glew explaining that "[i]t can do it once, it can do it repeatedly.  They don't need to be different or the same time period so it can resemble something much more like a long rectangle than a square.").  Demaray's attempt to capture a conventional DC power supply with this shut-off feature by looking to whether it causes the target voltage to alternate between voltages—on (unexpected) occasion or even just once—cannot  reasonably be interpreted to mean "oscillation" under its plain and ordinary meaning and the intrinsic record.

      **First**, the plain meaning of "oscillates" includes alternating or changing (*e.g.,* at regular intervals or with a particular frequency).  Ex. 19 at 1414 ("any effect that varies periodically back and forth between two values").  Furthermore, the claims already recite "alternating positive and negative voltages" and thus "oscillates" must connote more than "alternating" or changing alone.

      **Second**, consistent with the plain meaning, the specification confirms that the "pulsed" aspect of "pulsed DC power supply" requires oscillation at a frequency and/or at regular intervals.  Indeed, the patentee repeatedly and consistently described "pulsed DC" with both frequency and reverse time (the time in the second or alternative voltage) (in other words, at regular intervals) — in contradiction to the random alleged "pulse" provided in conventional DC power supplies.  Notably, "pulsed DC" appears 31 times in the specification, and **each** time it has a frequency and reverse time.  *See,*'657 patent, 13:38-42 ("parameters of pulsed DC power supply 14 is set, including the power, frequency, and reverse pulsing time."); 2:66-3:2; 5:46-55; 11:8-10; 11:44-47; 14:58-59; 15:18-20; 21:40-41; 22:6-13; 22:30-33; 22:53-55; Tables 1A-1C, 2-4; Figs. 9-10.

      As both parties agree that "pulsed DC power" is at least "DC power that oscillates", to the extent Demaray confirms in its responsive brief there is an *O2 Micro* dispute as to the meaning of "oscillates" in both sides' proposed constructions (as Applied believes), for the reasons explained above, the Court should clarify the meaning of "oscillates" to require the changing at regular

1   intervals (*e.g.,* having a frequency) and/or clarify that "oscillates" requires more than alternating

2   or changing (once or sporadically) as already required by the claims.

3         2.    **"pulsed DC power" is "in the form of a square wave"**

4         a.    **Demaray Repeatedly Defined "Pulsed DC Power" in the Form of a "Square Wave"**

5

6       The patentee repeatedly and exclusively defined "pulsed DC power" in the form of a

7   "square" wave during prosecution of the asserted patents and co-pending IPR proceedings.

8   Demaray made clear that its alleged invention would not "unduly distort the ***square-wave of the***

9   ***pulsed DC signal***" and "detrimentally affect[] deposition conditions" in order to overcome prior

10  art rejections and obtain allowance of the claims.  Ex. 5 at 1134 (¶ 3).  The patentee was

11  consistent that providing that "***square wave pulse of the DC power*** … to the target" was

12  imperative: "[o]therwise, the pulse that would reach the target is distorted so that the benefits of

13  the pulsed DC power are not realized." *Id*. at 1307.  One would have to dismiss the entire record

14  of repeated and consistent statements to find a "square wave" is not required. *GPNE Corp. v.*

15  *Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016).

16

17      ***First***, Dr. Demaray himself ***equated*** "the ***pulsed-DC*** power supply" with "the ***square***

18  ***wave*** power supply" (Ex. 5 (June 7, 2006) at 1134 (¶ 4)) in his declaration to the PTO after

19  receiving multiple rejections (*see* Ex. 5 at 481-89; 674-76).  Similarly, during co-pending IPR

20  proceedings, Demaray equated the "***pulsed-DC power supply***" with "***the square wave power***

21  ***supply***." *See* Ex. 4 at 12.  Dr. Demaray stressed the importance of not "unduly distort[ing] the

22  ***square wave of the pulsed-DC power*** signal applied to the target, which detrimentally affects the

23  deposition conditions." Ex. 5 at 1134 (¶ 3); *see also id*. at 1135 (¶ 8) (distinguishing prior art

24  feature that "will distort the ***pulsed-DC square wave***").  The patentee relied on Dr. Demaray's

25  statements to distinguish prior art features it contended "do[] not allow the broad frequency range

26  ***required for the square wave of the pulsed-DC supply***." *Id*. (June 12, 2007) at 1131.

27

28

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

1

2

Indeed, during prosecution of the asserted patents, the patentee repeatedly characterized –

no less than 9 times – pulsed DC as having a "square" wave or shape:

3

4

5

6

> Applicants discovered that a narrow band rejection filter … passes the pulsed DC frequencies which form **the square pulse of the pulsed DC power** to the target *so that the benefits of pulsed DC deposition with RF bias can be realized*. The elimination of a narrow band of frequencies about a single frequency in a narrow band rejection filter has a small effect on **the square shape of the pulsed DC pulse**.

7

Ex. 5 at 1302-03; *see also id*. at 1294 and 1301.

8

9

b.    **Pulsed DC Power's "Square Wave" is Inextricably Tied to "Narrow Band Rejection Filter"**

10

As the patentee's repeated and consistent assertions to the Patent Office demonstrate, the

11

pulsed DC power's "square wave" fits hand in glove with the claimed "narrow band rejection

12

filter" feature of the alleged invention.  Specifically, the alleged invention requires an NBRF by

13

virtue of the pulsed DC power's "square wave" needing to pass through the filter to reach the

14

15

target  (*see*, *e.g.*, Ex. 5 at 1386-87, 1302-03).  As the patentee stated:

16

17

18

19

> [T]he recited "band rejection filter" works at the frequency of the RF bias supply and blocks only a narrow band of frequencies around the frequency of the RF bias supply.  This allows **the square wave pulse of the DC power** … to be transmitted through the filter to the target.  *Otherwise, the pulse that would reach the target is distorted so that the benefits of the pulsed DC power are not realized*.

20

*Id.* at 1307; *see also id*. at 1303 ("[t]he elimination of a narrow band of frequencies about a single

21

frequency in a narrow band rejection filter has a small effect on the square shape of the pulsed

22

DC pulse.").  As explained, "the *square wave pulse of the DC power* … is formed of all

23

frequencies both higher and lower than the biased frequency."  Ex. 5 at 1307.  This was reiterated

24

by Dr. Glew before the PTAB.  *See* Ex. 32 at ¶ 23 (explaining, with reference to page 1307 of Ex.

25

26

3, that "*the waveform for a DC pulse* can be understood as a mathematical composite of

27

sinusoidal waves, each having their own frequencies"); *see also id*. at ¶¶ 24-27, 97, 179

28

(addressing pulsed DC power's *square wave*).    Substantially all of those "frequencies"

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

constituting the pulsed DC square wave must pass through the filter, and accordingly demand the use of an NBRF—"[t]he filter **must** pass the pulsed DC signal **without unduly affecting the shape** of that signal while rejecting the RF power.  Therefore, the filter **passes** <u>all frequencies except for the frequency of the [RF] bias power itself</u>."  Ex. 5 at 1130-31; *see also id*. at 1386-87 ("In order for the pulsed DC power applied to the target to be useful, the pulsed DC power <u>must include substantially all of its … constituents</u>, and therefore only a band rejection filter that filters out a specific narrow band of [frequencies] can be utilized.").

The patentee repeatedly explained why other (unclaimed) filters, which block a broader band of frequencies, are incompatible with the "pulsed DC power".  *See, e.g.*, Ex. 5 at 667-70, 1131, 1134-35, 1302-03, 1387.  Filters that provide "elimination of either all higher frequencies or all lower frequencies from the single frequency effectively destroys **the shape of** <u>**the square pulse**</u> and eliminates control of both the magnitude and duration of the positive portion of the pulse."  *Id*. at 1303.  For example, a "<u>low pass filter</u> … would destroy all of the low frequency components of the pulses."  *Id*. at 1387; Ex. 4 at 25-26; *see also* Ex. 5 at 667-70.  Similarly, a "<u>band-pass filter</u> does not protect the pulsed-DC power supply and will distort the pulsed DC square wave."  Ex. 5 at 1135 (¶ 8); *see also id*. at 1134 (¶ 3), 1131, 1302-03.

Aside from the repeated and consistent statements to support patentability, the specification confirms that "pulsed DC power supply" (*see* '657 patent, 5:46-55) outputs a "square wave."  *See* Ex. 6 at ¶ 3 (Pinnacle Plus "produced a 10 kW **square wave**").

Given the clear record equating "the **pulsed-DC** power supply" with "the **square wave** power supply", and patentee's consistent, repeated, and exclusive emphasis of "pulsed DC power" in the form of a "square wave," the terms should be construed accordingly.

### 3.   **Demaray's Proposed Constructions Should Be Rejected**

Aside from ignoring the patentee's consistent, repeated, and exclusive emphasis of the "square wave" form, Demaray's proposed constructions render the claims' plain language superfluous and have the effect of removing "pulsed" from the claims.  Demaray's proposal

attempts to improperly expand the claims to capture the use of *continuous* DC (not pulsed) power

supplies it disclaimed during prosecution.  Demaray's proposals should therefore be rejected.

a.    **Demaray's Proposed Constructions Would Render the Claims'
      Plain Language Superfluous and Effectively Remove "Pulsed"**

Applied does not dispute that in the context of the patents-in-suit, "pulsed DC power"

provides "positive and negative voltages," as it is specifically recited in the claims.   Thus,

Demaray's inclusion of such language in its constructions is superfluous, and should be rejected.

*See Wasica Finance GmbH v. Continental Automotive Systems, Inc.*, 853 F.3d 1272, 1288 n.10

(Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void,

meaningless, or superfluous.").

Furthermore, adopting Demaray's proposed constructions would result in confusion as

shown below, in particular where Demaray appears to interpret "oscillates" no differently than

"alternates."  *See infra* Section III.B.1.  Demaray effectively replaces "pulsed" with "oscillates

[interpreted by Demaray as alternates] between positive and negative voltages"—but the claim

already requires "providing alternating negative and positive voltages."

| '276 patent, limitation [1b] (as written) | "…, the **pulsed** DC power supply providing alternating negative and positive voltages to the target" |
|---|---|
| '276 patent, limitation [1b] (with Demaray's proposal inserted) | "…, the **supply for providing direct current power that oscillates [*i.e.*, alternates] between positive and negative voltages** providing alternating negative and positive voltages to the target" |

By (1) replacing "pulsed" with "alternating between positive and negative

voltages, which (2) is superfluous of other language added to the claims during

prosecution (providing alternating positive and negative voltages) that relied on the same

intrinsic support for Demaray's proposed construction for "pulsed DC power" effectively

Demaray removes "pulsed" from the claim.  Ex. 5 at 1297-98; Ex. 7 at 322-323, 325; Ex.

8 at 972-73, 976-77. Demaray cannot rewrite and broaden the claim in this manner.

4.    **Demaray's Proposals Appear to be an Attempt at Capturing
      Conventional DC Power Supplies it Disclaimed**

The patentee, throughout prosecution of the asserted patents, make clear that its alleged

invention requires "pulsed" DC power, *not* DC power:  "use of a DC bias power supply to bias

the target in an RF PVD system does not, in any way, imply a pulsed DC PVD system, as claimed." Ex. 5 at 668. The patentee repeatedly distinguished a DC power supply from a "**pulsed** DC power supply". *See id*. at 191 ("*Fukui* teaches that a DC power supply is coupled to bias the target… *Fukui* does not teach a **pulsed** DC power supply."); *id*. ("*Le* utilizes a **pulsed** DC power supply and not a DC power supply."); *id*. at 666 (*Fukui* discloses "a DC power supply (**NOT** a **pulsed** DC power supply) is coupled to the target…"). Indeed, when faced with a rejection over prior art, the patentee argued that the prior art "has enabled utilization of a DC power supply, but not a **pulsed** DC power supply." Ex. 5 at 936.

The patentee also distinguished DC and "pulsed" DC power supplies based on the filters that can be used with them. For example, the patentee acknowledged that *low pass filters* can be used with DC power supplies. *See* Ex. 5 at 666 ("[A] DC power supply (NOT a pulsed DC power supply) is coupled to the target through a low-pass filter."). However, the patentee represented that placing such a low pass filter between the "pulsed DC power supply" and target would render the system "**inoperative**." *Id.* at 668. As the patentee further represented, a *low* pass filter could not be used with a "pulsed DC power supply" (in contrast to a DC power supply) because a "low pass filter blocks a portion of the pulsed DC frequency to the target and therefore the benefits of using pulsed DC power are lost." *Id*. at 1302; *see also id*. at 667, 1307, 1387 (same).

Dr. Demaray has continued to distinguish DC power from "pulsed" DC power supplies. *See* Ex. 34 at 3214 ("DC Sputtering" vs. "**Pulse** DC Sputtering"); Ex. 35 at 2701. Thus, Demaray's proposed constructions should be rejected, as "[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

\* \* \* \* \*

Accordingly, Demaray's proposed constructions should be rejected and the terms should be construed, as Applied proposes, in light of the patentee's consistent, repeated, and exclusive emphasis of "pulsed DC power" in the form of a "square wave" that oscillates at regular intervals.

C. **"a method of depositing an insulating film on a substrate, comprising:" ('657 pat., cl. 2)**

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

| Applied's Proposal | Demaray's Proposal |
|---|---|
| Preamble is limiting. | Preamble is not limiting, except for "insulating film on a substrate" |

The parties agree "insulating film on a substrate" is limiting, only disputing whether the full preamble (including "depositing") is limiting (as Applied proposes) or whether the ***depositing*** of the "insulating film" can be read out of the otherwise limiting preamble (as Demaray proposes). The preamble recites "[a] method of ***depositing*** <u>an insulating film</u> ***on a substrate***," which the claim cross-references when reciting "wherein <u>an oxide material</u> is ***deposited on the substrate***"—confirming the "oxide material" is part of the "insulating film" deposited via the claimed method. '657 patent at cl. 2; *id.* at 4:51-54 (discussing "insulating oxide layers"). By clarifying the relationship between the "oxide material" and the "insulating film," "depositing" in the preamble gives life, meaning, and vitality to the claim. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). This distinguishes the claim 2 preamble from that of claim 1 for which the parties agree only "insulating substrate" is limiting. Unlike claim 2, claim 1 does **not** recite any deposition or film in the body of the claim.

Furthermore, in claim 2, the term "depositing" is intertwined with the phrase "insulating film on a substrate" and thus "the preamble in this case cannot be neatly packaged into two separate portions." *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1371-72 (Fed. Cir. 2020). Just as the *Bio-Rad* court determined the action verb phrase "**conducting** . . . **in**" could not be divorced from the direct object of that action, claim 2's full preamble requires the same result: the action verb "**depositing**" cannot be excised from the direct object, an "insulating film."

| ***Bio-Rad*** **Preamble\*** | **'657 Patent Claim 2 Preamble\*** |
|---|---|
| A method of **conducting** *a reaction* in plugs **in** *a microfluidic system* | A method of **depositing** *an insulating film on a substrate* |

\* *Agreed constructions italicized* and **disputed action verbs** held to be limiting highlighted

The preamble here is unlike that which was found partially limiting in *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323-34 (Fed. Cir. 2015). In *TomTom*, although a portion of the preamble provided an antecedent basis for the body of the claim, the preamble as a whole "only state[d] the intended use of the invention . . . employ[ing] the standard pattern of such language: the words 'a method *for* a purpose or intended use comprising,' followed by the body of the claim." *Id.* at 1324.

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

The court thus found that the preamble phrase "generating and updating data *for use in*" was not limiting. *Id.* Here, the preamble recites a "method *of* depositing an insulating film," not a method for depositing for use in, and thus the preamble defines what the method *is*, not its intended use.

| *TomTom* Preamble | '657 Patent Claim 2 Preamble |
|---|---|
| A method *for* generating and updating data *for use in* a destination tracking system of at least one mobile unit | A method *of* depositing an insulating film on a substrate |

D.    **"the insulating film" ('657 pat., cl. 2)**

| Applied's Proposal[4] | Demaray's Proposal |
|---|---|
| "the insulating film comprising the oxide material" | Plain and ordinary meaning |

*See* Section E addressing both this term and the "wherein" clause together.

E.    **"wherein an oxide material is deposited on the substrate, and the insulating film is formed by reactive sputtering in a mode between a metallic mode and a poison mode" ('657 pat., cl. 2)**

| Applied's Proposal | Demaray's Proposal |
|---|---|
| "**resulting in** an oxide material is deposited on the substrate, and the insulating film is formed by reactive sputtering in a mode between a metallic mode and a poison mode" | Plain and ordinary meaning |

The parties' dispute regarding these two terms centers on Demaray's unreasonable and unsupported interpretation of the last limitation of method claim 2 of the '657 patent—"**wherein an oxide material is deposited on the substrate, and the insulating film** is formed by reactive sputtering in a mode between a metallic mode and a poison mode." Applied proposes, consistent with the plain meaning of the "wherein" clause, that "oxide material" is deposited as a result of the claimed "reactive sputtering" method, thereby clarifying that "insulating film [that] is formed by reactive sputtering" comprises the "oxide material." Demaray proposes "plain and ordinary meaning", but admits through a new infringement theory, supplemental *Markman* briefing and oral

---

[4] Considering Demaray's recent arguments before the Texas Court, Applied revised its proposed construction to align with what its customers proposed as an alternative at the *Markman* hearing.

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

argument before the Texas Court[5], that its alleged plain and ordinary meaning interpretation is one where "an oxide material is deposited on the substrate" (the first portion of the wherein clause) is wholly divorced from the preceding claimed "reactive sputtering" method steps, such that the "oxide material" can be deposited using **any** unclaimed method.  The plain and ordinary meaning of this claim language and the intrinsic record make clear that the last limitation—the "wherein" clause including the deposition of the "oxide material"—is the **<u>result</u>** of the claimed "reactive sputtering" process, not a disembodied limitation covering disparaged prior art methods.  The dispute, and the unreasonableness of Demaray's position, is illustrated in the demonstrative below (Ex. 20 at 13) from the recent *Markman* before the Texas Court comparing Applied's correct plain and ordinary meaning of the term with Demaray's interpretation that disembodies the deposition of "oxide material" on the substrate from the preceding reactive sputtering method steps:



1.   <u>**The Claims Support Applied's Plain and Ordinary Meaning**</u>

The claim language itself confirms the "wherein" clause is the result of the claimed "reactive sputtering" process.  "Wherein"/"whereby" clauses state the result of the method, and the

---

[5] For nearly a year in Texas, Demaray represented that it would not assert claim 2 if discovery confirmed that Applied's customers did not use DC power to the target and RF bias to the substrate **to produce an oxide material**.  In September 2021, and under the guise of "plain and ordinary meaning," Demaray changed its theory to allege that the "wherein an oxide material is deposited on the substrate" could be performed by any method unrelated to claimed method steps, giving rise to an *O2 Micro* dispute and necessitating further claim construction proceedings.

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

deposition of the "oxide material" is part of the "wherein" clause.  *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1329 (Fed. Cir. 2005).  Demaray can provide no reasonable explanation, let alone any intrinsic evidence in support, for why the "wherein" clause here should be read any differently.

Further, the preamble recites "[a] method of **_depositing_** <u>an insulating film</u> **_on a substrate_**," and the body of the claim in turn recites that "<u>an oxide material</u> **_is deposited on the substrate_**." '657 patent at cl. 2.  The deposition of that "oxide material" is the only deposition on a substrate recited in the claim and must be part of the "insulating film [that] is formed by reactive sputtering".  *See id*. at 4:51-54 (describing "insulating oxide layers").  Dependent claims provide additional support.  For example, claim 9 recites "[t]he method of claim 2, wherein **_the Oxygen flow_** is adjusted to adjust the index of refraction of **_the film_**."  Reference to "**_the_** Oxygen flow" means oxygen is necessarily present in claim 2 for forming "**_the_** film" (*i.e.*, the "insulating film") "by reactive sputtering" (*i.e.*, the target material reacting with oxygen process gas to deposit an "oxide material"); otherwise "the Oxygen flow" would lack antecedent basis.  *Id*. at cl. 9, 5:43-45, 9:6-8; Dkt. 46-1 at ¶ 39.  Thus, the claims confirms that the entire "wherein" clause, including the deposition of the "oxide material," is the result of the claimed "reactive sputtering" method, and that the "insulating film [that] is formed by reactive sputtering" comprises the "oxide material."

### 2.    <u>Patentee's Repeated and Consistent Statements in the Specification Support Applied's Plain and Ordinary Meaning</u>

Consistent with the claim language, the specification repeatedly and consistently characterizes the alleged invention as a method of depositing "oxide material" using the claimed pulsed DC "reactive sputtering" steps.  *E.g.*, *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1371 (Fed. Cir. 2016) (construing claim term in accordance with repeated and consistent characterization).  The '657 patent is titled "**_Biased Pulse DC Reactive Sputtering_** of Oxide Films," '657 patent at Title, and defines "the present invention" as related to "deposition of oxide and oxynitride films **_by pulsed DC reactive sputtering_**," *id*. at 1:10-13; *see also id*. at 2:45-54.  The patent criticizes prior art methods of depositing oxides, such as "chemical vapor deposition" and "RF sputtering," as leading to numerous problems.  *Id*. at 2:3-38; *see also id*. at 4:51-57; 5:66-6:6.  To remedy this problem, the patent proposes "**_new methods of depositing oxide and_**

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

*oxynitride films* and for forming planar optical devices." *Id*. at 2:39-41.  Those "new methods"

comprise the reactive sputtering steps of providing pulsed DC power to the target through a

narrow-band rejection filter and RF bias to the substrate to produce "[h]igh quality oxide films."

*E.g.*, *id*. at Abstract, 2:45-54, 5:12-6:6, 16:50-67, 17:24-60, 18:1-17, 20:1-8, 21:15-24, 22:5-58,

Fig. 4.  Demaray's attempt to broaden the claim to cover deposition of "oxide material" by

methods disparaged by the patent, such as CVD, should be rejected.[6]  Claim 2 also requires the

"*insulating film*" be "formed by reactive sputtering in a mode between a metallic mode and a

poison mode."  The metallic mode is characterized in part "by incomplete *oxidation of film*

*deposited on substrate 16* and therefore higher index films." '657 patent at 11:33-35. The patent

defines poison mode in terms of *oxide deposition*—"[t]he poison mode *is defined* as the ratio

where *the oxide* is etched from the surface of target 12 as fast as *the oxide* layer is formed."  *Id*. at

10:46-48.  Thus, the patentee's repeated description of the "present invention" as biased pulsed

DC reactive sputtering of oxide films, and disparagement of the prior art methods of depositing

oxide materials demonstrates that claim 2 recites a method for depositing an *oxide-based*

insulating film "*by reactive sputtering*."  *See*, *e.g.*, *Poly-America, L.P. v. API Indus., Inc.*, 839

F.3d 1131, 1136-37 (Fed. Cir. 2016) ("an inventor may disavow claims lacking a particular

feature when the specification describes 'the present invention' as having that feature" or "when

the specification distinguishes or disparages prior art based on the absence of that feature").

### 3.   Patentee's Lexicography of "Poison Mode" Supports Applied's Plain and Ordinary Meaning

The patent's *__definition__* of "poison mode" in terms of *oxide deposition* further requires that

the claimed "insulating film [that] is formed by reactive sputtering in a mode between a metallic

mode and a *poison mode*" comprises the "oxide material"—"[t]he poison mode *__is defined__* as the

ratio where *the oxide* is etched from the surface of target 12 as fast as *the oxide* layer is formed."

*Id*. at 10:46-48; *compare id*. at 12:8-9 ("Under this condition, the *rate of oxide formation* on the

_____

[6] At best, the patent states that the claimed *substrate* may comprise a silicon oxide layer that was

deposited by CVD, *id*. at 7:62-65, not that *oxide material* may be deposited on the substrate by

CVD because "CVD deposited films can have structural defects," *id*. at 2:17-19.

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

surface of the target 12 equals or exceeds the rate of sputter removal . . . ***This condition is sometimes referred to as the 'poisoned mode.'***") *with Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1378 (Fed. Cir. 2022) (finding specification statement that "[t]his bottom position is also sometimes referred to herein as the 'driven position'" amounts to lexicography of "driven position"). That the definition of "poison mode" is provided within the description of preferred embodiments does not change its lexicographical nature. *See Lenovo Holding Co., Inc. v. DoDots Licensing Sols. LLC*, No. 2021-1247, 2021 WL 5822248, at *3 (Fed. Cir. Dec. 8, 2021) (definitional statement within a paragraph directed to one embodiment still amounts to lexicography); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) (same). The applicant cited this definition during prosecution as written description support for the claimed "mode between a metallic mode and a poison mode." Ex. 8 at 504-06.

4. <u>**Patentee's Claim Amendments to Overcome Prior Art During Prosecution Further Confirms Applied's Plain and Ordinary Meaning**</u>

The file history also confirms that the "wherein" clause is the result of the preceding reactive sputtering method steps, and that the "insulating film" comprises the "oxide material." As discussed *infra* Section III.E.1., the plain and ordinary meaning of this claim cannot be read any other way. The file history does not change that reality. The applicant added claim 85, eventually issuing as claim 2. Ex. 8 at 289, 999; Ex. 21. After a written description rejection, the applicant changed "transition mode" to "a mode between a metallic mode and a poison mode" and relied on the previously mentioned definitions in the specification (in terms of ***oxide*** deposition) as written description support. Ex. 8 at 496-97, 503-06; Ex. 21. In addition, the claims were then amended to overcome another rejection over prior art covering the deposition of *oxide films* and *conductive films*. Ex. 8 at 958-59, 973, 976-78; Ex. 21. The applicant narrowed the preamble to recite depositing "an ***insulating*** film" (instead of any "film" which could include the prior art conductive films) pursuant to the claimed method steps, and recited "***oxide*** material" (instead of any "material"). Ex. 8 at 973, 976-77; Ex. 21. In doing so, the applicant connected "oxide material" to the "insulating film," making clear that the "oxide material" is deposited as a result of the claimed "depositing" method to form an "insulating film." Ex. 8 at 973; Ex. 21.

Moreover, the applicant left the "insulating film" as "formed by reactive sputtering in a mode between a metallic mode and a poison mode," which requires deposition of oxide material per the patentee's lexicography discussed above. *Id*. Finally, the applicant also moved the word "and" from before the "wherein" step to before the last "providing" step—making clear that the fourth "providing" step is the last step of the claimed method, and the "wherein" clause, which includes depositing the "oxide material," is the result of the claimed reactive sputtering method, and not a disembodied separate step. *Id*. Thus, after the final amendment, the claims required the deposition of oxide material by reactive sputtering (and not by some undisclosed, unclaimed method disconnected from the claim and never mentioned during these amendments). The oxide material is deposited by the claimed biased pulsed DC reactive sputtering steps.

F.      **"insulating substrate"** ('657 pat., cl. 1)

| Applied's Proposal | Demaray's Proposal |
|---|---|
| "base material that, considered in its entirety, is insulating" | Plain and ordinary meaning |

1.      **Demaray's Proposal To Not Construe the Term Should Be Rejected**

Demaray seeks to avoid construing "insulating substrate" so that it can later redefine the term to include any "substrate" merely "coated with an insulator,"[7] but such an interpretation is not consistent with the intrinsic record or the term's plain meaning.

***First***, by the claims' plain language, "an insulating substrate," is distinguishable from "*an insulating film* on a substrate," but that is precisely what Demaray, under the guise of plain and ordinary meaning today, will argue later—that mere coating of a substrate with an "insulating film" necessarily renders that substrate "insulating." But, simply put—when the patentee wanted to claim its alleged invention's use of a **specific type of substrate** (*i.e.*, "an insulating substrate"), it did that ('657 patent at cl. 1), and when it wanted to differently claim the invention's use of **any substrate** (*i.e.*, "a substrate") with a specific type of film (*i.e.*, "insulating film"), it did that (*id*. at cls. 2-21). *See* Ex. 33 at 82. Plaintiff's proposal should be rejected.

---

[7] *See* Ex. 16 (Glew Decl.) at ¶ 26 (opining that the "insulating substrate" term has a "plain and ordinary meaning [that] includes, but is not limited to, 'a wafer coated with an insulator.").

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

***Second***, neither the specification itself nor the intrinsic record more broadly identifies a wafer coated with an insulator (Demaray's apparent interpretation) as an example of an "***insulating*** substrate." Demaray appears to suggest that such an interpretation is supported by the specification's disclosure that a "***substrate*** … can be a silicon wafer or a silicon wafer coated with a layer a silicon oxide" or "a 6 inch wafer of substrate 16 which includes a 10 um thick thermal oxide substrate" or "a silicon substrate with an undercladding layer of thermally oxidized $SiO_2$ of about 15 um thick" (Ex. 22 at ¶ 33 (citing '657 patent at 7:62-64, 18:8-12, and 18:55-57), but those disclosures simply provide examples of "***substrates***," not whether the "substrates" are "insulating."[8] Indeed, there is no evidence that Demaray can point to supporting that an "insulating substrate" includes any substrate merely "coated with an insulator."

***Third***, Demaray's interpretation is not consistent with the term's plain meaning. Incredibly, under Demaray's interpretation, <u>any substrate</u>, even a ***very thick***, ***highly conducting*** wafer, would, by Demaray's apparent reasoning, be an "insulating substrate," so long as the wafer includes an <u>insulator coating</u>, ***however thin and however minimally insulating***. That is not the plain and ordinary meaning of "insulating substrate," and accordingly, it should be rejected.

### 2.   <u>Applied's Proposal Should Be Adopted</u>

Applied's proposed construction—"base material that, considered in its entirety [as opposed to considering just one layer, as Demaray intends], is insulating"—is consistent with the term's plain meaning as well as the intrinsic record.

***First***, the plain meaning of "substrate" is the "base material" or starting material on which circuits are made or films are deposited. *See* Ex. 23 at 2797 ("***substrate***—Also called "***base material***. 1. The supporting material on or in which the parts of an integrated circuit are attached

---

[8] Also, contrary to Demaray's suggestion, silicon is a "semiconductor" whose "electrical properties lie between those of conductors … and insulators" (Ex. 23 (Modern Dictionary of Electronics (1999)) at 2796) and oxides are not necessarily "insulating," but can be conducting. *See* Ex. 24 (US7262131) at 14:22-25 (named inventors explaining use of "conducting oxide").

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

or made."); Ex. 25 (Thin Film Tech. Handbook) at 2815 (The "substrate … provide[s] the base onto which thin film circuits are fabricated and various thin film multilayers are deposited.").

*Second*, the specification confirms this plain meaning of "substrate." *See*, *e.g.*, '657 patent at 18:59-19:3 (describing that "[a] layer of active core material is then *deposited on substrate 16*"). Indeed, substrates described in the extrinsic evidence as providing the "base onto which thin film circuits are fabricated and various thin film multilayers are deposited"—*e.g.*, "glass," "silicon," "metals" or "a Si … substrate … covered with silicon dioxide dielectric layer" (Ex. 25 at 2815-816)—are the same substrates disclosed in the specification. *See* '657 patent at 7:62-8:1 (explaining that the "substrate [] can be a silicon wafer or a silicon wafer coated with a layer of silicon oxide" or "glass" or "metal."), 18:8-12, 18:55-59. Thus, a "substrate" can be comprised of a single material such as glass or a silicon wafer, or a material pre-coated with another layer (*e.g.*, silicon wafer coated with a layer of silicon oxide) – both serve as the "base on which thin film circuits are fabricated and various thin film multilayers are deposited." The fact that multiple films may be *subsequently* deposited onto the substrate does not change what the substrate is. *See id*. at 19:4-13 (describing that "[a] passive layer of aluminasilicate is then *deposited over the active layer*."); 19:14-16 (describing that an "[u]pper cladding layer is then deposited"); *see also id*. at 19:39-20:17 (Example 4 describing a sequence of films/layers, such as an "active core film" and a "top cladding layer" deposited on substrate 16); 18:1-49 (Example 2).

*Third*, other intrinsic evidence repeatedly confirms that the substrate provides the base on which films are to be deposited. *See, e.g.*, Ex. 26 (US556100) at 2:5-14, Fig. 1 (showing films 32 and 34 deposited on substrate 22); Ex. 27 (US6281142) at 8:1-8, Fig. 1 (showing layers 18 and 22 formed on substrate 10); Ex. 28 (US5303319) at 2:66-3:3, Fig. 3 (showing layer 14 formed on substrate 30); Ex. 29 (US5483613) at 2:47-57, Fig. 1 (showing layer 40 formed on substrate 20).

*Finally*, the inventors' other publications confirm that the plain meaning of "substrate" is the base material on which films are to be deposited. U.S. Pub. No. 2007/0053139 discloses "a substrate 301" on which a sequence of layers are deposited. *See* Ex. 30 at [0062], Fig. 6. Again, throughout the process and afterwards, the substrate remains the same base material.

APPLIED'S OPENING CLAIM
CONSTRUCTION BRIEF

DATED:  March 18, 2022

YAR R. CHAIKOVSKY
PHILIP OU
MATTHIAS KAMBER
JOSEPH J. RUMPLER, II
DAVID OKANO
ANDY LEGOLVAN
BORIS LUBARSKY
PAUL HASTINGS LLP


By: */s/ Yar R. Chaikovsky*
                    YAR R. CHAIKOVSKY

Attorneys for Plaintiff
APPLIED MATERIALS