IRELL & MANELLA LLP
Morgan Chu (70446)
MChu@irell.com
Benjamin W. Hattenbach (186455)
BHattenbach@irell.com
Samuel K. Lu (171969)
SLu@irell.com
Olivia L. Weber (319918)
OWeber@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:   (310) 277-1010
Facsimile:    (310) 203-7199

FOLIO LAW GROUP PLLC
C. Maclain Wells (221609)
Maclain@foliolaw.com
2376 Pacific Ave.
San Francisco, CA 94115
(415) 562-8632

Attorneys for Defendant
DEMARAY LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| APPLIED MATERIALS, INC., | Case No. 5:20-cv-09341-EJD |
| Plaintiff, | **DEMARAY LLC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |
| vs. | |
| DEMARAY LLC, | |
| Defendant. | |

11077433

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   THE DEMARAY PATENTS ...............................................................................1

III.  DISPUTED CONSTRUCTIONS ..........................................................................2

    A.    "Narrow band rejection filter" ('657 Patent, cls. 1, 2, 20; '276 Patent, cls. 1, 6) .......................................................................................................2

        1.    This Term Does Not Require Construction ...................................2

        2.    Applied Seeks To Add An Extraneous "Passing" Requirement ...................................................................................3

        3.    The Prosecution History Does Not Support Adding The "Passing" Limitation To "Narrow Band Rejection Filter" .........3

    B.    Pulsed DC power/Pulsed DC power supply ('657 Patent, cls. 1, 2, 11; '276 Patent, cls. 1, 6) .........................................................................5

        1.    Patentee Acted As Its Own Lexicographer ..................................5

        2.    Demaray's Construction Is Consistent With And Supported By The Patent Specification ........................................................7

        3.    Applied Seeks To Import The Square Wave Limitation, But Such Language Appears Nowhere In The Patent Specification ................................................................................7

        4.    Applied Seeks To Import A Frequency Limitation, But The Intrinsic Evidence Does Not Support Such a Construction ....................11

        5.    Demaray's Claim Construction Would Not Render The Claim Language Superfluous ....................................................12

    C.    "A method of depositing an insulating film on a substrate, comprising:" ('657 patent, cl. 2 preamble) ...........................................14

    D.    "the insulating film" ('657 Patent, cl. 2) ............................................15

        1.    The Applicants Did Not Act As Their Own Lexicographers Or Make A Clear And Unmistakable Disavowal Of Claim Scope ...........................................................................................16

        2.    In The Prosecution History Applicants Did Not Act As Their Own Lexicographers Or Make A Clear And Unmistakable Disavowal Of Claim Scope ..........................................................18

        3.    Applied's Arguments Regarding Reactive Sputtering And The Poison Mode Do Not Change the Scope Of The Claims .................19

1

**Page**

2

3    E.    "Insulating substrate" ('657 Patent, cl. 1) ................................................................. 20

4          1.    The Specification Discloses Insulating Substrates (Such As
               Silicon Wafers) And Non-Insulating Substrates (Such As

5               Metal Substrates) ........................................................................................ 20

6          2.    Applied's Claim Construction Arguments Misunderstand The
               Purpose Of The "Insulating Substrate" Limitation .................................... 21

7
   IV.    CONCLUSION ............................................................................................................ 22
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- ii -

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>**Page(s)**</u>

3

**Cases**

4

*Absolute Software, Inc. v. Stealth Signal, Inc.*,

5
  659 F.3d 1121 (Fed. Cir. 2011) ...............................................................................................17

6
*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
  967 F.3d 1353 (Fed. Cir. 2020) ........................................................................................14, 15

7
*CCS Fitness, Inc. v. Brunswick Corp.*,

8
  288 F.3d 1359 (Fed. Cir. 2002) ....................................................................................4, 5, 13

9
*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*,
  508 F.3d 1366 (Fed. Cir. 2007) ................................................................................................4

10

*Finjan Inc. v. Symantec Corp.*,

11
  No.14-cv-02998, 2017 WL 550453 (N.D. Cal. Feb. 10, 2017) ................................................1

12
*GE Lighting Sols., LLC v. AgiLight, Inc.*,

13
  750 F.3d 1304 (Fed. Cir. 2014) ...........................................................................................5, 7

14
*GPNE Corp. v. Apple Inc.*,
  830 F.3d 1365 (Fed. Cir. 2016) ..............................................................................................17

15

*NeoMagic Corp. v. Trident Microsystems, Inc.*,

16
  287 F.3d 1062 (Fed. Cir. 2002) .........................................................................................9, 11

17
*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,

18
  521 F.3d 1351 (Fed. Cir. 2008) ................................................................................................1

19
*Powell v. Home Depot U.S.A., Inc.*,
  663 F.3d 1221 (Fed. Cir. 2011) ................................................................................................8

20

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,

21
  904 F.3d 965 (Fed. Cir. 2018) ................................................................................................10

22
*Tech. Prop. Ltd. LLC v. Huawei Techs. Co., Ltd.*,

23
  849 F.3d 1349 (Fed. Cir. 2017) ................................................................................................3

24
*TomTom, Inc. v. Adolph*,
  790 F.3d 1315 (Fed. Cir. 2015) ........................................................................................14, 15

25

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,

26
  853 F.3d 1272 (Fed. Cir. 2017) ..............................................................................................13

27
**Other Authorities**

28

*Modern Dictionary of Electronics* ................................................................................................7

1   I.    **INTRODUCTION**

2        The WDTX court has already construed each of the terms that Applied proposes for

3   construction, and in each case, Judge Albright rejected either Applied's proposed construction or one

4   that is substantively similar. Exs. C, D (WDTX Claim Construction Orders). The parties agree that

5   the WDTX court's determinations are entitled to "reasoned deference." *Finjan Inc. v. Symantec*

6   *Corp.*, No.14-cv-02998, 2017 WL 550453, at *3 (N.D. Cal. Feb. 10, 2017). Because claim

7   construction "is not an obligatory exercise in redundancy" requiring courts to substitute other

8   language for understandable claim terms, *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521

9   F.3d 1351, 1362 (Fed. Cir. 2008), the WDTX court gave most of the disputed terms their plain and

10  ordinary meaning. Consistent with those determinations, in Applied's four recent *inter partes*

11  review petitions, it did not seek construction of even a single one of these claim terms. Wells ¶

12  13.[1] The Court should see Applied's proposals for what they are—an invitation for conflicting

13  rulings from a different court and an avenue for appeal. No further constructions are necessary.

14  II.   **THE DEMARAY PATENTS**

15       The Demaray Patents[2] generally concern equipment and processes used to deposit thin

16  films in the production of semiconductor products. Glew ¶ 18. Layers of those films, which are

17  deposited in chambers within reactors, form structures such as transistors and electrical

18  interconnections of the sort that make up modern integrated circuits. Glew ¶ 18.

19       The patents focus on a process called physical vapor deposition ("PVD") sputtering in

20  which metal particles from a "target" create a plasma that deposits the films on a semiconductor

21  wafer. Glew ¶ 19. The patents describe approaches for preventing undesired buildup of the

22

23  [1] All exhibits are attached to the Declaration of C. Maclain Wells ("Wells") filed herewith. Also

24  referenced is the Declaration of Dr. Alexander Glew ("Glew") also filed herewith, Ex. K.

25  [2] The "Demaray Patents" are U.S. Patent Nos. 7,381,657 and 7,544,276 ("'657 patent" and "'276

26  patent," respectively) (Exs. A-B). Given that the specifications are substantively equivalent,

27  example citations are provided to the '657 patent specification.

28

1  deposited material on the target surface ("poisoning") and damaging electrical "arcing" that it can

2  cause by using pulses of DC power. Glew ¶ 20. These approaches are useful with a broad array of

3  process gasses "includ[ing] combinations of Ar, $N_2$, $O_2$, $C_2F_6$, $CO_2$, CO and other process gasses"

4  (Ex. A, 3:5-9) used in depositing a wide variety of thin films including "oxides, fluorides, sulfides,

5  nitrides, phosphates, sulfates, and carbonates, as well as other wide band gap semiconductor

6  materials" (*id.*, 2:55-56, 7:47-52, 16:19-24). An insight of the inventors (which is recited in each

7  and every claim) was that a narrow band rejection filter (a "NBRF") can be used to protect arc

8  detection circuitry, *e.g.,* in the DC power supply, from damaging feedback from a RF bias. *See*

9  Devendran Decl. Ex. 8 ('657 FH) at 915.

10  **III.    DISPUTED CONSTRUCTIONS**

11      **A.    "Narrow band rejection filter" ('657 Patent, cls. 1, 2, 20; '276 Patent, cls. 1, 6)**

12  | **Demaray:** Plain and ordinary meaning | **Applied:** "filter that passes all of the |
13  | | frequencies of the power supply except |
    | | within a narrow band" |

14            **1.    This Term Does Not Require Construction**

15        The WDTX court has addressed this exact claim construction issue and found that the term

16  should be given its plain and ordinary meaning. Ex. C at 3. The term has an ordinary and customary

17  meaning in the industry. Glew ¶ 62. If further construction is deemed necessary, the term should be

18  construed as "a filter which ***rejects*** a narrow band of frequencies." *Id* .[3] The focus of the claims is on

19  the frequencies that are ***rejected***. For example, Claim 1 of the '276 patent recites that the filter

20  "***rejects*** at a frequency of the RF bias power supply" and claim 6 recites that the filter "operat[es] at a

21  frequency of the RF bias power supply." Similarly, the '657 patent claims recite "providing an RF

22  bias at a frequency that corresponds to the narrow band ***rejection*** filter." *See, e.g.,* Ex. A, cl. 1.

23        This meaning is confirmed by the specification, which teaches that the NBRF "prevents the

24  bias power from [the ***RF***] power supply ***18*** from coupling into ***pulsed DC*** power supply ***14***." Ex. A,

25  5:50-51. Such coupling can, *e.g.,* damage arc detection circuitry in the ***DC*** power supply. The

26  ―――――――――――――

27  [3] Unless otherwise noted, internal citations and subsequent history are omitted, and emphasis is

28  added.

specification teaches that prevention of such coupling is accomplished by using a filter that ***rejects*** frequencies corresponding to the RF bias power: "filter 15 [which] is a 2 MHz **band *rejection* *filter*** …prevents the 2 MHz power from the bias to substrate 16 from damaging the [***DC***] power supply ***18***." *Id.,* 5:61-65. In other words, frequencies corresponding to the RF bias power are ***rejected*** by the "**band *rejection* *filter***" (in one example, within a ***narrow*** 100 kHz bandwidth). *Id.* There is no mention of passing other frequencies. Moreover, this is a "comprising" claim allowing the NBRF to be combined with other filtering elements that may impact other frequencies.

### 2.    Applied Seeks To Add An Extraneous "Passing" Requirement

Applied seeks to rewrite the "narrow band ***rejection*** filter" limitation into a "filter that ***passes*** all of the frequencies of the power supply except within a narrow band." But there is no basis for the Court to depart from the plain and ordinary meaning.

Demaray's plain and ordinary meaning construction, "narrow band ***rejection*** filter," and its alternative construction, "a filter which ***rejects*** a narrow band of frequencies," both focus (as is warranted, given the words used in the claims) on what is being ***rejected***. Applied's construction on the other hand re-writes the claim term altogether to eliminate the concept of "rejecting" or "rejection" to focus on "***passing***:" a "filter that ***passes*** all of the frequencies of the power supply except within a narrow band." That "passing" limitation is nowhere present in the claim language or suggested by its plain and ordinary meaning. Rejecting and passing frequencies are different subjects. Filters can reject alone; pass alone; or, both reject and pass different frequencies simultaneously. Glew ¶¶ 65-67. By analogy, when a court rejects a particular motion pending before it, that does not mean all other pending motions are granted. Because the claim term here speaks only of rejecting, there is no basis to add the "passing" limitation into the claims.

### 3.    The Prosecution History Does Not Support Adding The "Passing" Limitation To "Narrow Band Rejection Filter"

Applied appears to argue that the doctrine of prosecution disclaimer warrants departing from the plain and ordinary meaning. Br. 7-8. Under Federal Circuit case law, disclaiming statements must be "clear and unmistakable to one of ordinary skill in the art" for there to be a surrender of claim scope. *Tech. Prop. Ltd. LLC v. Huawei Techs. Co., Ltd.*, 849 F.3d 1349, 1357 (Fed. Cir.

1    2017). And this analysis is conducted by a review of the prosecution history as a whole. *See Elbex*

2    *Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1372-73 (Fed. Cir. 2007) (no "clear and

3    unmistakable" disclaimer when unsupported by specification and prosecution history as a whole).

4    While Applied cherry-picks passages from the prosecution history about the filter passing

5    frequencies above and below the rejected narrow band, it fails to identify any unmistakable

6    statements that the "narrow band ***rejection*** filter" should be re-written to make it a "filter that ***passes***

7    all of the frequencies of the power supply except within a narrow band." Neither the prosecution

8    history nor the specification supports adding the new limitation urged by Applied.

9         Notably, the applicants discussed the claimed filter throughout the vast majority of the

10    prosecution without any reference whatsoever to "passing." *See, e.g.*, Devendran Decl. Ex. 8 at 915

11    ("A filter that blocks too many of the constituent frequencies of the pulsed DC waveform results in

12    the target voltage not attaining a positive voltage. A filter that does not block the RF bias voltage can

13    result in failure of the DC power supply."); Devendran Decl. Ex. 5 ('356 FH) at 1458 (similar), 1303

14    ("The band rejection filter is arranged to reject RF power at the frequency of the RF bias to the

15    substrate.").

16         The inventor declaration from Dr. Demaray on which Applied relies described the specific

17    embodiment reduced to practice, which is not limiting. *CCS Fitness, Inc. v. Brunswick Corp.*, 288

18    F.3d 1359, 1366 (Fed. Cir. 2002) (ordinary meaning cannot be overcome "simply by pointing to the

19    preferred embodiment or other structures or steps disclosed in the specification or prosecution

20    history"). Subsequent discussions upon which Applied relies similarly cite to this declaration or are

21    discussing the specific tested embodiment.[4] Similarly, Applied's citations to statements in its co-

22    pending IPR (Br. 7) are mixed and matched with prosecution statements from a decade earlier and

23    do not support Applied's proposed construction.

24

25         ───────────────
         [4] Applied argues that proposed initial constructions in WDTX provided before it was clear

26    that Applied is trying to manufacture non-infringement positions in lieu of proper claim

27    construction should be somehow binding. The WDTX court already rejected that assertion.

28

1       Nor would Demaray's proposed construction of NBRF encompass other types of filters as

2    Applied argues. Br. 8. The term (and Demaray's construction) defines rejection in a "narrowband,"

3    not mere broadband rejection typically seen with, *e.g.*, low-pass or high-pass filters alone. *See,*

4    *e.g.*, Devendran Decl. Ex. 5 at 1303 (distinguishing a narrow band rejection filter from "a

5    conventional high or low pass filter"). That said, this is a "comprising" claim and a filter that is

6    directed at rejecting frequencies in narrowband, but that is also engineered to do other things as

7    well (*e.g.*, a dual-notch filter rejecting at a second frequency), would still meet this limitation.

8    **B.**    **Pulsed DC power/Pulsed DC power supply ('657 Patent, cls. 1, 2, 11; '276**

9           **Patent, cls. 1, 6)[5]**

| **Demaray:** "direct current power that oscillates between positive and negative voltages"<br><br>"Oscillates" does not require further construction, but if construed, should be interpreted to mean "alternates between positive and negative voltages" | **Applied:** "direct current power that oscillates in the form of a square wave"<br><br>"Oscillates" should be interpreted to mean "having a frequency" Br. 8. |
|---|---|

14       Consistent with the WDTX court's claim construction, the term "pulsed DC power" should

15    be construed as "direct current power that oscillates between positive and negative voltages." Ex. C

16    at 2.  There is no basis to import the limitations Applied requests that (1) the waveform be a "square

17    wave" or (2) the oscillation "having a frequency"—Applied's construction simply rehashes, in

18    different words, the defendants' proposed constructions in the WDTX cases, which also required "a

19    square wave at a set frequency [and] reverse time" and which the WDTX court rejected. Ex. C at 2.

20          **1.**    **Patentee Acted As Its Own Lexicographer**

21       It is black letter law that a patentee can act as its own lexicographer. *CCS Fitness*, 288 F.3d

22    at 1366. However, "[t]he standards for finding lexicography…are ***exacting***. To act as its own

23    lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its

24    plain and ordinary meaning and must clearly express an intent to define the term." *GE Lighting*

---

[5] The parties agree that the construction of "pulsed DC power supply" should be "supply for providing [pulsed DC power]," where the construction of "pulsed DC power" is in dispute.

DEMARAY'S RESPONSIVE
CLAIM CONSTRUCTION BRIEF

1     *Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). Here, the applicants did just that.

2     In the prosecution of the parent '356 application, the applicants stated that: "*Applicants*… ***explicitly***

3     ***defined pulsed DC power*** to refer to *power that oscillates between positive and negative voltages.*"

4     Devendran Decl. Ex. 5 at 1306. Applicants did ***not*** choose to define "pulsed DC power" as

5     constituting a "square wave" or requiring that the oscillation occur at a set "frequency." With one

6     exception, Demaray's claim construction comes word-for-word from applicant's "explicit

7     definition."[6] And the sole exception is that Demaray added the words "direct current" to clarify the

8     "DC" in "pulsed DC power." *See* Glew ¶ 55.

9        It is telling that Applied's brief makes ***no mention*** of the fact that applicants acted as their

10     own lexicographers, even though Applied makes lexicography arguments for other claim terms

11     (where the exacting standards for lexicography are not met). The reason for this lack of mention is

12     that Applied asks the Court to ignore the applicant's "explicit definition" and to render a claim

13     construction based on other ambiguous statements from the prosecution history discussing not the

14     claim invention as a whole, but specific embodiments reduced to practice involving "square waves"

15     (which is Applied's construction). *See* Br. 12-13. However, Applied's reliance upon such evidence is

16     unavailing as Applied would have the Court override the applicant's "explicit definition" with

17     ambiguous statements that do not express a clear intent to either (a) retract applicant's explicit

18     definition or (b) replace it with "square wave"/"frequency" limitations.

19        Moreover, the discussions relied upon by Applied are directed towards testing of a particular

20     embodiment that one of the inventors performed involving what he described as a square wave. *Id.*

21     (citing Devendran Decl. Ex. 6 at ¶ 3 (the Pinnacle Plus power supply "produced a 10 kW ***square***

22

23        [6] By limiting "pulsed DC power" to voltage that "oscillates between positive and negative"

24     (passing through zero), applicants departed from the plain and ordinary meaning of "pulsed DC

25     power." Glew ¶ 55. Should Applied argue that Demaray's claim construction is broader or narrower

26     than the plain and ordinary meaning of "pulsed DC power" in other regards, that would further

27     bolster Demaray's argument that applicants acted as their own lexicographers.

28

*wave*....")). This discussion regarding the inventor's testing was not definitional or directed towards the scope of the claim, much less a clear and unmistakable disavowal of claim scope. Absent such a clear and unmistakable disavowal, claims are not limited by preferred embodiments disclosed in the specification, *GE Lighting*, 750 F.3d at 1309, much less a description of the characteristics of exemplar implementations tested by the inventors and disclosed only in prosecution.

### 2. Demaray's Construction Is Consistent With And Supported By The Patent Specification

Demaray's claim construction is in accord with the specification. In particular, the definition that "pulsed DC power" constitutes direct current power that "oscillates between negative and positive voltages" (*i.e.*, potentials) is explicitly taught: "[f]or pulsed reactive **dc [direct current]** magnetron sputtering, as performed by apparatus 10, the polarity of the **power** supplied to target 12 by power supply 14 **oscillates between negative and positive potentials**" (*i.e.*, voltages). Ex. A, 5:36-39.[7]

### 3. Applied Seeks To Import The Square Wave Limitation, But Such Language Appears Nowhere In The Patent Specification

In a typical claim construction scenario, an accused infringer may try to import a limitation from the *specification*. But it is telling that Applied cannot even make such an argument. The language "square" and "square wave" appears nowhere in the specifications! (Contrast that with Demaray's support from the specification, where each and every word appears in the cited passage.) Instead, Applied seeks to import these limitations from the prosecution history. But as discussed above in Section III.B.1, in order to do so, the Court would have to find that the ambiguous statements regarding certain embodiments tested override the applicant's "explicit definition" (which they do not).

---

[7] *See also, e.g.,* The Modern Dictionary of Electronics (defining "pulse" as "[a] brief excursion of a quantity from normal"—here, an oscillation from a positive to a negative voltage, and back). Ex. I at DEMINT00003508; Glew ¶ 56.

1

2          While it is correct that pulsed DC power supplies can theoretically be engineered to provide

3    a "square wave," pulsed DC power supplies that provide different wave geometries are well known

4    in the industry. Glew ¶¶ 54-55. Additionally, even if Applied had proffered extrinsic evidence that

5    pulsed DC power supplies are limited to square waves (and it has not), Applied's claim construction

6    would still fail given that the applicants acted as their own lexicographers. Indeed, the patent

7    specifications as well as the explicit definition in the prosecution history do not mandate a particular

8    waveform—only that the "[direct current] power…oscillates between positive and negative

9    voltages." If a square wave were important to the invention (and it is not), then, presumably, the

10   applicants (i) would have disclosed square waves in the patent specifications (which they did not);

11   (ii) would have defined "pulsed DC power" as constituting a square wave (which they did not); and

12   (iii) would have claimed a square wave explicitly (which they did not). Nothing in the claims or

13   specifications mandates that a DC pulse must have a particular waveform geometry, much less a

14   square wave geometry.

15          Additional intrinsic evidence (in the form of a reference cited on the face of the patent)[8]

16   reaffirms that a square wave is only one option for pulsed wave shapes: "[a]lthough shown here as a

17   square wave, *any waveform* oscillated between a negative voltage portion and a less negative or

18   zero voltage portion *may be used to advantage*." Ex. F (Patent 6,350,353), 5:57-63, *see also id.*, cls.

19   3-4 (reciting a "pulsed DC power source"). Notably, this reference discussing the use of waveforms

20   other than a square wave is an Applied patent.

21

22

23

24          [8] References cited on the face of a patent are intrinsic evidence. *Powell v. Home Depot*

25   *U.S.A., Inc.*, 663 F.3d 1221, 1231 (Fed. Cir. 2011) ("Our cases establish that 'prior art cited in a

26   patent or cited in the prosecution history of the patent constitutes intrinsic evidence.'" (quoting

27   *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003)).

28

Applied's claim construction, requiring a square wave, also would not cover the preferred embodiment disclosed in the specification. It is black letter law that "a claim construction that excludes the preferred embodiment is rarely, if ever correct." *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002). Specifically, the patent discusses a preferred embodiment in which the reverse time of the pulse is varied.  Ex. A, 10:54-59. Such a waveform would create a wide variety of shapes other than a square wave, insofar as square waves need to be square. Glew ¶¶ 57-58. (In other words, as shown in the figures below, the width of the negative voltage is different than the width of the positive voltage, thereby making the waveform a "rectangular" waveform (bottom image) rather than a square waveform (top image)).





Applied's brief also mischaracterizes Dr. Glew's declaration on this point, stating that Dr. Glew "*agrees that pulsed DC power outputs a 'roughly approximate' 'square wave,*" as shown [in the first figure above]…." Br. 10 (citing Glew ¶ 55). ***But Dr. Glew said no such thing***: he stated that "[p]ulsed DC power …***could*** thus roughly approximate" a "square wave." Glew ¶ 55. ***And in the very next sentence***, Dr. Glew also stated that "[a]s practiced in the industry, however, 'pulsed DC power is **not restricted to power in the form of a square wave**." *Id.* Indeed, Dr. Glew explicitly described a "rectangular shape[d]" waveform as not constituting a square wave and that "a wide variety of shapes other than a 'square' wave" were possible with pulsed DC power.  Glew ¶ 57. Thus, there is no evidence of record that "pulsed DC power" must constitute a square wave, notwithstanding Applied's egregious mischaracterization of Dr. Glew's declaration on this point.

The specification further addresses the possibility of waveforms that are neither squares nor rectangles, in particular, relating to the problem of insulating material buildup on the target causing voltage drops. Ex. A, 17:7-10 ("When target 12 under goes [sic] the transition from metallic to poison mode, the target voltage drops …."). That voltage drop would also naturally result in waveforms other than square waves. Glew ¶ 45. (In other words, the waveform does not necessarily have a square or rectangular shape due to non-linearities.) Thus, this intrinsic evidence further contradicts the Applied's argument that "pulsed DC power" should be narrowed exclusively to "square" waveforms. *See also* Glew ¶ 59 (explaining model square wave forms).

Finally, Applied seeks a construction that fundamentally misdescribes the technology at issue. The intrinsic evidence (in the form of a reference cited on the face of the patent) explains that square waves "virtually never" occur in practice. *See* Ex. G at 2 ("***The pulse may be intended to be square (in that only two levels are expected)*** … ***In practice, the waveforms are virtually never as intended due to nonlinearities of either the plasma or the power supply circuitry. So, the shapes of the resulting power waveforms are complex.***"); Glew ¶¶ 46-47. Accordingly, beyond the many other problems noted above, Applied's proposed limitation is also technologically unsound and presumptively incorrect. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 972 (Fed. Cir. 2018) (holding that inoperable construction was wrong where "no real-world power supply controllers could operate with an absolutely fixed, or non-varying, frequency").

**4.    Applied Seeks To Import A Frequency Limitation, But The Intrinsic Evidence Does Not Support Such a Construction**

Additionally, in the WDTX cases, Applied's lawyers also argued that the square wave had to have "a set frequency, reverse time, and amplitude." *E.g.,* Ex. E at 7. Applied seeks to have the Court rewrite applicant's "explicit definition" to require, in addition to a square wave, oscillation at a set frequency (*i.e.,* constant pulsing). While Demaray submits that "oscillates" does not need to be construed, Demaray addresses Applied's claim construction argument for oscillates ("having a frequency").

Fatal to Applied's claim construction argument is the fact that it would exclude a preferred embodiment. *NeoMagic*, 287 F.3d at 1074 (a claim construction that excludes the preferred embodiment is rarely if ever correct). The specification discloses using occasional pulses of DC power that alternate between negative and positive potentials, rather than continuous DC power, because "[d]uring the positive period, the insulating layer on the surface of target 12 is discharged and arcing is prevented." Ex. A, 5:39-41. In particular, the specification explains that in a preferred embodiment, pulses are provided to the target to prevent arcing: "[t]he reverse pulsing time is determined by the amount of arcing generated during the process. Longer reverse time means longer discharge time and thus less arcs. However, if the reverse time is too long, the deposition rate will decrease." *Id.,* 10:54-59; *see also* 5:41-43 ("To obtain arc free deposition, the pulsing frequency exceeds a critical frequency that depend on target material, cathode current and reverse time."); *see also,* Glew ¶ 56 (explaining that a POSITA would understand this is not describing set time interval, but that such pulses can be provided as necessary (*i.e.*, at a frequency that exceeds a critical frequency) to obtain arc free deposition.). Thus, in a preferred embodiment, DC power is pulsed when arcing is detected, not on a set frequency (as Applied argues). Demaray's claim construction, in contrast, would cover that preferred embodiment. Thus, if "oscillates" needs to be construed (and Demaray contends that it does not), then it should be construed as "alternating between positive and negative" voltages. Such a construction would also be consistent with the claim language, as described in the next section.

Other intrinsic evidence (in the form of a reference cited on the face of the patent) is in

1  accord. Ex. J at 7, Fig. 5; 3 (applying pulsed DC power when an arc is detected, and with a

2  waveform that is not a square wave). This is also shown in the manual for the "AE Pinnacle Plus"

3  power supply to which Applied points as requiring a set frequency. Br. 12. This is identified as an

4  example of a pulsed DC power supply in the specification. Ex. A, 5:46–48. The manual states:



10  Ex. H at AMAT-DEM-PA_0000252. Indeed, "pulsing at the current threshold" is its "default

11  setting." *Id.* at AMAT-DEM-PA_0000258. "If the unit is set to pulse at the current threshold,

12  pulsing is disabled until the Pinnacle Plus+ unit detects current flow above the current threshold.

13  At this point the unit will begin to pulse." *Id.* Any construction requiring constant pulsing would

14  exclude the default setting in the exemplar power supply identified in the specification.

15       Finally, the plain and ordinary meaning of "pulsed DC power, as used in the industry, has no

16  requirement of constant pulsing" (*i.e.*, at a set frequency). Glew ¶ 56. As explained by Dr. Glew,

17  varying the wavelength, magnitude, time period, or frequency of the pulse are techniques known in

18  the industry. Glew ¶¶ 56-58. Indeed, Dr. Glew discusses how pulsed DC power can be used

19  intermittently, only when arcing is detected. Glew ¶ 56.

20       **5.**     **Demaray's Claim Construction Would Not Render The Claim**
21                   **Language Superfluous**

22       Demaray's claim construction, besides being the one "explicitly defined" by the applicants,

23  does not "remov[e] 'pulsed' from the claims," as Applied argues (Br. 14), nor does it capture the use

24  of "continuous DC…power" (*id.* at 15). Demaray's construction requires the DC power to oscillate

25  (or "alternate between positive and negative") voltages—this is not continuous DC power. A

26  waveform that is "continuous DC…power" would be a set positive or negative voltage ***at all times***.

27  Thus, Applied's argument that Demaray is attempting to capture "continuous (and not pulsed) DC

28  power" (Br. 3) is without merit.

1    Defendants also attempt to classify pulsing of DC power at arc detection as "cover[ing]

2    PVD systems using *conventional* (and not *pulsed*) DC power supplies that may unexpectedly shut

3    off on occasion (or even once or not at all during a PVD process)." Br. 9. First, the claims are not

4    directed at pulsed DC power standing alone and such power supplies in the art are not relevant to

5    claim construction. Second, in "conventional" DC power sources (as defined by Applied) the

6    voltage remained at the same polarity. During prosecution the applicants recognized that there

7    were different possible definitions of "pulsed DC power" (*e.g.*, when the voltage, *e.g.,* on the

8    target, maintains the same polarity and when polarity reverses). The applicants "explicitly defined

9    pulsed DC power to refer to power that oscillates between positive and negative voltages [as

10   opposed to where] the target remains at a negative voltage throughout the deposition." Devendran

11   Decl. Ex. 5 at 1305. Moreover, Demaray's construction would ***not*** render the claim language

12   superfluous, as Applied contends. For example, claims 1 and 6 of the '276 patent recite a pulsed DC

13   power supply that according to Demaray's construction is a "supply for providing direct current

14   power that oscillates between positive and negative voltages." This limitation is silent on where

15   the resulting voltages are measured. The added limitation in those claims "providing alternating

16   negative and positive voltages to the target" limits the voltage swing of the voltages "to the target."

17   Additionally, even if Applied were correct (it is not), as Applied's citation to *Wasica Finance*

18   makes clear, it is entirely permissible to construe claim terms in a way that renders other limitations

19   void, meaningful, or superfluous (it is only "disfavored"). *See Wasica Fin. GmbH v. Cont'l Auto.*

20   *Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017). However, the law is crystal clear that where

21   the patentee has acted as its own lexicographer, that claim construction doctrine overrides all others.

22   *CCS Brunswick*, 288 F.3d at 1366 ("[T]he claim term will not receive its ordinary meaning if the

23   patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term

24   in either the specification or prosecution history.").

25

26

27

28

**C.** **"A method of depositing an insulating film on a substrate, comprising:" ('657 patent, cl. 2 preamble)**

| **Demaray:** Preamble is not limiting, except for "insulating film on a substrate" | **Applied:** Preamble is limiting |
|---|---|

Demaray agrees that the phrase "insulating film on a substrate" is limiting because it provides an antecedent basis for the element "insulating film," which appears elsewhere in the claim body. The dispute centers around the word "depositing," which Demaray argues is not limiting because it simply "states a purpose or intended use of the invention" The WDTX court already addressed this exact issue and agreed with Demaray's proposed construction. Ex. D at 2; *see also* Glew ¶¶ 42-44.

The Federal Circuit has made clear that, where a portion of the preamble provides an antecedent basis for an element in the claim body (*e.g.*, "insulating film"), that fact "does not necessarily convert the entire preamble into a limitation, particularly one that only states the intended use of the invention" (*e.g.,* "depositing"). *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015). As in *TomTom,* here, "depositing" does not provide an antecedent basis for any claim element. *Id.* at 1323-24. While the word "deposited" is in the claim body, it relates to the "oxide material" element, not the "insulating film" element from the preamble. Instead, the "insulating film" element in the claim body "is formed by." Thus, "depositing" in the preamble simply "state[s] a purpose or intended use," which would render such preamble language non-limiting. *Id.* Finally, "the invention claimed…is structurally complete without the ["depositing"] language." *Id.* at 1324. In other words, the full method can be practiced without adding the "depositing" limitation given the recitation that "the insulating film is ***formed*** by reactive sputtering…." Ex. A, cl. 2.  "[D]eletion of the ['depositing'] phrase does not affect the structure or steps of the claimed invention," which renders the "depositing" limitation non-limiting. *TomTom*, F.3d at 1324. The WDTX court agreed with Demaray's claim construction that the "depositing" limitation from the preamble is not limiting.

The case cited by Applied, *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1371-72 (Fed. Cir. 2020), does not lead to a different conclusion. In that case, each substantive

word in the preamble ("conducting a reaction in plugs in a microfluidic system") also appeared

in the body of the claims: "conducting a reaction," "plug," and "in a microfluidic system." *Id.* at

1361. Based on this fact (as well as language from the prosecution history indicating that the

preamble was intended to be limiting), the *Bio-Rad* court distinguished *TomTom*, stating: "it is

clear the claim drafters intended to limit the claimed methods to on-chip reactions, ***using both the***

***preamble and the body of the claim*** to define the claimed invention." *Id*. at 1371. In this case,

there is no evidence of any such intent (especially since "***depositing***" an "insulating film" appears

nowhere in the claim body). Applied's only argument of intent is that a variant of the verb

"depositing" is also used in the claim body for the "oxide material" element, which is deposited.

Br. 17. But Applied conflates the "oxide material" element with the "insulating layer" element,

when (1) the body of the claim draws a clear distinction between the two and (2) the preamble

makes no mention of an "oxide material."

### D.    "the insulating film" ('657 Patent, cl. 2)

| **Demaray:** Plain and ordinary meaning | **Applied:** "the insulating film comprising the oxide material" |
| --- | --- |

|     **"wherein an oxide material is deposited on the substrate, and the insulating film is formed by reactive sputtering in a mode between a metallic mode and a poison mode" ('657, cl. 2)** |
| --- |

| **Demaray:** Plain and ordinary meaning | **Applied:** "resulting in an oxide material deposited on the substrate, and the insulating film is formed by reactive sputtering in a mode between a metallic mode and a poison mode" |
| --- | --- |

Demaray addresses these two claim terms together, as Applied did in its brief. Br. 18. At

the outset, the following emphasized claim language is ***not in dispute***: "wherein ***an oxide material***

is ***deposited on the substrate, and the*** insulating film ***is formed by reactive sputtering in a mode***

***between a metallic mode and a poison mode.***" These phrases appear word-for-word in Applied's

proposed construction (as does the phrase "insulating film," though the meaning of that term is in

dispute) and the parties agree have their plain and ordinary meaning. The dispute centers around the

meaning of "insulating film," which Applied argues should be re-written to mean "insulating film

1    comprising the oxide material." The WDTX court has addressed this exact issue and rejected

2    Applied's proposals. Ex. D at 3.

3        Applied's construction is suspect from the outset insofar as it simply takes the existing claim

4    language "insulating film" and tacks onto it the additional limitation "comprising the oxide

5    material." Applied is not arguing that the meaning of "insulating film" is unclear, thereby warranting

6    construction. How could it, when Applied uses the exact same language in its claim construction?

7    Instead, the dispute is whether the plain and ordinary meaning of "insulating film" should be

8    narrowed by tacking on Applied's additional limitation. But the case law is clear that, where a claim

9    term has a "plain and ordinary meaning" (as Applied concedes it does here), that meaning will only

10   be narrowed due to (i) the patentee acting as its own lexicographer (where "[t]he standards for

11   finding lexicography…are *exacting*") or (ii) the patentee making a clear and unmistakable disavowal

12   of claim scope. There is no basis for such a departure from the plain and ordinary meaning here.

13           **1.    The Applicants Did Not Act As Their Own Lexicographers Or Make A**
             **Clear And Unmistakable Disavowal Of Claim Scope**

14

15       Based on Applied's addition of the limitation "comprising the oxide material" to "insulating

16   film," it is self-evident that the plain and ordinary meaning of "insulating film" is *not* limited to

17   oxides. Glew ¶ 35. The specification is consistent with this understanding, teaching that an

18   "insulating film" can be formed separate and apart from an oxide material, stating that various

19   "[o]ptically useful materials" can be deposited "***onto substrate 16*** includ[ing] ***oxides***, [but also

20   including] fluorides, sulfides, ***nitrides***, phosphates, sulfates, and carbonates." Ex. A, 7:47-50.

21   Moreover, "***substrate 16***" can include silicon wafers already "***coated with a layer of silicon oxide.***"

22   *Id.*, 7:62-65. In other words, and this is critical, the specification explicitly teaches that a ***non-oxide***

23   ***"insulating layer"*** (such as a ***nitride***) can be formed on top of a ***separately formed*** layer of silicon

24   ***"oxide material."*** The specification further confirms in multiple passages that these layers can be,

25   and typically are, separate layers, even in the preferred embodiments. *Id.,* 18:10-12, 18:55-57. These

26   disclosures are consistent with Demaray's proposed constructions and rebuts Applied's argument that

27   the "oxide material" cannot be separate and apart from the "insulating film." Applied's argument that

28   the Demaray patents disparage the deposition of an "insulating layer" on top of a separate "oxide

1   material" similarly is divorced from the disclosures in the specification that "[s]ubstrate **16** with the
2   thermal oxide layer can be purchased from [third parties]" for use in the disclosed processes. *Id.,*
3   18:57-59.

4        The fact that the full scope of the term "insulating films" includes non-oxides is further
5   underscored by the dependent claims, *e.g.,* Claim 4, which recites that the process gas can be "N$_2$
6   [or] NH$_3$"—neither of which would result in an oxide, but a nitride instead, for example. Glew ¶ 48.
7   Notably, Applied fails to discuss this dependent claim—though Applied does discuss other
8   dependent claims, such as Claims 8-9, which cover embodiments wherein the process gas includes
9   oxygen (which can result in an oxide layer). Br. 3. In other words, when ***all of the dependent claims***
10  are considered (not just the ones Applied prefers), they establish that the "insulating film" that is
11  formed in independent claim 2 can be oxides (dependent claims 8-9) or, critical to this analysis, non-
12  oxides (such as nitrides) (dependent claim 4).

13       Applied relies upon references to "the present invention" and what it characterizes as
14  "repeated and consistent" references to oxides in the specification as purported evidence that the
15  applicants acted their own lexicographers and/or made clear and unmistakable disavowals. Br. 20.
16  First, as the Federal Circuit has explained, "use of the phrase 'present invention'…is not
17  always...limiting, such as where the references to a certain limitation as being the 'invention' are not
18  uniform, or where other portions of the intrinsic evidence do not support applying the limitation to
19  the entire patent." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir.
20  2011); *see also GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1371 (Fed. Cir. 2016) ("consistent
21  disclosure" required for lexicography). Here, both the specification and claims are clear that the
22  tested oxide thin films are only examples, stating, *e.g.,* that these examples are "***exemplary only*** and
23  are ***not*** intended to be limiting." Ex. A, 22:59-67. Indeed, as already discussed, the specification
24  explicitly discloses that various "[o]ptically useful materials" can be deposited "includ[ing] ***oxides***,
25  [but also including] fluorides, sulfides, ***nitrides***, phosphates, sulfates, and carbonates." *Id.*, 7:47-50;
26  *see also* 7:47-52 (using other reactive gases giving rise to films other than oxides: "Other gasses
27  such as *N$_2$, NH$_3$*, CO, NO, CO$_2$, halide containing gasses other gas-phase reactants can also be
28  utilized."). Also as discussed above, dependent claim 4 recites that the process gas can be "N$_2$ [or]

NH₃"—neither of which would result in an oxide. Glew ¶ 48. Contrary to Applied's arguments, this manifests a clear intent and unmistakable intent by the applicants to also claim "insulating films" that are ***not*** an oxide material.

> ### 2. In The Prosecution History Applicants Did Not Act As Their Own Lexicographers Or Make A Clear And Unmistakable Disavowal Of Claim Scope

The prosecution history also does not support Applied's lexicography or disclaimer arguments. First, the applicants clearly distinguished between "insulating films" and "oxides" and did not use the terms interchangeably or require that the "insulating films" comprise an oxide. In the amendments leading to Claim 2, the patentee intentionally changed "an ***oxide*** film" to "the ***insulating*** film," explicitly broadening the claims so that they covered insulating films that comprise oxides and non-oxides, so long as they were insulating:

> Claim 85 (Currently amended):  A method of depositing [[a]] an insulating film on a substrate, comprising:
>
> ...
>
> wherein [[a]] an oxide material is deposited on the substrate, and an oxide the insulating film is formed by reactive sputtering in a mode between a metallic mode and a poison mode.

Devendran Decl. Ex. 8 at 974.

Additionally, where the patentee wanted to claim insulating films comprising oxides formed by a particular process, i.e., "reactive sputtering in poison mode," as Applied argues is the case with claim 2, the patentee knew how to do so and in fact did so:

> Claim 60 (Previously presented):  A method of depositing a film on a substrate, comprising:
>
> ...
>
> wherein a material is deposited on the substrate, and an oxide film is formed by reactive sputtering in poison mode.

*Id.*, 503.

> Claim 86 (New) A reactor, comprising:

...

> wherein a material is deposited on the substrate when pulsed DC power from the pulsed DC power supply is applied to the target in the presence of a process gas and the material is an oxide film formed by reactive sputtering in transition mode.

Devendran Decl. Ex. 8 at 291. This refutes Applied's arguments regarding lexicography and disclaimer. Instead, the evidence shows that the applicants purposefully chose to claim more broadly, replacing "an oxide film" with "the insulating film."

### 3. Applied's Arguments Regarding Reactive Sputtering And The Poison Mode Do Not Change the Scope Of The Claims

Applied argues that "claim 2 recites a method for depositing an *oxide-based* insulating film '*by reactive sputtering*.'" Br. 21. But the patent discloses that "[t]ypically, substrate *16* can be a silicon wafer or a silicon wafer coated with *a layer of silicon oxide formed by a chemical vapor deposition process or by a thermal oxidation process*." Ex. A, 7:62-65. Indeed, the patent even discloses that "[s]ubstrate *16* with the thermal oxide layer can be purchased from [third parties]" for use in the disclosed processes. *Id.,* 18:57-59.  In other words, the patent specification provides ample support for Demaray's argument that claim 2 simply requires that "an oxide material is deposited" on the substrate; it does not require that such oxide material be deposited only by reactive sputtering, as Applied contends.

Finally, Applied's reliance on the purported lexicography of "poison mode" fares no better. Applied argues that "poison mode" requires deposition of an oxide material, citing a purported definition in the specification. Br. 21. But "poison mode" is not the term in dispute, "insulating layer" is. And Applied did not seek a construction for "poison mode," either separately or in the claim construction set forth here. Even if it did, its proposed limitations on poison mode would fail. The passage on which Applied relies relates to a tested embodiment in which oxide films are formed by the chemistry used in that example, but the specifications make clear that the term "poison mode" also applies more broadly to other disclosed "various films." Ex. A, 16:19-24 ("Therefore, depositions of *various films* in embodiments of apparatus …."). The specification discloses using other reactive gases that would give rise to films other than oxides that also implicate poison modes,

1  as that term is understood by one of ordinary skill in the art. *Id.*, 7:47-52 ("Other gasses such as $N_2$,

2  $NH_3$, CO, NO, $CO_2$, halide containing gasses other gas-phase reactants can also be utilized."); 3:5-9

3  ("Process gasses can be fed into the reaction chamber of the reactor apparatus. In some

4  embodiments, the process gasses can include combinations of Ar, $N_2$, $O_2$, $C_2F_6$, $CO_2$, CO and other

5  process gasses."); Glew ¶ 48. Finally (and most critically), Applied's argument ignores the fact that

6  applicants explicitly claimed the use of "$N_2$ [or] $NH_3$" in dependent claim 4, which means that the

7  applicants explicitly contemplated that the "poison mode" of independent claim 2 also include

8  nitrogen gas, and nitrides, (and is not limited to oxygen, and oxides).

9  **E.    "Insulating substrate" ('657 Patent, cl. 1)**

| **Demaray:** Plain and ordinary meaning | **Applied:** "base material that, considered in its entirety, is insulating " |
| --- | --- |

"Insulating substrate" has a plain and ordinary meaning in the industry (Glew ¶ 26) and, as
the WDTX court already determined, needs no construction. Ex. C at 2. That plain and ordinary
meaning is ***not***, as Applied argues, a "base material, ***that considered in its entirety***, is insulating."
Glew ¶ 29. As explained below, Applied's construction is inconsistent with the plain and ordinary
meaning of "insulating substrate" in the industry. *Id.* It also introduces a new term "base material,"
which appears nowhere in the specification and does not have an accepted plain and ordinary
meaning like "substrate."

**1.    The Specification Discloses Insulating Substrates (Such As Silicon Wafers) And Non-Insulating Substrates (Such As Metal Substrates)**

The specification teaches that "a substrate can be ***any*** material and, in some embodiments,
is a silicon wafer." Ex. A, 2:61-62; Glew ¶ 27. What makes something a substrate is that it is the
material or workpiece on which the reactor performs work. Glew ¶ 28. In the case of the PVD
process at issue here, it is the material or workpiece upon which the target material or film is
deposited. *Id.* This is consistent with the intrinsic record, which teaches that a "substrate" is the
workpiece upon which the film is "deposited." *E.g.*, Ex. A, 2:55-56; 5:28-29; 6:24-65; 7:47-50; 8:33-
37; *see also* 7:62-65 ("Substrate 16 can be a solid, smooth surface. Typically, substrate 16 can be a
silicon wafer or a silicon wafer coated with a layer of silicon oxide formed by a chemical vapor

1  deposition process …."). Figure 1B from the specification shows substrate 16 in a reactor.



## FIG. 1B

With the understanding that the substrate is simply the workpiece upon which the film is deposited, the next question relates to the limitation "insulating." The specification teaches that substrate materials can include "*glass* … a glass-like material, quartz, a *metal*, a metal oxide, or a plastic material." *Id.* at 7:62-8:1; Glew ¶ 27. The specification goes on to discloses that "substrate **16 *can be a silicon wafer or a silicon wafer coated with a layer of silicon oxide* ....**" Ex. A, 8:63-65. The variety of possible substrates is the reason why claim 1 recites an "*insulating* substrate." As explicitly taught by the patent, metal can be a substrate. But metal is ***not*** an insulator; it is a conductor. Thus, "an insulating substrate" would exclude *metal* substrates or *metal* workpieces. An "insulating substrate" would typically cover glass, glass-like materials, quartz, and plastic, which are typically insulators. An "insulating substrate" would also cover "*a silicon wafer,*" which in its pure form is also considered to be an insulating material, Glew ¶¶ 27, 33, as well as "*a silicon wafer coated with a layer of silicon oxide*." Glew ¶ 33. So long as the substrate is insulating, it matters not if intervening non-insulative layers have been previously deposited. Glew ¶ 33.

### 2.    Applied's Claim Construction Arguments Misunderstand The Purpose Of The "Insulating Substrate" Limitation

Applied's argument that Demaray "can later redefine the term ['insulating substrate'] to include 'any substrate' merely 'coated with an insulator'" (Br. 24) is incorrect. The "insulating

1   substrate" (whether a silicon wafer, a silicon wafer with an oxide layer, a glass workpiece, or a

2   plastic film) must provide an insulating surface for the deposition process—*i.e.,* it cannot be a

3   metal workpiece because that is not an insulator. But neither must the substrate be homogenous.

4   Glew ¶ 32.

5          As for Applied's argument that claim 2 must be construed consistently with claim 1, there

6   is nothing inconsistent about the use of the Demaray's constructions for "insulating substrate" in

7   claim 1 and "insulating film" in claim 2. Claim 2 would cover the deposition of "an insulating

8   film" on any substrate, including insulating silicon wafers and non-insulating metal workpieces.

9   Claim 1, in contrast, would not cover the deposition of a film on a non-insulating substrate such as

10  a metal workpiece.

11  **IV.    CONCLUSION**

12         For all of the foregoing reasons, the Court should grant reasonable deference to the WDTX

13  court's consideration of these issues and adopt Demaray's claim constructions, which are consistent

14  with those findings.

15

16  Dated:  April 1, 2022                         Respectfully submitted,
                                                   IRELL & MANELLA LLP
17

18                                                 By: */s/ Samuel K. Lu*
                                                       Samuel K. Lu
19                                                     Attorneys for Defendant DEMARAY LLC

20

21

22

23

24

25

26

27

28

11077433                              - 22 -                    DEMARAY'S RESPONSIVE
                                                                CLAIM CONSTRUCTION BRIEF