1  IRELL & MANELLA LLP
   Morgan Chu (70446)
2  MChu@irell.com
   Benjamin W. Hattenbach (186455)
3  BHattenbach@irell.com
   Samuel K. Lu (171969)
4  SLu@irell.com
   Olivia L. Weber (319918)
5  OWeber@irell.com
6  1800 Avenue of the Stars, Suite 900
   Los Angeles, California 90067-4276
7  Telephone:   (310) 277-1010
   Facsimile:   (310) 203-7199
8
9  FOLIO LAW GROUP PLLC
   C. Maclain Wells (221609)
10 Maclain@foliolaw.com
   2376 Pacific Ave.
11 San Francisco, CA 94115
   Telephone:   (415) 562-8632
12
   Attorneys for Defendant
13 DEMARAY LLC

14              **UNITED STATES DISTRICT COURT**

15             **NORTHERN DISTRICT OF CALIFORNIA**

16                  **SAN JOSE DIVISION**

17 APPLIED MATERIALS, INC.,          )   Case No. 5:20-cv-09341-EJD
                                      )
18          Plaintiff,               )   **DEMARAY LLC'S OPENING**
                                      )   **CLAIM CONSTRUCTION BRIEF**
19      vs.                          )   **(MARCH 13, 2023)**
                                      )
20 DEMARAY LLC,                      )
                                      )
21          Defendant.               )
22 DEMARAY LLC,                      )
                                      )
23          Counterclaimant,         )
                                      )
24      vs.                          )
                                      )
25 APPLIED MATERIALS, INC.,          )
                                      )
26          Counterdefendant.        )

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.   THE DEMARAY PATENTS ....................................................................................... 2

III.  RELEVANT CLAIM CONSTRUCTION LAW .......................................................... 3

IV.   DISPUTED CONSTRUCTIONS ................................................................................. 4

     A.   "Narrow band rejection filter" ('657 Patent, cls. 1, 2, 20; '276 Patent, cls. 1, 6).............................................................................................................. 4

          1.   This Term Does Not Require Construction ................................................. 5

          2.   Applied Seeks To Add An Extraneous "Centered" Requirement .................................................................................................. 5

          3.   Applied Seeks To Add An Extraneous "Passing" Requirement .................................................................................................. 7

          4.   The Prosecution History Does Not Support Adding The "Passing" Limitation To "Narrow Band Rejection Filter" ......................... 7

     B.   Pulsed DC power/Pulsed DC power supply ('657 Patent, cls. 1, 2, 11; '276 Patent, cls. 1, 6)........................................................................................ 8

          1.   Patentee Acted As Its Own Lexicographer .................................................. 9

          2.   Demaray's Construction Is Consistent With And Supported By The Patent Specification.......................................................................... 9

          3.   Applied's Claim Construction Leaves Unanswered How "Oscillates" Would Be Interpreted By "A Person Of Ordinary Skill In The Art" ............................................................................................. 10

     C.   "A method of depositing an insulating film on a substrate, comprising:" ('657 patent, cl. 2 preamble) ............................................................ 12

     D.   "an RF bias power supply coupled to the substrate"/"an rf bias power supply coupled to provide an RF bias to the substrate ('276 Patent, cls. 1 and 6) ............................................................................................. 13

          1.   No Deviation From The Plain And Ordinary Meaning Of "Coupled" Is Warranted ............................................................................... 13

          2.   The Specifications Are Consistent With The Plain And Ordinary Meaning Of The Claim Terms At Issue .................................... 14

          3.   Demaray's Statements In The IPRs Regarding The Lack Of An NBRF In The Prior Art Do Not Constitute A Clear And Unmistakable Disavowal Of Claim Scope ............................................... 18

1
**Page**

2

3          4.      Demaray's IPR Arguments Focused On Whether The
                   Combined Prior Art References Disclosed A NBRF, Not On
4                  Whether The RF Bias Was "Remote" Or The Direct Or
                   Indirect Nature Of The RF Bias Coupling .................................. 19
5
       E.     "providing an RF bias ... to the substrate" ('657 Patent, cls. 1 and 2)................. 22
6
          1.      "Coupled" And "Pulsed DC Power Source" Do Not Appear
7                  In The '657 Patent Claims ........................................................ 22

8          2.      No Deviation From The Plain And Ordinary Meaning Of
                   "Providing" Is Warranted ......................................................... 23
9
          3.      The Specifications Are Consistent With The Plain And
10                 Ordinary Meaning Of The Claim Terms At Issue ..................... 23

11         4.      Demaray's Statements In The IPRs Regarding The Lack Of
                   An NBRF In The Prior Art Do Not Constitute A Clear And
12                 Unmistakable Disavowal Of Claim Scope ................................ 24

13  V.     CONCLUSION............................................................................................ 24

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3    **Cases**

4    *Bradford Co. v. Conteyor N. Am., Inc.,*
     603 F.3d 1262 (Fed. Cir. 2010)..................................................................................12

5    *CCS Fitness, Inc. v. Brunswick Corp.,*
6    288 F.3d 1359 (Fed. Cir. 2002)...............................................................................7, 8

7    *CIAS, Inc. v. Alliance Gaming Corp.,*
     504 F.3d 1356 (Fed. Cir. 2007)....................................................................................6

8    *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.,*
9    508 F.3d 1366 (Fed. Cir. 2007)....................................................................................7

10   *Finjan Inc. v. Symantec Corp.,*
     No.14-cv-02998, 2017 WL 550453 (N.D. Cal. Feb. 10, 2017) ..................................1

11   *GE Lighting Sols., LLC v. AgiLight, Inc.,*
12   750 F.3d 1304 (Fed. Cir. 2014)....................................................................................8

13   *Intervet Am., Inc. v. Kee-Vet Lab'ys, Inc.,*
     887 F.2d 1050 (Fed. Cir. 1989)..........................................................................2, 3, 12

14
     *Markman v. Westview Instruments, Inc.,*
15   52 F.3d 967 (1995)................................................................................................3, 17

16   *MBO Lab'ys, Inc. v. Becton, Dickinson & Co.,*
17   474 F.3d 1323 (Fed. Cir. 2007).......................................................................15, 16, 20

18   *MEMS Tech. Berhad v. Int'l Trade Comm'n,*
     447 F. App'x 142 (Fed. Cir. 2011) ......................................................................12, 15

19   *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
20   521 F.3d 1351 (Fed. Cir. 2008)....................................................................................1

21   *Omega Eng'g, Inc. v. Raytek Corp.,*
     334 F.3d 1314 (Fed. Cir. 2003)............................................................................3, 4, 17

22
     *Phillips v. AWH Corp.,*
23   415 F.3d 1303 (Fed. Cir. 2005)..............................................................................4, 20

24   *Tech. Prop. Ltd. LLC v. Huawei Techs. Co., Ltd.,*
     849 F.3d 1349 (Fed. Cir. 2017)....................................................................................7

25   *Teleflex, Inc. v. Ficosa N. Am. Corp.,*
26   299 F.3d 1313 (Fed. Cir. 2002)....................................................................................4

27   *TomTom, Inc. v. Adolph,*
     790 F.3d 1315 (Fed. Cir. 2015)..................................................................................11

28

1  **I.      INTRODUCTION**

2         In its previous claim construction brief ***in this case***, D.I. 138 (filed March 18, 2022), Applied

3  agreed with Demaray that the WDTX court's claim construction determinations are entitled to

4  "reasoned deference." D.I. 138 at 8; *see Finjan Inc. v. Symantec Corp.*, No.14-cv-02998, 2017 WL

5  550453, at *3 (N.D. Cal. Feb. 10, 2017).[1] With the exception of the coupled/providing "RF bias…to

6  the substrate" terms, the WDTX court has already construed each of the claim terms that Applied

7  again proposes for construction, and in each of those cases, Judge Albright rejected either Applied's

8  proposed construction or one that is substantively similar. *See* D.I. 145-4, 145-5.[2] Because claim

9  construction "is not an obligatory exercise in redundancy" requiring courts to substitute other

10  language for understandable claim terms, *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521

11  F.3d 1351, 1362 (Fed. Cir. 2008), the WDTX court gave most of the disputed terms their plain and

12  ordinary meaning. Thus, the Court should see Applied's proposed claim constructions here for

13  what they are—a thinly veiled attempt by an accused infringer to re-litigate claim construction

14  positions that its lawyers have already lost in co-pending cases in the WDTX in the hopes of

15  creating conflicting rulings and an avenue for appeal.[3]

16         Substantively, it is also important to note that Applied's claim construction arguments were

17  previously rejected by the WDTX court because Applied's attorneys improperly sought to re-write

18  claim terms having plain and ordinary meanings to add limitations unsupported by the intrinsic

19

20  _____

[1] Unless otherwise noted, internal citations and subsequent case history are omitted, and any

21  emphasis is added.

22  [2] All exhibits are attached to the Declaration of Thomas Horn ("Horn") filed herewith.

23  [3] Applied is represented here by Kirkland & Ellis and Paul Hastings, both of whom also represent

24  defendants Intel and Samsung in the WDTX cases. *Compare* D.I. 143-1 (March 28, 2022 Ou

25  Decl.); D.I. 199 (Feb. 2, 2023 Joint Claim Construction Statement) *with* Intel's Mtn. for Further

26  Claim Construction, D.I. 290 at 26, No. 6:20-cv-00636 (W.D. Tex. Feb. 23, 2023); Samsung's

27  Mtn. for Further Claim Construction, D.I. 267 at 25, No. 6:20-cv-00636 (W.D. Tex. Feb. 23,

28  2023).

record. Moreover, as described below, ***Applied's claim constructions have, in some cases, changed significantly from the March 2022 briefing*** – adding further limitations in some cases, and removing limitations in other cases, but still leaving open the possibility of Applied stealth-litigating its previously proffered claim constructions before a jury at trial.

As for the coupling/providing "RF bias…to the substrate" terms, Applied asks the Court to rewrite the claim terms by repeating the claim language verbatim, and then tacking on twenty-one new, additional and unsupported narrowing words: "such that the pulsed DC power source and the RF bias power are coupled to different components (target and substrate respectively)." This is not claim construction—it is the improper addition of extraneous limitations. *Intervet Am., Inc. v. Kee-Vet Lab'ys, Inc.*, 887 F.2d 1050, 1053–54 (Fed. Cir. 1989). In addition, Applied's newly-proposed narrowing limitations (a) are contrary to the plain and ordinary meaning of the claim terms "coupled" and "providing;" (b) are inconsistent with the patents' broad disclosures regarding the scope of those claim terms; (c) would add multiple new claim limitations from the '276 Patent claims to the '657 Patent claims, including "pulsed DC power source" and "coupled;" (d) are written in a manner that, as Applied appears to interpret them, could exclude each and every embodiment disclosed in both patent specifications; and (e) are not supported by the prosecution history, including the language cited by Applied from the IPRs that it filed and lost.

## II.    THE DEMARAY PATENTS

The Demaray Patents focus on a process called physical vapor deposition ("PVD"), which is performed in a chamber having a substrate (or wafer) on which metal is deposited; a metal target from which the deposited metal originates; and a plasma between the substrate and the target. Ex. 5 ¶¶ 17–18 (2/16/2021 WDTX Declaration of Alex Glew). The patents describe the simultaneous use of pulsed DC power (which helps create the plasma and reduces damaging electrical "arcing") as well as the use of RF bias power (which provides certain desirable deposition characteristics). *Id.* ¶¶ 18, 20.

The patents teach that when RF bias power is coupled with pulsed DC power, the RF bias power can present a danger to the DC power supply. *Id.* ¶¶ 21, 52. An insight of the inventors was that a narrow band rejection filter (a "NBRF") could be used to protect the DC power supply from

1  the RF bias power in such a system: "Filter 15 prevents the bias power from [RF bias] power

2  supply 18 from **coupling** into [the] pulsed DC power supply 14." '657 Patent at 5:56–57; *Id.* ¶¶ 21,

3  52. Thus, each of the claims at issue recites that a NBRF is "coupled between the pulsed DC

4  power supply and the target area." *See*, *e.g.*, Claim 1 of the '276 Patent.

5      As is discussed in detail below in Section IV.D., the patents teach coupling of the RF bias

6  power to the target. As shown in annotated Figure 1A of the '657 Patent below, to the left of filter

7  15 (green) is the target 12 (yellow) and to the right of filter 15 is the pulsed DC power supply

8  (PDC POWER) 14 (blue). The patents teach that in the absence of filter 15, power from the RF

9  bias power supply 18 (in purple at the bottom) would be coupled to the pulsed DC power supply

10  14 (in blue at the far right), potentially damaging it. Ex. 2, '657 Patent at 5:56–57; Ex. 5 ¶¶ 21, 52

11  (same).

12      Figure 1A also shows a pathway for the RF

13  bias through the target, specifically, from the RF

14  bias power supply 18 (purple), through electrode

15  17 (brown), then insulator 54 (orange), then

16  substrate 16 (red), then plasma 53 (not colored),

17  then target 12 (yellow), until it reaches filter 15

18  (green) (which blocks the RF bias power from

19  reaching the pulsed DC power supply 14 on the



*'276 and '657 Patents, Fig. 1A (annotated)*

**FIG. 1A**

20  other side of the filter). *See* '657 Patent at 5:25–34. Figure 1A shows no other pathway for the RF

21  bias power to be delivered to the filter, where the filter is "coupled between the pulsed DC power

22  supply and the target area" (as is required by the claims). ***RF bias must therefore be coupled to***

23  ***the target 12, either directly or indirectly***, in order for the NBRF in this system to block the RF

24  bias from damaging the DC power supply 14.

## III.    RELEVANT CLAIM CONSTRUCTION LAW

26      Because the Court is already familiar with claim construction law, Demaray only briefly

27  highlights certain principles that are particularly important to the issues before the Court.

28

First, "interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation ... which is improper.' ... [T]he claims as allowed are what we have to deal with and it is not for the courts to say that they contain limitations which are not in them." *Intervet Am., Inc. v. Kee-Vet Lab'ys, Inc.*, 887 F.2d 1050, 1053–54 (Fed. Cir. 1989).

Second, "[a]lthough the prosecution history can and should be used to understand the language used in the claims, it too cannot 'enlarge, diminish, or vary' the limitations in the claims." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (1995).

Third, there is "a 'heavy presumption' that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). Because the prosecution represents an "ongoing negotiation" rather than the "final product" of the negotiation, "it often lacks the clarity of the specification, and thus, is less useful for claim construction purposes." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005). Accordingly, the Federal Circuit has set a high standard for finding that statements in the prosecution limit the ordinary meaning of a term in the issued claims: "[C]laim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of ***manifest exclusion or restriction***, representing a ***clear disavowal*** of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1327 (Fed. Cir. 2002). The Federal Circuit has "required the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness and so unmistakable as to be unambiguous evidence of disclaimer." *Omega Eng'g*, 334 F.3d at 1325.

## IV.    DISPUTED CONSTRUCTIONS

### A.    "Narrow band rejection filter" ('657 Patent, cls. 1, 2, 20; '276 Patent, cls. 1, 6)

| **Demaray:** "Plain and ordinary meaning." D.I. 199 at 9. | **Applied:** "filter that passes all of the frequencies of the pulsed-DC power supply, except within a narrow band centered on the frequency of the RF bias applied to the substrate." D.I. 199 at 9-10. |
| --- | --- |

1    It should be noted that Applied has changed its claim construction since March of 2022. It
2   has added the language "of the pulsed-DC" and "centered on the frequency of the RF bias applied
3   to the substrate." *Compare* D.I. 126 at 1, *with* D.I. 199 at 9-10. Applied has not explained why its
4   previous claim construction was incorrect or the reasons for these additions.

5                    **1.    This Term Does Not Require Construction**

6    The WDTX court has addressed this exact claim construction issue and found that the term
7   should be given its plain and ordinary meaning. Ex. 3 at 3. The term has an ordinary and customary
8   meaning in the industry. Ex. 6 (4/21/22 Glew NDCA Decl.) ¶ 62. If further construction is deemed
9   necessary, the term should be construed as "a filter which ***rejects*** a narrow band of frequencies." *Id.*
10  The focus of the claims is on the frequencies that are ***rejected*** – not, as Applied argues, on the
11  frequencies that are passed. For example, Claim 1 of the '276 patent recites that the filter "***rejects*** at a
12  frequency of the RF bias power supply," and claim 6 recites that the filter "operat[es] at a frequency
13  of the RF bias power supply." Ex. 1, cls. 1, 6. Similarly, the '657 patent claims recite "providing an
14  RF bias at a frequency that corresponds to the narrow band ***rejection*** filter." *See, e.g.,* Ex. 2, cl. 1.

15   This meaning is confirmed by the specification, which teaches that the NBRF "prevents the
16  bias power from [the ***RF***] power supply ***18*** from coupling into ***pulsed DC*** power supply ***14***." Ex. 1
17  at 5:50-51. Such coupling can, *e.g.,* damage arc detection circuitry in the ***DC*** power supply. The
18  specification teaches that prevention of such coupling is accomplished by using a filter that ***rejects***
19  frequencies corresponding to the RF bias power: "filter 15 [which] is a 2 MHz ***band rejection***
20  ***filter***…prevents the 2 MHz power from the bias to substrate 16 from damaging the [***DC***] power
21  supply ***18***." *Id.,* 5:61-65. In other words, frequencies corresponding to the RF bias power are
22  ***rejected*** by the "***band rejection filter***" (in one example, within a ***narrow*** 100 kHz bandwidth). *Id.*
23  There is no mention of passing other frequencies. Moreover, this is a "comprising" claim allowing
24  the NBRF to be combined with other filtering elements that may impact other frequencies.

25                    **2.    Applied Seeks To Add An Extraneous "Centered" Requirement**

26   Applied seeks to tack on the further limitation (not in its previous March 2022 claim
27  construction) "except within a narrow band centered on the frequency of the RF bias applied to the
28  substrate." This limitation appears nowhere in the claims and does not even appear in the patent

DEMARAY'S OPENING CLAIM
CONSTRUCTION BRIEF

1   specification. Moreover, as previously discussed, the independent claims already recite that the

2   filter "*rejects* at a frequency of the RF bias power supply," "operat[es] at a frequency of the RF bias

3   power supply, or has a "a frequency that corresponds to the narrow band rejection filter." *See*

4   Section IV.A.1. There is no requirement that the frequency be "centered," whatever meaning

5   Applied attributes to that new term.

6       Notably, Applied's claim construction appears designed to exclude the possibility of a

7   "narrow band rejection filter" that would otherwise meet all of the requirements of a narrow band

8   rejection filter and the claims as written, but for which Applied can argue that the frequency

9   response is slightly off "center," (*e.g.*, due to hardware limits), even though the filter rejects at the

10  RF bias frequency. Such a "centered" narrow band rejection filter is not required by the claim

11  language or the specification.

12      Alternatively, Applied's claim construction may also exclude filter boxes that include a

13  narrow band rejection filter but that also include other filters that may reject at other frequencies. In

14  other words, Applied's claim construction appears to limit the claimed reactor to one that "contains"

15  (only) a narrow band rejection filter, but not a reactor that "comprises" a narrow band rejection filter

16  (as the claim is currently written). A "comprising" claim (which is what these claims are) is an

17  *open-ended* claim: it encompasses all of the elements listed, but may also include additional,

18  unnamed (and therefore unclaimed) elements. *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d

19  1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well understood

20  to mean 'including but not limited to.'"). Thus, the "comprising" claims at issue would cover a

21  processing chamber that has a NBRF alone or in combination with additional, unnamed (and

22  therefore unclaimed) filtering elements.

23      To be clear, Demaray does *not* seek to broaden the term NBRF beyond its plain and

24  ordinary meaning. (Demaray is certainly *not* arguing that a different filter can be substituted for a

25  NBRF.) While any additional, unclaimed filter elements may, and indeed would be expected to,

26  reject frequencies that are not rejected by the NBRF, *a NBRF must still be present in any such*

27  *filter combination* and that NBRF must still "reject[] a narrow band of frequencies," including,

28  *e.g.*, "a frequency of the RF bias power supply." *See, e.g.*, Ex. 1, cl. 1. Instead, it is Applied that

DEMARAY'S OPENING CLAIM
CONSTRUCTION BRIEF

1   appears to be seeking to limit the claims, contrary to the intrinsic evidence and the canons of claim

2   construction, to reactors that contain *only* a NBRF and *no* other filter elements

3           **3.    Applied Seeks To Add An Extraneous "Passing" Requirement**

4           Applied seeks to rewrite the "narrow band *rejection* filter" limitation into a "filter that *passes*

5   all of the frequencies of the pulsed-DC power supply except within a narrow band centered on the

6   frequency of the RF bias applied to the substrate." But there is no basis for the Court to depart

7   from the plain and ordinary meaning.

8           Demaray's plain and ordinary meaning construction, "narrow band *rejection* filter" focuses

9   (as is warranted, given the words used in the claims) on what is being *rejected*. Applied's

10  construction on the other hand re-writes the claim term altogether to eliminate the concept of

11  "rejecting" or "rejection" to focus on "*passing*:" a "filter that *passes* all of the frequencies of the

12  power supply except within a narrow band." That "passing" limitation is nowhere present in the

13  claim language or suggested by its plain and ordinary meaning. Rejecting and passing frequencies

14  are different subjects. Filters can reject alone; pass alone; or both reject and pass different

15  frequencies simultaneously. Ex. 6 ¶¶ 65-67. By analogy, when a court rejects a particular motion

16  pending before it, that does not mean all other pending motions are granted. Because the claim

17  term here speaks only of rejecting, there is no basis to add the "passing" limitation into the claims.

18          **4.    The Prosecution History Does Not Support Adding The "Passing"**

19                  **Limitation To "Narrow Band Rejection Filter"**

20          In its prior briefing in March of 2022, Applied appears to argue that the doctrine of

21  prosecution disclaimer warrants departing from the plain and ordinary meaning. Br. 7-8. Under

22  Federal Circuit case law, disclaiming statements must be "clear and unmistakable to one of ordinary

23  skill in the art" for there to be a surrender of claim scope. *Tech. Prop. Ltd. LLC v. Huawei Techs.*

24  *Co., Ltd.*, 849 F.3d 1349, 1357 (Fed. Cir. 2017). And this analysis is conducted by a review of the

25  prosecution history as a whole. *See Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366,

26  1372-73 (Fed. Cir. 2007) (no "clear and unmistakable" disclaimer when unsupported by

27  specification and prosecution history as a whole). While Applied cherry-picks passages from the

28  prosecution history about the filter passing frequencies above and below the rejected narrow band, it

DEMARAY'S OPENING CLAIM
CONSTRUCTION BRIEF
11201680                                    - 7 -                      Case No 5:20-cv-09341-EJD

1    fails to identify any unmistakable statements that the "narrow band *rejection* filter" should be re-

2    written to make it a "filter that *passes* all of the frequencies of the power supply except within a

3    narrow band." Neither the prosecution history nor the specification supports adding the new

4    limitation urged by Applied.

5          Notably, the applicants discussed the claimed filter throughout the vast majority of the

6    prosecution without any reference whatsoever to "passing." *See, e.g.*, Ex. 9 at 208 ("A filter that

7    blocks too many of the constituent frequencies of the pulsed DC waveform results in the target

8    voltage not attaining a positive voltage. A filter that does not block the RF bias voltage can result in

9    failure of the DC power supply."); Ex. 7 ('356 FH) at 1458 (similar), 1303 ("The band rejection filter

10   is arranged to reject RF power at the frequency of the RF bias….").

11         The inventor declaration from Dr. Demaray on which Applied previously relied described

12   the specific embodiment reduced to practice, which is not limiting. *CCS Fitness, Inc. v. Brunswick

13   Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (ordinary meaning cannot be overcome "simply by

14   pointing to the preferred embodiment or other structures or steps disclosed in the specification or

15   prosecution history"). Subsequent discussions upon which Applied previously relied also cite to this

16   declaration or are discussing the specific tested embodiment. Similarly, Applied's previous citations

17   to statements in its IPR (Br. 7) were mixed and matched with prosecution statements from a decade

18   earlier and do not support Applied's proposed construction.

19         Nor would Demaray's proposed construction of NBRF encompass other types of filters as

20   Applied previously argued. Br. 8. The term (and Demaray's construction) defines rejection in a

21   "narrowband," not mere broadband rejection typically seen with, *e.g.*, low-pass or high-pass filters

22   alone. *See, e.g.*, Ex. 7 at 1303 (distinguishing a narrow band rejection filter from "a conventional

23   high or low pass filter"). That said, this is a "comprising" claim and a filter that is directed at

24   rejecting frequencies in narrowband, but that is also engineered to do other things as well (*e.g.*, a

25   dual-notch filter rejecting at a second frequency), would still meet this limitation.

26       **B.    Pulsed DC power/Pulsed DC power supply ('657 Patent, cls. 1, 2, 11; '276

27             Patent, cls. 1, 6)**

28   | **Demaray:** "'direct current power that oscillates | **Applied:** "'pulsed DC power' means 'direct |

| | |
|---|---|
| between positive and negative voltages,' wherein 'oscillates' does not require further construction, but it includes 'providing alternating negative and positive voltages to the target'." D.I. 199 at 1 | current power that oscillates between positive and negative voltages,' wherein 'oscillates' should have its plain and ordinary meaning as understood by a person of ordinary skill in the art." D.I. 199 at 1-2. |

Consistent with the WDTX court's claim construction, the term "pulsed DC power" should be construed as "direct current power that oscillates between positive and negative voltages." Ex. 3 at 2. "Oscillates" does not require further construction, but, consistent with the actual claim language, it includes "providing alternating negative and positive voltages to the target."

### 1.    Patentee Acted As Its Own Lexicographer

It is black letter law that a patentee can act as its own lexicographer. *CCS Fitness*, 288 F.3d at 1366. However, "[t]he standards for finding lexicography…are ***exacting***. To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning and must clearly express an intent to define the term." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). Here, the applicants did just that. In the prosecution of the parent '356 application, the applicants stated that: "*Applicants . . . **explicitly defined pulsed DC power** to refer to **power that oscillates between positive and negative voltages.**"* Ex. 7 at 1306. Demaray then went on to amend the claims to clarify that this oscillation occurs at the target by providing alternating negative and positive voltages to the target. Ex. 7 at 1298. With one exception, Demaray's claim construction comes word-for-word from applicant's "explicit definition."[4] And the sole exception is that Demaray added the words "direct current" to clarify the "DC" in "pulsed DC power." *See* Ex. 6 ¶ 55.

### 2.    Demaray's Construction Is Consistent With And Supported By The Patent Specification

---

[4] By limiting "pulsed DC power" to voltage that "oscillates between positive and negative" (passing through zero), applicants departed from the plain and ordinary meaning of "pulsed DC power." Ex. 6 ¶ 55. Should Applied argue that Demaray's claim construction is broader or narrower than the plain and ordinary meaning of "pulsed DC power" in other regards, that would further bolster Demaray's argument that applicants acted as their own lexicographers.

1    Demaray's claim construction is in accord with the specification. In particular, the definition

2    that "pulsed DC power" constitutes direct current power that "oscillates between negative and

3    positive voltages" (*i.e.*, potentials) by alternating negative and positive voltages to the target is

4    explicitly taught: "[f]or pulsed reactive ***dc [direct current]*** magnetron sputtering, as performed by

5    apparatus 10, the polarity of the ***power*** supplied to target 12 by power supply 14 ***oscillates between***

6    ***negative and positive potentials*** " (*i.e.,* voltages). Ex. 2 at 5:36-39.[5]

7                **3.        Applied's Claim Construction Leaves Unanswered How "Oscillates"**

8                           **Would Be Interpreted By "A Person Of Ordinary Skill In The Art"**

9        Applied has informed the Court that it is moving for summary judgment of non-infringement

10   based upon its position that the oscillations "between negative and positive voltages" should be

11   measured at the output of the DC power supply. Dkt. 196 (briefing schedule). But, the claim

12   language makes crystal clear where the oscillating voltage is measured—"alternating negative and

13   positive voltages to the target." Ex. 1, cl. 1; *see also* Ex. 2, '657 patent, cl. 1 ("such that the target

14   alternates between positive and negative voltages"). This is consistent with the patent specification:

15   "[f]or pulsed reactive de magnetron sputtering, as performed by apparatus 10, ***the polarity of the***

16   ***power supplied to target 12*** by power supply 14 ***oscillates between negative and positive***

17   ***potentials*** ." '276 patent 5:30-33. And this is also consistent with the prosecution history of the

18   parent application which states that: "Applicants have explicitly defined pulsed DC power to refer

19   to power that oscillates between positive and negative voltages" and refers the corresponding

20   disclosure cited above in the specification. Ex. 7 at 1306 (note that the file history mistakenly

21   refers to [0053], but meant [0051] which contains the language above). In the subsequent

22   applications leading to the claims at issue, the examiner allowed claims with the alternating

23   voltage to the target limitation. *Id.* at 7, 434-435 and 8, 217-218 (part 3). Thus, Demaray's

24

25

---

26   [5] *See also, e.g.,* The Modern Dictionary of Electronics (defining "pulse" as "[a] brief excursion of

27   a quantity from normal"—here, an oscillation from a positive to a negative voltage, and back). Ex.

28   10 at DEMINT00003508; Ex. 6 ¶ 56.

DEMARAY'S OPENING CLAIM
CONSTRUCTION BRIEF

1    construction expressly makes clear that the oscillations "between negative and positive voltages"

2    includes "providing alternating negative and positive voltages to the target."

3        It is also important to note that Applied's claim construction in March of 2022 differs from

4    its claim construction in March of 2023, at least as it is presently written. Applied's prior claim

5    construction was: "direct current power that oscillates *in the form of a square wave*," but in its

6    March 2022 briefing, Applied also argued that "oscillates" should be interpreted to mean "having a

7    *frequency*." D.I. 138. at 8. Neither "a square wave" nor "a frequency" is in the claim language as

8    written or in the patent specification.

9        As set forth in detail in Demaray's prior opposition claim brief, D.I. 145 at 5-13, Applied's

10   March 2022 claim construction was wrong. In a typical claim construction scenario, an accused

11   infringer may try to import a limitation from the *specification*. But it is telling that Applied cannot

12   even make such an argument. The language "square" and "square wave" appears nowhere in the

13   specifications! (Contrast that with Demaray's support from the specification, where each and every

14   word appears in the cited passage.) Instead, Applied sought to import these limitations from the

15   prosecution history. But as discussed above in Section IV.B.1 (and in the March 2022 briefing), in

16   order to do so, the Court would have to find that the ambiguous statements regarding certain tested

17   embodiments override the applicant's "explicit definition" (which they do not). Thus, Applied

18   appears to have dropped this explicit argument (for now).

19       Additionally, in the WDTX cases, Applied's lawyers also argued that the square wave had to

20   have "a set frequency, reverse time, and amplitude." *E.g.,* Ex. 3 at 2. While Applied did not add the

21   "frequency" language explicitly in its March 2022 claim construction (or now), Demaray believes –

22   based on Applied's briefing in March of 2022 – that Applied continues to maintain that "pulsed DC

23   power" requires pulses "at regular intervals (e.g., frequency)." D.I. 138 at 10. Applied also appears

24   to have dropped this argument (for now).

25       For these reasons, Demaray is concerned that Applied will litigate the meaning of oscillate at

26   trial through its expert witness. Applied has already made clear its intent to do so through its

27   amended claim construction: "…wherein 'oscillates' should have its plain and ordinary meaning as

28   understood by a person of ordinary skill in the art," which is silent on the issue of "square wave"

DEMARAY'S OPENING CLAIM
CONSTRUCTION BRIEF
11201680

Case No 5:20-cv-09341-EJD

and "frequency." Demaray does not agree with Applied's claim construction as currently formulated because it simply kicks the can down the road. Applied can and will litigate its "square wave" and "frequency" claim construction at trial. ***If Applied wishes to litigate either of these two issues, Applied should make clear its intent to do so <u>now</u> and the basis for its claim construction argument in this round of claim construction briefing before the Court. Otherwise, Applied's expert should be precluded from raising this claim construction issue at trial.*** Demaray shall address Applied's arguments on reply, should Applied state (as it should) that it intends to pursue this claim construction. In which case, the Court should adopt a claim construction that precludes Applied's frequency and square wave arguments at trial.

### C.   "A method of depositing an insulating film on a substrate, comprising:" ('657 patent, cl. 2 preamble)

| | |
|---|---|
| **Demaray:** "Preamble is not limiting, except for 'insulating film on a substrate'." D.I. 199 at 16. | **Applied:** "Preamble is limiting." D.I. 199 at 16. |

Demaray agrees that the phrase "insulating film on a substrate" is limiting because it provides an antecedent basis for the element "insulating film," which appears elsewhere in the claim body. The dispute centers around the word "depositing," which Demaray argues is not limiting because it simply "states a purpose or intended use of the invention" The WDTX court already addressed this exact issue and agreed with Demaray. Ex. 4 at 2; *see also* Ex. 6 ¶¶ 42-44.

The Federal Circuit has made clear that, where a portion of the preamble provides an antecedent basis for an element in the claim body (*e.g.*, "insulating film"), that fact "does not necessarily convert the entire preamble into a limitation, particularly one that only states the intended use of the invention" (*e.g.,* "depositing"). *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015). As in *TomTom,* here, "depositing" does not provide an antecedent basis for any claim element. *Id.* at 1323-24. While the word "deposited" is in the claim body, it relates to the "oxide material" element, not the "insulating film" element from the preamble. Instead, the "insulating film" element in the claim body "is formed by." Thus, "depositing" in the preamble simply "state[s] a purpose or intended use," which would render such preamble language non-

limiting. *Id.* Finally, "the invention claimed…is structurally complete without the ["depositing"] language." *Id.* at 1324. In other words, the full method can be practiced without adding the "depositing" limitation given the recitation that "the insulating film is **formed** by reactive sputtering. . . ." Ex. 2, cl. 2. "[D]eletion of the ['depositing'] phrase does not affect the structure or steps of the claimed invention," which renders the "depositing" limitation non-limiting. *TomTom*, F.3d at 1324. The WDTX court agreed with Demaray's claim construction that the "depositing" limitation from the preamble is not limiting.

> **D.** **"an RF bias power supply coupled to the substrate"/"an RF bias power supply coupled to provide an RF bias to the substrate ('276 Patent, cls. 1 and 6)**

| | |
|---|---|
| **Demaray**: "<u>Coupled</u>: does not require further construction, but if construed, should be given its plain and ordinary meaning, which is not limited to 'directly' coupled." D.I. 199 at 21. | **Applied**: "an RF bias power supply coupled to the substrate, such that the pulsed DC power source and the RF bias power are coupled to different components (target and substrate respectively)." D.I. 199 at 21. |

As noted, Applied asks the Court to rewrite the claim terms "coupled to the substrate"/"coupled to ... the substrate" by repeating the claim language verbatim, and then tacking on twenty-one new, additional and unsupported narrowing words: "such that the pulsed DC power source and the RF bias power are coupled to different components (target and substrate respectively)." This is not claim construction—it is the improper addition of extraneous limitations. *Intervet Am.*, 887 F.2d at 1053–54. It should also be noted that Applied's lawyers also represent defendants Intel and Samsung in the WDTX cases. And this exact issue was briefed by the defendants in that case. Demaray expects that Applied will make largely the same arguments here and argues here accordingly.

> **1.** **No Deviation From The Plain And Ordinary Meaning Of "Coupled" Is Warranted**

The word "coupled," and variations, thereof are oft-used in patent claim drafting, and numerous cases address the broad plain and ordinary meaning given to the word "coupled." The word "coupled" does not require a first component be "directly" coupled to a second component.

*See, e.g., Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1270 (Fed. Cir. 2010) ("We agree with Bradford that the district court erroneously construed the term 'coupled to,' and ***we hold that the term should be construed broadly so as to allow an indirect attachment.***"); *MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 152 (Fed. Cir. 2011) ("Nowhere in the specification is the claimed electrical coupling described as 'direct,' and nothing in the claim language or specification suggests that 'electrically coupled' should have any interpretation other than its plain meaning."). Accordingly, in the example above, the first component may be coupled to components other than the second component, absent language to the contrary.

The claim language is in accord. The claims as written do not exclude "indirect" coupling through other components or exclude the possibility that the coupled components may also be coupled to other components. If that had been the patentees' intention, that would have been easy to accomplish, simply by adding the word "directly" before "coupled"—something the patentees did not do. If Applied's new, ambiguous claim construction is meant to require "direct" coupling or mutually exclusive coupling of the substrate/target, then that would be inconsistent with the claims as written.

### 2. The Specifications Are Consistent With The Plain And Ordinary Meaning Of The Claim Terms At Issue

The word "coupled" is broad and does not require either (1) "direct" coupling or (2) exclude the possibility that the coupled components may also be coupled to other components. The patent specifications underscore both of these points.

#### a. The Specifications Teach Indirect Coupling

For example, the Demaray Patents disclose that "Apparatus 10 includes a target 12 which is electrically coupled through a filter 15 to a pulsed DC power supply 14." Ex. 2 at 5:25–26. In other words, a first component (the target) is coupled to a second component (the pulsed DC power supply) and also coupled to a third component (the filter). The specifications are also clear that the first and second components (the target and the pulsed DC power supply) are coupled together, even though there is a third component (the filter) located between them. Thus, the patent specifications confirm that the word "coupled" does not require a first component to be "directly"

coupled to a second component; the first component may be indirectly coupled to the second component through a third component. Providing yet another example of indirect coupling, the patents teach that the RF bias power supply (a first component) is coupled to the substrate (a second component) through an electrode and an insulator (third and fourth components). Ex. 2 at 5:32–34 ("Substrate 16 is capacitively coupled to an electrode 17 through an insulator 54. Electrode 17 can be coupled to an RF power supply 18.")

Other portions of the patent specifications similarly underscore that "coupling" does not preclude indirect coupling through other components and that coupling can include various mechanisms. For example, the patent specifications disclose:

- Capacitive coupling (through an insulator): "substrate 16 is capacitively **coupled** to an electrode 17 through an insulator 54." *Id.* at 5:32–34.

- Coupled plasma: "When power is applied to the substrate, a so-called plasma sheath is formed about the substrate and ions are **coupled** from the plasma." *Id.* at 9:61–63.

- Electrical coupling: "Apparatus 10 includes a target 12 which is electrically **coupled** through a filter 15 to a pulsed DC power supply 14.*" Id.* at 5:25–26.

- Optical coupling: "the **coupling** of light into and out of the waveguide*" Id*. at 18:63–64.

**b.     Figure 1A Supports Demaray's Claim Construction**

In its proposed rewriting of the claims, Demaray expects Applied's lawyers to rely upon the preferred embodiment in Figure 1A (as they did in WDTX). There, the pulsed DC power supply 14 is coupled to the target 12 and the RF bias power supply 18 is coupled to the substrate 16. An annotated Figure 1A is reproduced below. Applied ignores key aspects of even this disclosed configuration.

**i.     Figure 1A Discloses Indirect Coupling**

Figure 1A, consistent with the other passages noted above, illustrates that any claim construction requiring that two elements be "directly" coupled is incorrect. Filter 15 (green) is located between pulsed DC power supply 14 (blue) and target 12 (yellow), even though the patent describes the pulsed DC power supply and target as "coupled." Ex. 2 at 5:25–34. And insulator 54 (orange) and electrode 17 (brown) are located between substrate 16 (red) and RF bias power

DEMARAY'S OPENING CLAIM
CONSTRUCTION BRIEF

supply 18 (purple), even though the patent describes RF bias power supply and substrate as "coupled." *Id.* Demaray is unaware of any embodiment disclosed in the specifications having a narrow band rejection filter 15 that directly couples the DC power supply and the target or that directly couples the RF bias power and the substrate. "[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007).

**ii.  Figure 1A And The Disclosures Relating To Filter 15 Confirm That RF Bias Power Is Coupled To The Target**

Figure 1A and the discussions relating to filter 15 similarly confirm that any construction requiring that the RF bias power supply be coupled to the substrate and not coupled to the target would be improper, for it would exclude that preferred embodiment (and any other embodiments of which Demaray is aware). Indeed, ***it is the existence of coupling between the RF bias power supply and the target that is the source of a key problem solved by the Demaray Patents.***

The Demaray Patents teach that when RF power is used to bias the substrate at the same time that pulsed DC power is applied to the target, the RF power presents a danger to the DC power supply. Ex. 5 ¶¶ 21, 52. Filter 15 solves this problem: "Filter 15 prevents the bias power from [RF bias] power supply 18 from coupling into [the] pulsed DC power supply 14." Ex. 2 at 5:56–57; Ex. 5 ¶¶ 21, 52. In one embodiment, filter "prevents the 2 MHz power from the bias to substrate 16 from damaging power supply 18." Ex. 2 at 5:63–65, Abstract ("a filter which filters out the effects of a bias power applied to the substrate, protecting the pulsed DC power supply"); Ex. 5 ¶¶ 21, 52. In other words, the Demaray Patents clearly disclose that, absent filter 15, the RF bias power from supply 18 could infiltrate the pulsed DC power supply 14, potentially damaging it.

But how does the RF bias power reach the protective filter 15? The pathway disclosed in Figure 1A is from RF bias power supply 18 (purple), through electrode 17 (brown), then insulator 54 (orange), then substrate 16 (red), then plasma 53 (not colored), then target 12 (yellow), until it reaches filter 15 (green) (which prevents damaging RF bias power from reaching the pulsed DC power supply 14 on the other side of the filter). Because the filter is positioned between the target

**DEMARAY'S OPENING CLAIM CONSTRUCTION BRIEF**

and the DC power supply, Figure 1A shows no other pathway for the RF bias power to be delivered to the filter. Thus, ***the RF bias must be able to couple to the target 12, either directly or indirectly***. Any claim construction requiring that the RF bias power supply be coupled to the substrate and ***not*** coupled to the target would be contrary to the plain teachings of the Demaray Patents.

**c.    Claim Constructions That Do Not Cover Any Disclosed Embodiments Are Rarely If Ever Correct**

If Applied's ambiguous proposed additions to the claims exclude the possibility of RF power being coupled to the target in addition to the substrate, then the preferred embodiment of Figure 1A with filter 15 (indeed all of the embodiments of which Demaray is aware) would ***not*** be practiced by the claims. "[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *MBO Lab'ys*, 474 F.3d at 1333.

It is important to note, of course, that when RF bias power is directly coupled to the target in the type of Applied Materials reactors (*e.g.*, Cirrus and Avenir reactors) and processes at issue in this case, such RF bias power would also be indirectly coupled to the substrate through the same plasma 53 pathway that we have been discussing. *See, e.g.,* Ex. 12 at 3:10–14 (U.S. Patent No. 10,242,873) (issued to Applied Materials, Inc.) ("Examples of other PVD chambers suitable . . . include the CIRRUS™ and AVENIR™. . . ."); *id.* at 1:45–48 ("The reduction in RF power delivered to the plasma [by the RF power provided to the target assembly] reduces the ionization rate, which can be seen directly by a decrease in the RF current measured at a substrate support impedance circuit…. ").

There is nothing in the patent specifications that would preclude the use of such a pathway. The Demaray Patents are not limited to systems in which the RF bias power is first introduced into the chamber in particular locations; they teach the use of a NBRF to prevent RF bias power coupled to the target from causing damage by coupling into the DC power supply. Ex. 2 at 5:56–57 ("Filter **15** prevents the bias power from [RF bias] power supply **18** from coupling into [the] pulsed DC power supply **14**."). And, critically, consistent with the patent specifications' teachings,

1   damaging RF bias power coupled to the target (no matter the pathway) would still be filtered out

2   by the NBRF between the target and the DC power supply.

3                   **3.    Demaray's Statements In The IPRs Regarding The Lack Of An NBRF**

4                           **In The Prior Art Do Not Constitute A Clear And Unmistakable**

5                           **Disavowal Of Claim Scope**

6           The law is clear that a prosecution disclaimer arises only when there is a clear and

7   unmistakable disclaimer of claim scope. *Omega Eng'g*, 334 F.3d at 1325. This burden is nearly

8   insurmountable when, as here, a purported disclaimer would result in patent claims that do not

9   cover any embodiment of the patent specifications and, indeed, would render irrelevant the

10  problem that the patent was intended to solve (the coupling of RF bias power from the target to the

11  DC power supply). Additionally, contrary to explicit instructions from the *Markman* decision

12  itself (*see Markman*, 52 F.3d at 980, "the prosecution history … cannot 'enlarge, diminish, or vary'

13  the limitations in the claims"), the defendants here *are* seeking to use the prosecution history to

14  diminish *and* vary the limitations in the claims. With that in mind, Demaray addresses the IPRs

15  (brought by Intel and Samsung after this lawsuit was filed), as well as Demaray's statements in

16  those proceedings.

17                  **a.    Demaray's IPR Statements Show It Was <u>Not</u> Disclaiming**

18                          **Coupling Of RF Bias To The Target**

19          In the PO Sur-Reply ***from the IPRs***, Demaray affirmatively argued that in order for the

20  NBRF to operate in accordance with the disclosures of the Demaray Patents, ***the RF bias power***

21  ***must be coupled to the target***. This was in response to an argument that Petitioners had made

22  regarding the Barber reference. *See* Ex. 13 at 26. Petitioners had argued that there was RF bias

23  coupling between the target and the substrate in the Barber reference. *Id.* at 25–26. Demaray

24  responded that such "coupling was small," *Id.* at 26, and was not sufficient to warrant the use of

25  the claimed NBRF:

26          The waveform [in Barber] therefore confirms Dr. Glew's opinion that a POSITA
            would understand that there was ***little coupling between Barber's target and***
27          ***substrate*** because of Barber's reactor design and would therefore not have thought
            it beneficial to use a filter, let alone a claimed NBRF, in Barber.

28

*Id.* In other words, Demaray argued that, in the claimed invention, the NBRF was useful when there was a sufficiently large RF bias power coupled to the target to present a risk of damage to the DC power supply, but that there was insufficient RF bias power coupled to the target in Barber to warrant the use of a NBRF. This argument accords with the teachings of the Demaray Patents that an NBRF is used to prevent damaging RF bias power from the target from coupling into the DC power supply: "Filter 15 prevents the bias power from [RF bias] power supply 18 from coupling into [the] pulsed DC power supply 14." Ex. 2 '657 Patent at 5:56–57.

Demaray's arguments in the PO Sur-Reply made it crystal clear that (contrary to what Applied now argues, while disregarding these passages) Demaray has never disavowed systems where RF bias power is coupled to the target. And as discussed above in Section V.A.2.c, such an addition to the claim language would also exclude the preferred embodiment, rendering such an addition presumptively incorrect (even if the law permitted the addition of limitations to issued claims, which it does not).

### 4. Demaray's IPR Arguments Focused On Whether The Combined Prior Art References Disclosed A NBRF, Not On Whether The RF Bias Was "Remote" Or The Direct Or Indirect Nature Of The RF Bias Coupling

Demaray's arguments regarding patentability in the IPR proceedings focused upon whether or not the combined prior art references included an NBRF. The passage below comes directly from the PO Response and summarizes Demaray's arguments in the IPRs:

**A. Prior Art Neither Teaches, Nor Suggests, The Claimed Narrow Band-Rejection Filter**

Petitioner's combination does not teach the required narrow band-rejection filter for multiple reasons:

(1) Neither Barber/Belkind nor Hirose discloses a filter "between the pulsed DC power supply and the target area"; and

(2) The operating frequency of Hirose's filter 20, relied on by Petitioner, is intentionally offset from the "frequency of the RF bias power supply" rather than "reject[ing]" or "operating at a frequency of the RF bias power supply" as required by the claims.

1  Ex. 14 at 41. Consistent with the teachings of its Patent that "[f]ilter 15 prevents the bias power

2  from [RF bias] power supply 18 from coupling into [the] pulsed DC power supply 14," Ex. 2, '657

3  Patent 5:56–57, Demaray never disavowed RF bias power coupling to the target.

            a.    **The Statements Relied Upon By Applied Are Not Clear And**
4
                  **Unmistakable Disavowals That RF Bias Power Is Not Coupled**
5
                  **To The Target**
6

7        None of the statements relied upon by Applied, alone or in combination, constitute a clear

8  and unmistakable disclaimer that would support a rewriting that excluded RF power from being

9  coupled to the target. (Moreover, none of these statements would constitute clear and

10 unmistakable disclaimers for purposes of other arguments Applied appears to be trying to set up

11 with their ambiguous new language.) Here, the IPR statements relied upon by Applied do not

12 support Applied's assertions and certainly, when considered in proper context, would not warrant

13 overriding both explicit claim language and disclosures in the specifications.

14       Many of the statements referenced by Applied simply explain why NBRFs were not used

15 in the prior art references at issue and are not directed at disclaiming systems where RF bias power

16 couples to the target. The following passage expected to be relied upon by Applied is

17 representative of how Demaray's arguments focused on the filter (note that the emphasis in the

18 original):

19       …at the time of invention, POSITAs neither knew nor found it desirable to couple a
         claimed narrow band-rejection filter to a pulsed DC power source to block RF energy or
20       current from a remote RF power source (*i.e.*, RF power source applied to a different
         component than the DC power source). Glew at ¶ 175.…This conclusion is further
21       supported by references…all involving the use of claimed bipolar pulsed DC to a target
         and an RF bias to a substrate but ***without a filter coupled to the pulsed DC power supply***."
22

23 Ex. 14 at 57–58 (emphasis in original); *see also* Ex. 15 at 19–20 (no NBRF with "configurations

24 where DC and RF were directly connected"); Ex. 16 at 40–41 (no NBRF); Ex. 17 ¶¶ 114, 137,

25 141–144, 151, 152, 175 (no NBRF or teaching thereof). In other words, as discussed in Section

26 V.A.3.b, Demaray's arguments regarding patentability in the IPR proceedings focused upon

27 whether or not the combined prior art references included an NBRF or would have taught an

28

1  NBRF. At no point did Demaray disclaim, as Applied's claim constructions may suggest, RF bias

2  power coupled to the target.

3        Applied's arguments about statements from the Oral Hearing fare no better. Demaray's

4  attorneys were arguing that NBRFs were not used in the prior art references at issue. Nothing in

5  those statements disclaimed RF bias coupled to the target and the substrate, as Applied's

6  ambiguous claim constructions may suggest. *See, e.g.*, Ex. 18 at 76:7–15, 77:4–7, 82:2–11, 82:12–

7  83:13 ('276 and '657). The following passage from the Oral Hearing is representative regarding the

8  prior art reference's lack of disclosure regarding NBRFs:

9 > Another thing is even Exhibit 1025 does not disclose a narrow band rejection filter or
> even band rejection filter. It just means the RF power, the RF filter, or AC blocking filter.
10 > And Dr. Glew has explained that a person of ordinary skill in the art would understand an
> AC blocking filter would be understood as a low pass filter that blocks out AC
11 > frequencies, and that's in slide 77. And Dr. Subramanian will dispute that necessarily
> means a low pass filter. He agrees that the manuals themselves don't explicitly say what
12 > types of filters to use, and that's on slide number 78.

13  Ex. 18 at 83:4–13.

14        While Applied is expected to argue that "the proposed claim constructions are taken

15  essentially verbatim from Demaray statements to the PTAB during the IPR proceedings," Intel's

16  Mtn. for Further Claim Construction, D.I. 290 at 15, No. 6:20-cv-00636 (W.D. Tex. Feb. 23,

17  2023); Samsung's Mtn. for Further Claim Construction, D.I. 267 at 15, No. 6:20-cv-00636 (W.D.

18  Tex. Feb. 23, 2023), at 15, Applied ignores (and attempts to alter) the context of those statements,

19  the disclosures in the Demaray Patents, and the plain claim language. None of those statements

20  constitute a clear and unmistakable disavowal of claim scope, much less a disavowal of an RF bias

21  power supply coupled to both the substrate and the target. Consistent with the Federal Circuit's

22  observation that the prosecution history "often lacks the clarity of the specification and thus is less

23  useful for claim construction purposes," *Phillips*, 415 F.3d at 1317, the patent specifications' clear

24  teachings and claims should control. Following the Federal Circuit's admonition that "[a] claim

25  interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever,

26  correct," *MBO Lab'ys*, 474 F.3d at 1333, and longstanding rules against claim narrowing under the

27

28

guise of "construction," the Court should reject any addition to the claims newly requiring that the

RF bias power supply be coupled to the substrate and not coupled to the target.

### E.   "providing an RF bias ... to the substrate" ('657 Patent, cls. 1 and 2)

| **Demaray**: "Providing: does not require further construction, but if construed, should be given its plain and ordinary meaning, which is not limited to 'directly' providing" | **Applied**: "providing an RF bias ... to the substrate, such that the pulsed DC power source and the RF bias power are coupled to different components (target and substrate respectively)" |
|---|---|

As previously noted, Applied ask the Court to rewrite the claim term "providing…to the

target" by repeating the claim language verbatim, and then appending twenty-one new, additional,

and unsupported narrowing words: "such that the pulsed DC power source and the RF bias power

are coupled to different components (target and substrate respectively)." This, again, is improperly

adding extraneous limitations, not claim construction.

### 1.   "Coupled" And "Pulsed DC Power Source" Do Not Appear In The '657 Patent Claims

As an initial matter, ***neither*** the word "coupled" nor the phrase "pulsed DC power source,"

both included in Applied's proposed addition, ***appear in any of the claims of the '657 Patent***.

These claim limitations appear only in the '276 Patent claims. Applied improperly seeks to import

claim limitations from the '276 Patent into the claims of the '657 Patent. Such a re-write of the '657

Patent claims is not permissible. The law is clear that "there must be a ***textual reference in the

actual language of the claim with which to associate a proffered claim construction***.... If we

once begin to include elements not mentioned in the claim in order to limit such claim ... we

should never know where to stop." *NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1310 (Fed.

Cir. 2005).

The '657 Patent claims do not contain a textual reference for the word "coupled." Claims 1

and 2 of the '657 Patent each use the word "providing" four different times in the claim—all with

broad scope ("providing a process gas between a target and a substrate," "providing a magnetic

field to the target," "providing an RF bias to the substrate," and "providing pulsed DC power to the

target through a narrow band rejection filter"). Moreover, the claims as written do not specify the

source of the claim element which is being provided. For example, none of the claim limitations

1   specify what sources provide the "pulsed DC power" or the "RF bias" (or for that matter, the

2   "process gas" or the "magnetic field"). Thus, the "pulsed DC power source" limitation Applied is

3   attempting to graft onto the claim is plainly extraneous.

4        Similarly, the word "providing" does not contain a textual reference for the word

5   "coupled." The claims are agnostic as to the pathway the RF bias power takes to reach its

6   destination at the substrate. While the claims do specify that the ***pulsed DC*** power must travel

7   "through a narrow band rejection filter" to reach its destination at the target, this limitation does

8   not contain a textual reference that would permit rewriting of the claims as Applied propose to

9   require a "coupled" pulsed DC power source or "coupled" ***RF bias*** power.

10        **2.   No Deviation From The Plain And Ordinary Meaning Of "Providing"**

11            **Is Warranted**

12        As explained above, the claims as written do not exclude "indirect" coupling through other

13   components or exclude the possibility that other components may also be coupled along with the

14   recited components. (Indeed, as discussed, the word "coupled" does not appear in the Providing

15   Limitation at all, and it would be improper to add that limitation.) If that had been the intention of

16   the patentees, that would have been easy to accomplish simply by adding the word "coupled

17   directly" before "to the target"—something the patentees did not do. If Applied's new, ambiguous

18   claim construction is meant to require "direct coupling" or mutually exclusive "coupling" of the

19   substrate/target, then that would be inconsistent with the claims as written.

20        **3.   The Specifications Are Consistent With The Plain And Ordinary**

21            **Meaning Of The Claim Terms At Issue**

22        For the reasons set forth in Section IV.D.2, the patent specifications are consistent with the

23   plain and ordinary meaning of "providing" (even if the Court were to construe it as having a

24   "coupled" requirement, which as explained above, the Court should not). The word "coupled" is

25   broad and does not require either (1) "direct" coupling or (2) exclude the possibility that the

26   coupled components may also be coupled to other components. The patent specifications confirm

27   that the word "coupled" should be accorded a construction consistent with these two meanings.

28

DEMARAY'S OPENING CLAIM
CONSTRUCTION BRIEF

1    As with the Coupled Limitations, if Applied's ambiguous proposed additions to the claims

2    exclude the possibility of RF power being coupled to the target in addition to the substrate, then

3    the preferred embodiment of Figure 1A with filter 15 (indeed all of the embodiments of which

4    Demaray is aware) would ***not*** be practiced by the claims. "A claim interpretation that excludes a

5    preferred embodiment from the scope of the claim is rarely, if ever, correct.") *MBO Lab'ys*, 474

6    F.3d at 1333.

7    **4.    Demaray's Statements In The IPRs Regarding The Lack Of An NBRF**

8    **In The Prior Art Do Not Constitute A Clear And Unmistakable**

9    **Disavowal Of Claim Scope**

10    For the reasons set forth in Sections IV.D.3-4, the IPR statements relied upon by Applied

11    do not support Applied's claim construction for the Providing Limitation.

12    **V.    CONCLUSION**

13    For all of the foregoing reasons, the Court should grant reasonable deference to the WDTX

14    court's consideration of these issues and adopt Demaray's claim constructions, which are consistent

15    with those findings. The Court should also reject Applied's attempt to tack on twenty-one new,

16    additional and unsupported narrowing words for the coupling/providing "RF bias…to the

17    substrate" terms.

18

19    Dated: March 13, 2023                Respectfully submitted,

20                                          IRELL & MANELLA LLP

21

22                                          By: */s/ Samuel K. Lu*

23                                          Samuel K. Lu

24                                          Attorneys for Defendant DEMARAY LLC

25

26

27

28

DEMARAY'S OPENING CLAIM
CONSTRUCTION BRIEF
11201680                      - 24 -              Case No 5:20-cv-09341-EJD